DAMON M. BROWN, County Counsel
(SBN 242265)
  Damon.Brown@sdcounty.ca.gov
JOHN P. COOLEY, Chief Deputy (SBN
162955)
  John.Cooley@sdcounty.ca.gov
AUSTIN M. UHLER, Principal Deputy
(SBN 319684)
  Austin.Uhler@sdcounty.ca.gov
**OFFICE OF COUNTY COUNSEL,
COUNTY OF SAN DIEGO**
1600 Pacific Highway, Room 355
San Diego, CA 92101
Tel: (619) 531-4860

CATHERINE S. SIMONSEN (SBN
307325)
  Catherine@simonsensussman.com
THOMAS G. MATTES (SBN 355010)
Thomas.Mattes@simonsensussman.com
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel: (917) 747-5196

JOHN P. FISKE (SBN 249256)
  JFiske@baronbudd.com
LINDSAY STEVENS (SBN 256811)
  LStevens@baronbudd.com
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: (858) 251-7424

*Attorneys for Plaintiffs the People of the State of California, acting by and through
the Office of County Counsel, County of San Diego; County of San Diego; and San
Diego County Fire Protection District*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Office of County Counsel, County of San Diego; COUNTY OF SAN DIEGO; SAN DIEGO COUNTY FIRE PROTECTION DISTRICT, <br><br> Plaintiffs, <br><br> v. <br><br> REV GROUP, INC.; E-ONE, INC.; KOVATCH MOBILE EQUIPMENT CORP.; KME GLOBAL, LLC; KME HOLDINGS, LLC; KME RE HOLDINGS LLC; FERRARA FIRE APPARATUS, INC.; FFA HOLDCO, INC.; FFA ACQUISITION CO., INC.; FERRARA FIRE APPARATUS HOLDING COMPANY, INC.; SPARTAN FIRE, LLC; SMEAL SFA, LLC; SMEAL LTC, LLC; SMEAL HOLDING, LLC; DETROIT TRUCK MANUFACTURING, LLC; AIP, LLC; AMERICAN INDUSTRIAL | Case No. **'26 CV 2045 TWR MSB** <br><br> **ANTITRUST AND UNFAIR COMPETITION LAW COMPLAINT** <br><br> **DEMAND FOR JURY** |

PARTNERS CAPITAL FUND IV LP; AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV (PARALLEL), LP; AIP/CHC HOLDINGS, LLC; AIP CF IV, LLC; AIP/CHC INVESTORS, LLC; OSHKOSH CORPORATION; PIERCE MANUFACTURING INC.; MAXI-METAL, INC.; BOISE MOBILE EQUIPMENT, INC.; BME FIRE TRUCKS LLC,

Defendants.

# TABLE OF CONTENTS

Nature of the Action ........................................................................................................5

Parties ............................................................................................................................14

Jurisdiction and Venue .................................................................................................24

Fire Apparatuses and Chassis.......................................................................................26

   I.    Background.........................................................................................................26

       A.    Custom Fire Apparatuses.................................................................27

       B.    Custom Chassis................................................................................33

       C.    Custom Fire Apparatus Builders and Custom Chassis Manufacturers...34

       D.    Other Fire Apparatuses and Their Builders ...................................41

       E.   The REV Group Defendants' Control Over Their Dealer Networks and Their Purchase-and-Sale Transactions with Customers....................................43

   II.   Relevant Fire Apparatus and Chassis Markets ...............................................46

       A.    Relevant Product Markets................................................................46

       B.    Geographic Scope of Relevant Markets ........................................58

       C.    Barriers to Entry and Expansion in the Relevant Markets ....................61

   III.  Defendants Have Engaged in Anticompetitive Schemes to Harm Competition in the Relevant Fire Apparatus and Custom Chassis Markets ........66

       A.    The REV Group Defendants and AIP Defendants' Anticompetitive Conduct ...........................................................................................................66

       B.    The Oshkosh Defendants' and BME Defendants' Anticompetitive Conduct ...........................................................................................................71

       C.    Defendants' Anticompetitive Schemes Have Substantially Lessened and May Substantially Lessen Competition or Tend to Create a Monopoly in the Relevant Markets ...........................................................................................75

Replacement Parts for Pierce Fire Apparatuses...................................................93

Defendants Have Used Their Unlawfully Acquired Dominance to Overcharge Fire Departments, Delay Deliveries, and Otherwise Worsen Terms, Injuring and Threatening To Further Injure Plaintiffs ...............................................................103

Violations Alleged.............................................................................................106

Request for Relief .............................................................................................137

# COMPLAINT

Plaintiffs the People of the State of California, acting by and through the Office of County Counsel, County of San Diego, in its law enforcement capacity (the "People"); and the County of San Diego and the San Diego County Fire Protection District in their individual capacities (together, the "County of San Diego Plaintiffs," and together with the People, "Plaintiffs"), bring this civil antitrust and unfair competition action against Defendants REV Group, Inc., E-ONE, Inc., Kovatch Mobile Equipment Corp., KME Global, LLC, KME Holdings, LLC, KME RE Holdings LLC, Ferrara Fire Apparatus, Inc., FFA Holdco, Inc., FFA Acquisition Co., Inc., Ferrara Fire Apparatus Holding Company, Inc., Spartan Fire, LLC, Smeal SFA, LLC, Smeal LTC, LLC, Smeal Holding, LLC, and Detroit Truck Manufacturing, LLC (together, the "REV Group Defendants"); AIP, LLC, American Industrial Partners Capital Fund IV LP, American Industrial Partners Capital Fund IV (Parallel), LP, AIP/CHC Holdings, LLC, AIP CF IV, LLC, and AIP/CHC Investors, LLC (together, the "AIP Defendants"); Oshkosh Corporation, Pierce Manufacturing Inc., and Maxi-Métal, Inc. (together, the "Oshkosh Defendants"); and Boise Mobile Equipment, Inc. and BME Fire Trucks LLC (together, the "BME Defendants," and together with the REV Group Defendants, AIP Defendants, and Oshkosh Defendants, "Defendants"), and in support allege as follows:

## NATURE OF THE ACTION

1. This action challenges Defendants' multi-year anticompetitive schemes to consolidate and "roll up" markets for critical lifesaving apparatuses—fire trucks and the chassis on which they are built—and exclusionary restraints in the markets for replacement parts for their apparatuses. Defendants have acquired small and large fire apparatus competitors, as well as key companies in the fire apparatus supply chain, and Oshkosh and Pierce have restricted fire departments'

Complaint - 5

ability to replace parts, all with the intent and effect of substantially lessening competition in and, indeed, threatening the monopolization of these markets.

2.     Through their illegal schemes, Defendants have reaped extraordinary profits on the backs of fire departments, taxpayers, cities, and counties. The County of San Diego Plaintiffs have suffered substantial overcharges and lost equipment value as Defendants have shut down plants, substantially increased prices, and severely extended delivery timelines, and Oshkosh and Pierce have restrained the County's ability to obtain replacement parts. The People of the State of California have suffered harm alongside the County of San Diego Plaintiffs, as the higher prices and costs Defendants have forced on California fire departments have drained localities' health and safety budgets.

3.     Private equity has played a pivotal role in this destruction of competition. About a decade ago, Defendant private equity firm American Industrial Partners ("AIP"), from its offices in Midtown Manhattan, observed that fire truck markets in the United States were relatively deconcentrated—that is, full of small manufacturers, some owned and operated by the same family for generations, that competed against one another. This competitive dynamic allowed localities to drive innovation and negotiate lower prices for fire trucks for their fire departments, and ultimately for taxpayers. Although at the time the County of San Diego Plaintiffs and the People benefited from this competition, American Industrial Partners saw an opportunity to profit by eliminating it through the consolidation of the smaller manufacturers into an industry giant with the power to extract high prices.

4.     AIP sought to exploit the fact that fire trucks are critical lifesaving apparatuses: every locality needs to provide firefighting services to its citizens. Localities, their fire departments, and taxpayers must pay for these services, even if choices dwindle and prices go up for firefighting equipment. AIP saw that eliminating competitors—by acquiring them, instead of competing on the merits—

would give it the power to profiteer by imposing ever increasing supra-competitive prices on localities, thereby raking in extraordinary payouts for AIP and its executives.

5. Accordingly, AIP embarked on an over decade-long strategy to consolidate the markets for fire apparatus and chassis manufacturing, starting in 2008 with its acquisition of E-ONE, Inc. ("E-ONE"), a builder of custom fire apparatuses and chassis founded in 1974 in Ocala, Florida. At the time, E-ONE was already one of the largest fire apparatus manufacturers in the United States. In August 2010, AIP combined four portfolio companies, including E-ONE, to form Allied Specialty Vehicles, Inc. ("ASV").

6. Five years later, in 2015, AIP rebranded ASV as REV Group, Inc. and accelerated its consolidation strategy. In 2016, AIP and REV Group acquired Kovatch Mobile Equipment Corp. ("KME"), a family-owned manufacturer based in Nesquehoning, Pennsylvania, effectively combining E-ONE and KME under common control and ownership. To further capitalize upon its consolidation scheme, AIP debuted REV Group on the public markets through an initial public offering ("IPO") in January 2017. While continuing to portray its brands to fire departments as steeped in tradition and local community-building, in its prospectus, REV Group marketed itself to Wall Street rather brazenly as an "Experienced Consolidator," telling potential investors that the status quo of small and fragmented manufacturers presented "an opportunity for market leadership" and "acquisitive growth." REV Group's IPO was a smashing success, funneling $275 million in proceeds to REV Group and its controlling shareholders at AIP. This financing enabled the roll-up strategy to proceed quickly, with AIP and REV Group acquiring Ferrara Fire Apparatus, Inc. ("Ferrara") of Holden, Louisiana, in April 2017, thus achieving the consolidation of E-ONE, KME, and now Ferrara under common ownership and control.

7. In 2020, AIP and REV Group deployed their war chest to consolidate several historic brands in one fell swoop with their acquisition of Spartan Emergency Response, the emergency response segment of Spartan Motors. Notably, Spartan had itself been the product of recent consolidation. Spartan Motors had acquired Smeal Fire Apparatus, Ladder Tower Company, and US Tanker Fire Apparatus ("UST") in 2017, just shortly after Smeal itself had acquired both Ladder Tower and UST in 2014. REV Group combined E-ONE, KME, Ferrara, and now Spartan under common ownership and control.

8. Spartan Emergency Response was a key acquisition, as it was and remains (as Spartan Fire today) one of only three manufacturers of custom chassis that not only use their chassis in their own apparatuses, but also supply their chassis to competing apparatus builders. By gaining control of this critical input on which many smaller competitors depended, REV Group gained effective control over the supply chain of many builders.

9. With nearly a dozen once-independent companies rolled up under a single corporation, the REV Group Defendants began to leverage this dominance to extract profits from the most captive of customers—fire departments and the taxpayers who fund them. In early 2022, REV Group and KME shut down two historic KME plants in Nesquehoning, Pennsylvania, and Roanoke, Virginia. Nearly 400 skilled workers in Nesquehoning and dozens in Roanoke lost their jobs, and many skilled tradespeople were effectively removed from the industry. This deliberate output reduction had its intended effect—backlogs skyrocketed to a record $4.2 billion in undelivered orders by fiscal year 2024, and the REV Group Defendants hiked prices on the order of 50-100% or more. REV Group executives cheerfully celebrated these price increases and related "price realization" to Wall Street investors and analysts, as they translated into spectacular returns for their shareholders. As Timothy Sullivan, REV Group's then-CEO, told analysts, while the companies the AIP Defendants and REV Group acquired had been operating

with profit margins of 4-5%, they were on a path "to get all of them above that 10% level. . . . You bring them into the fold, you got to give them the religion, and they've got it now."

10. More recently, multinational conglomerate Oshkosh Corporation and its subsidiary Pierce Manufacturing have joined in on the consolidation party. For decades, Pierce has been a dominant producer of fire apparatuses, chassis, and parts in the United States. In 2021, Pierce combined with its direct competitor, Defendant Boise Mobile Equipment, Inc., the leading specialized builder of wildland fire apparatuses in the United States, to form a subsidiary of Boise Mobile that they jointly co-own, BME Fire Trucks, LLC. They announced this combination as Pierce's "purchase of an ownership interest in Boise Mobile Equipment" and a "Strategic Alliance/Partnership." Through this acquisition and combination, Pierce and the BME Defendants effectively eliminated competition between themselves to supply wildland fire apparatuses while entrenching their dominant market positions, and Pierce secured itself as the exclusive distributor of the BME Defendants' fire apparatuses.

11. Then, in 2022, Oshkosh acquired Maxi-Métal, Inc., the dominant and fast-growing designer and manufacturer of fire apparatuses in Canada that supplies both the Canadian and U.S. markets. In one acquisition, Oshkosh removed a large custom apparatus builder from the marketplace that was competing with Pierce while, at the same time, entrenching Pierce's dominant position as a manufacturer of custom chassis by ensuring that the entirety of Maxi-Métal's chassis demand moving forward will go to Pierce, and not to any actual or would-be competing custom chassis manufacturers.

12. As with the AIP and REV Group Defendants, when engaging with Wall Street, the Oshkosh Defendants have celebrated the numerous backlogs that fire departments face across the country. For example, Oshkosh CEO John Pfeifer described the company's nearly $660 million Q1 2022 Fire and Emergency

backlog as "another record backlog." The very next quarter, Pfeifer was elated to report to Wall Street investors that "[w]e have the strongest backlog we've ever had in Fire & Emergency." The next quarter, Pfeifer boasted that: "Pierce's backlog is at an all-time high up more than 80% compared to the prior year, highlighting excellent demand for our products as evidenced by our leading market share." And two years later, in 2024, Pfeifer sang the same tune, rejoicing with Wall Street investors that "[o]ur backlog for Pierce trucks continue[s] to grow." All the while, the Oshkosh Defendants raised prices, with Pfeifer announcing two price increases in the first half of 2022 alone.

13. On top of their apparatus and chassis consolidation scheme, the Oshkosh Defendants have also combined with the dealers they authorize to sell Pierce replacement parts to dominate the markets for replacement parts for Pierce apparatuses. Pierce enforces a strict agreement with its parts dealers in which, for a wide variety of parts for Pierce apparatuses, those dealers agree not to sell customers parts that are fully compatible with and operable in Pierce apparatuses, other than Pierce proprietary parts sold by Pierce. Pierce and its parts dealers also enforce restrictive clauses in customer warranty agreements under which customers may void their warranty if they replace a part in a Pierce apparatus with a non-Pierce proprietary part. Pierce also intentionally designs its apparatuses so that only parts manufactured by the Oshkosh Defendants can be used to replace original parts when they break. The Oshkosh Defendants thereby unlawfully stifle competition in these markets and reap exorbitant profits in the replacement parts business from customers who, absent this conduct, could have gotten the parts they needed at a lower price from a competing parts manufacturer.

14. In a competitive marketplace, firms could not impose such restraints on customer choice and would expand their productive capacity to increase output and meet increased or pent-up demand, keeping prices at a competitive equilibrium. But the markets for fire apparatuses, chassis, and Pierce replacement

parts are no longer competitive. They are markets dominated by powerful behemoths. These manufacturers bought their way to dominance, and they are now in full extraction mode, deliberately suppressing output, withholding supply, delaying deliveries, restricting competitive options, and charging supra-competitive prices without consequence. To make matters worse, Defendants' unlawful conduct has enabled other competitors to follow suit, using Defendants' higher prices as an opportunity to raise prices themselves, knowing that fire departments have nowhere else to turn.

15. The evidence of Defendants' use of their unlawfully acquired dominance to raise prices and otherwise worsen terms for the County of San Diego Plaintiffs and other public entities across the country is overwhelming. Pierce custom apparatus owners routinely pay two, three, and even four times as much for replacement parts from Pierce as competing manufacturers charge for equivalent parts, and two, three, and even four times as much as they would pay in a market without Pierce and its dealers' restrictions on customer choice and access.

16. Similarly, the apparatus price increases Defendants have imposed, and have enabled their competitors to impose, far exceed any reasonable measure of inflation and—despite Defendants' best efforts at subterfuge—cannot be explained away by COVID supply chain issues.

17. Indeed, time and again, Defendants have falsely blamed the shortages and price increases—which they deliberately imposed—on broader macroeconomic conditions seemingly outside of their control. While the pandemic brought on problems, "in hindsight," said Edward Kelly, General President of the International Association of Fire Fighters, "it was masking what ends up being a main driver of higher cost[s] and lag time[s] in production: the monopolizing of fire truck and ambulance manufacturing in the United States." In other words, not only did the REV Group Defendants, AIP Defendants, Oshkosh Defendants, and BME Defendants scheme to consolidate the relevant markets to profiteer off the

backs of public entities, but they also deliberately used misinformation campaigns to prevent customers from connecting the dots between Defendants' recent acquisitions and the higher prices and other worsening terms they were experiencing.

18. Our nation's federal and state antitrust and unfair competition laws have long outlawed the kinds of acquisitive schemes Defendants have parasitically plotted and carried out on the backs of localities and taxpayers across America. Nearly 80 years ago, Congress amended the Clayton Anti-Merger Act to "prevent[] the formation of further oligopolies . . . . Where an industry was composed of numerous independent units, Congress appeared anxious to preserve this structure."[1] Congress realized that then-existing laws, the original Section 7 of the Clayton Act of 1914 and the Sherman Act of 1890, often appeared impotent in the face of these schemes:

> Imminent monopoly may appear when one large concern acquires another, but it is unlikely to be perceived in a small acquisition by a large enterprise. As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act test against them. Where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply.[2]

In amending Section 7 of the Clayton Act in 1950, Congress made clear that consolidations, whether in buying a single large company or successive small ones, are illegal long before they give rise to the monopoly power condemned by Sherman Act Section 2.

---

[1] *Brown Shoe Co. v. United States*, 370 U.S. 294, 333-34 (1962).
[2] *Id.* (quoting S. Rep. No. 81-1775, at 5 (1950)) (alterations omitted).

Complaint - 12

19. Meanwhile, Sherman Act Section 2 outlaws not only monopolization, but also attempt and conspiracy to monopolize. Sherman Act Section 1 forbids contracts, combinations, and conspiracies in restraint of trade, and the California Cartwright Act—even more sweeping in its prohibitions on concerted activity—outlaws multiple harmful "combination[s] of capital, skill or acts by two or more persons," including those that restrain trade, reduce output, prevent competition, fix prices, or otherwise preclude free and unrestricted competition.[3] Clayton Act Section 3 and the Cartwright Act further prohibit exclusive dealing arrangements such as Pierce's agreements with its dealers under which they agree to make only proprietary Pierce parts—and not competing parts—available to Pierce apparatus owners. Finally, the California Unfair Competition law forbids not only violations of the federal and California antitrust laws, but also unfair business acts and practices that violate the policy and spirit, or constitute an incipient violation, of antitrust laws.

20. Defendants have violated all of these laws. Through acquisitions, combinations, and anticompetitive practices, they have created highly concentrated and oligopolistic markets that they control, allowing them to cut supply, raise prices, delay deliveries, or force the use of their proprietary parts to the deep financial detriment of localities across the country. Indeed, these localities have had no choice but to endure these detriments—nevertheless carrying out their charge to protect the public safety—as supply and quality have diminished and prices have skyrocketed. All so that Defendants could earn their outsized, extractive returns.

21. Our fire departments do not deserve this. Our firefighters do not deserve this. The taxpayers those firefighters swear an oath to protect do not deserve this. The extraction of excessive private rents from the public must stop,

---

[3] Cal. Bus. & Prof. Code § 16720.

Complaint - 13

Case 2:26-cv-00635-WCG    Filed 04/01/26    Page 13 of 140    Document 1

and it must stop now. While monetary damages can compensate the County of San Diego Plaintiffs for the higher prices, output restrictions, degradation in quality, delivery delays, and other harms they have suffered in their procurement of fire apparatuses and parts, the break-up of Defendants' massive corporations—the undoing of each acquisition and combination that contributed to their market power—and an injunction against their future anticompetitive conduct is essential to prevent the damage Defendants will otherwise continue to inflict on fire departments across the nation. Seeking this and other equitable relief, as well as penalties, damages—automatically trebled—attorneys' fees, the costs of suit, and all other relief deemed just and proper by the Court, the People and the County of San Diego Plaintiffs further allege as follows:

## PARTIES

22. Plaintiff the People of the State of California consists of all natural persons residing in the State of California. The Office of County Counsel, County of San Diego ("County Counsel") is authorized to bring an action for equitable relief under the Unfair Competition Law on behalf of the People under Cal. Bus. & Prof. Code §§ 17203, 17204, and 17206. This authorization includes securing injunctive relief and civil penalties under Cal. Bus. & Prof. Code §§ 17204 and 17206. The County Counsel has a unique role in representing the People in antitrust cases in carrying out the public interest in this State, particularly where equitable actions are concerned.

23. Plaintiff County of San Diego is a political subdivision of the State of California. Established in 1850, the County of San Diego is one of California's original 27 counties. It is the second-most populous county in California, with a population of over 3.3 million. The County encompasses 18 incorporated cities, as well as several dozen unincorporated communities and Indian reservations across a varied topography bounded by the Pacific Ocean to the west, Mexico to the south, Imperial County to the east, and Orange and Riverside Counties to the north. Its

land area is about twice as large as the state of Delaware. As a subdivision of the State, the County of San Diego is charged with providing numerous essential services along with firefighting that affect the lives of its residents including law enforcement, tax collection, public health protection, social services, and flood control.

24. The County's Department of Purchasing and Contracting and the Fleet Management Division of the County's Department of General Services are together responsible for the procurement and maintenance of all fire apparatuses and equipment used by the County. The County's fleet consists of approximately 75 fire trucks, including 26 structural engines, 14 water tenders, 12 Type 6 patrols, 10 command vehicles, 7 wildland engines, 4 urban search and rescues, and 2 other trucks, and includes apparatuses built and sold by Defendant Pierce Manufacturing Inc. and the REV Group Defendants.

25. Plaintiff San Diego County Fire Protection District (the "CFPD") is a dependent special district under California law. It was established by the County Board of Supervisors in 2008. CFPD assesses and collects special funds to be managed and used by San Diego County Fire, the department of the County that provides firefighting services.

26. San Diego County Fire delivers fire protection and emergency medical services to 42 communities through 35 fire stations, and over 500 first responders. These communities include Agua Caliente, Ballena, Barrett Junction, Boulevard, Campo, Canebrake, Cuyamaca, De Luz, Deerhorn Valley, Dehesa, Descanso, Dulzura, Four Corners, Guatay, Harbison Canyon, Intermountain, Jacumba, Jamul, Julian, Lake Morena, Lawson Valley, Lyons Valley, Mount Laguna, Ocotillo Wells, Otay Mesa, Palomar Mountain, Pauma Valley, Pine Hills, Pine Valley, Potrero, Ranchita, Rincon, San Felipe, San Pasqual, Shelter Valley, Sunshine Summit, Sycamore Canyon, Tecate, Tierra Del Sol, Warner Springs, Wynola, and Yuima. Figure 1 below displays San Diego County Fire's service area:

**Figure 1**

27. The "County of San Diego Plaintiffs" refer to Plaintiffs County of San Diego and San Diego County Fire Protection District. The County of San Diego Plaintiffs have been and continue to be negatively impacted by higher prices and reduced quality of fire apparatuses and parts and delivery delays.

28. Defendant REV Group, Inc. ("REV Group") is one of the largest manufacturers of fire trucks in the United States. REV Group sells its fire trucks and custom chassis under the brands of the several manufacturers it has acquired over time: E-ONE, Ferrara, KME, Spartan, Smeal, and Ladder Tower (the "REV Group Brands"). In addition to a range of fire trucks and chassis, REV Group manufactures several other categories of vehicles, including ambulances, terminal trucks, sweepers, recreational vehicles, and truck campers. In fiscal year 2024, REV Group reported $1.73 billion in net sales of specialty vehicles, the category

which includes fire trucks and chassis. REV Group also manufactures and sells replacement parts for its vehicles, estimating in 2019 that replacement parts for its already-sold vehicles amounted to as much as $830 million of potential sales. REV Group is incorporated under the laws of the state of Delaware, with its principal place of business in Brookfield, Wisconsin.

29. Defendant E-ONE, Inc. ("E-ONE") is a fire apparatus and custom chassis manufacturer formed in 1974. In the mid-1980s E-ONE had become the largest fire apparatus builder in the United States. In 2008, Defendant American Industrial Partners acquired E-ONE for $20 million, which AIP later combined with Defendants KME, Ferrara, and the Spartan ER Entities to form REV Group. E-ONE is a wholly owned subsidiary of REV Group incorporated under the laws of the state of Delaware and headquartered in Ocala, Florida.

30. Defendants KME Global, LLC, KME Holdings, LLC, KME RE Holdings LLC (the "KME Holding Defendants"), and Kovatch Mobile Equipment Corp. ("KME," and together with the KME Holding Defendants, the "KME Entities") are wholly owned subsidiaries of REV Group. KME is a fire apparatus and custom chassis manufacturer founded in 1946. From 1946 to 2016, KME was a family-owned company that built a strong brand and reputation as a producer of high-quality fire apparatuses and custom chassis. As of 2016, KME had expanded from its humble beginnings in Pennsylvania to a company with over 800 employees, national sales, and facilities in California, New York, and Virginia. In 2016, REV Group acquired KME for $40.1 million. KME is incorporated under the laws of the state of Pennsylvania and is headquartered in Nesquehoning, Pennsylvania. KME Global, LLC is incorporated under the laws of the state of Pennsylvania and based in Pennsylvania. Both KME Holdings, LLC and KME RE Holdings LLC are incorporated under the laws of the state of Delaware and based in Pennsylvania.

31. Defendants FFA Holdco, Inc., FFA Acquisition Co., Inc., Ferrara Fire Apparatus Holding Company, Inc. (the "Ferrara Holding Companies") and Ferrara Fire Apparatus, Inc. ("Ferrara," and together with the Ferrara Holding Companies, the "Ferrara Entities") are wholly owned subsidiaries of REV Group. Ferrara is a fire apparatus and custom chassis manufacturer founded in 1979. Ferrara operated for years as an independent supplier; in April 2017, REV Group acquired the company for roughly $100 million. Ferrara is incorporated under the laws of the state of Louisiana and has its principal place of business in Holden, Louisiana. The Ferrara Holding Companies are each incorporated under the laws of the state of Delaware and based in Louisiana.

32. Defendant Spartan Fire, LLC ("Spartan Fire") is a wholly owned subsidiary of REV Group incorporated under the laws of Nevada with its principal place of business in Brandon, South Dakota. Defendants Smeal SFA, LLC ("Smeal SFA"), Smeal LTC, LLC ("Smeal LTC"), Smeal Holding, LLC ("Smeal Holding"), and Detroit Truck Manufacturing, LLC ("DTM") are wholly owned subsidiaries of REV Group incorporated under the laws of, and headquartered in, Michigan. Spartan Fire, Smeal SFA, Smeal LTC, Smeal Holding, and DTM (collectively the "Spartan ER Entities") do business under the Spartan, Smeal, and Ladder Tower brands. Spartan Fire, through various corporate iterations, has been manufacturing fire apparatuses and custom chassis since 1979. Smeal SFA, through various corporate iterations, has been manufacturing fire apparatuses and custom chassis since 1955. Smeal LTC, through various corporate iterations, has been manufacturing fire apparatuses since the 1970s. The Spartan ER Entities' predecessor, Spartan Motors, operated independently for years, until REV Group acquired the Spartan emergency response unit from Spartan Motors in February 2020 for $55 million.

33. The "REV Group Defendants" are composed of Defendants REV Group, E-ONE, KME Entities, Ferrara Entities, and Spartan ER Entities. E-ONE,

REV Group, KME, Ferrara, Spartan Fire, Smeal SFA, Smeal LTC, and DTM all have sought to transact or actually transacted business in the State of California and the United States. E-ONE, KME, Ferrara, Spartan Fire, Smeal SFA, Smeal LTC, and DTM all have participated in, supported, advanced, and realized profits from REV Group's unlawful conduct. Similarly, the KME Holding Entities, Ferrara Holding Entities, and Smeal Holding have directed, controlled, participated in, or hold assets resulting from the fruits of REV Group, E-ONE, KME, Ferrara, Spartan Fire, Smeal SFA, Smeal LTC, and DTM's unlawful conduct.

34. Defendant AIP, LLC, doing business as American Industrial Partners ("AIP" or "American Industrial Partners"), is a Delaware limited liability company with its principal place of business in New York, New York. AIP is a private equity firm focused on buying up middle-market manufacturing and industrial service companies. Among other investment characteristics, AIP seeks out "value creation opportunities" in "basic-needs" industries ripe for consolidation of competing firms and production facilities. Far from being a passive investor, AIP instead forms "operating partnership[s] with management," provides access to AIP's "engineering and operating resources," and otherwise "seek[s] to leverage [its] operational experience" to benefit the firms it owns and controls, such as REV Group and the REV Group Defendants. As REV Group itself explained in filings with the SEC, AIP adopts a "business building investment strategy," and only invests "when it believes it can significantly improve the underlying business' performance through the implementation of an operating agenda."

35. After acquiring E-ONE, the then-independent producer of E-ONE-branded apparatuses and chassis, in 2008, AIP combined E-ONE with three other "specialty vehicle" manufacturers in its portfolio in 2010 to form Allied Specialty Vehicles, Inc. ("ASV"). In 2015, AIP rebranded the combination as REV Group. From 2006 to March 2024, AIP controlled REV Group and its predecessor portfolio companies through a web of related entities ("AIP Funds") organized as

limited partnerships or limited liability companies controlled and managed by AIP "partners," who are LLC members of AIP, LLC, as well as other AIP personnel. These AIP partners and personnel raise money from investors and pool that money into investment vehicles called "funds," which include the AIP Funds.

36. The AIP Funds include Defendant American Industrial Partners Capital Fund IV LP ("AIP Fund IV"), Defendant American Industrial Partners Capital Fund IV (Parallel), LP ("AIP Parallel Fund"), and Defendant AIP/CHC Holdings, LLC ("AIP Holdings"). Each of the AIP Funds is a Delaware limited partnership or limited liability company that shares its principal place of business with AIP in New York, New York. AIP Holdings has held an ownership interest in REV Group or its constituent entities since at least 2008. AIP Fund IV and AIP Parallel Fund each held an ownership interest in REV Group or its constituent entities from at least 2008 until March 2024.

37. Since 2008, AIP has exercised control over, and management of, the AIP Funds through Defendant AIP CF IV, LLC ("AIP CF"), the General Partner responsible for the management of AIP Fund IV and AIP Parallel Fund, and Defendant AIP/CHC Investors, LLC ("AIP/CHC"), the managing member responsible for management of AIP Holdings. Both AIP CF and AIP/CHC are Delaware limited liability companies, and each shares its principal place of business with AIP and the AIP Funds in New York, New York. In REV Group's 2017 IPO prospectus, REV Group described its "primary equity holders" as "funds and an investment vehicle associated with AIP CF IV, LLC, which we collectively refer to as 'American Industrial Partners,' [or] 'AIP.'" REV Group then described AIP as "an operations and engineering-focused private equity firm," clarifying that AIP CF and AIP share a unity of identity and AIP CF is an agent for AIP. In a REV Group prospectus filed with the SEC in 2023, REV Group explained that, together, the AIP Funds remained its largest equity holders and all were "managed by AIP LLC, d/b/a American Industrial Partners." When REV Group subsequently filed an

amendment to its Shareholder Agreement, the amendment was signed by AIP CF and AIP/CHC on behalf of the AIP Funds.

38. In line with AIP's investment thesis to implement an "operating agenda" for REV Group, AIP controls AIP CF and AIP/CHC or shares a unity of identity with them, and they in turn exercise management and control over the AIP Funds and REV Group. Current AIP General Partners Dino Cusumano and Kim Marvin, and former General Partner John Becker, serve or have served as senior managing members of AIP CF and as managing members of AIP/CHC. Because Cusumano, Marvin, and Becker were senior managing members of AIP CF and managing members of AIP/CHC, REV Group was obligated to inform investors that they "may be deemed to share voting and dispositive power with respect to the shares held by the AIP funds."

39. Furthermore, former AIP partners Paul Bamatter, Graham Sullivan, and Donn Viola, along with Cusumano and Marvin, hold or have held indirect interests in AIP Holdings. Current or former AIP partners Bamatter, Cusumano, Marvin, Rotroff, and Viola, as well as current General Partner Justin Fish, all have served on REV Group's Board of Directors. Cusumano, an AIP General Partner since 2000, simultaneously served as Vice President of REV Group from 2008 to 2016 and held a term as chair of REV Group's compensation committee, responsible for, among other things, determining the compensation for REV Group's former CEO, Tim Sullivan. And current AIP partner Stanley Edme often served as the authorized signatory for AIP Funds, AIP CF, and AIP/CHC.

40. Acting through AIP CF, AIP/CHC, and the AIP Funds with a unity of identity or as agents, AIP exercised control over and management of REV Group. For example, in its 2017 IPO prospectus, REV Group explained to investors that AIP "will continue to have significant influence over us." Indeed, prior to REV Group's January 2017 IPO, the AIP Funds owned approximately 70% of REV Group's voting equity, with additional shares held directly by AIP partners,

including Cusumano, Fish, Marvin, Rotroff, and Viola. After the IPO, the AIP Funds retained 52-55% of REV Group's voting equity along with contractual rights enabling their continued substantial control of the firm. Under a Shareholders Agreement discussed in REV Group's IPO prospectus and other SEC filings, so long as the AIP Funds controlled a majority of outstanding common stock, AIP retained "the ability to exercise substantial control over all corporate actions requiring stockholder approval, irrespective of how [REV Group's] other stockholders may vote," including defining the size of the Board of Directors, electing and removing directors, amending the certificate of incorporation or bylaws, and approving mergers and other significant transactions. Moreover, under the Shareholders Agreement, so long as the AIP Funds held at least 15% of outstanding common stock, AIP retained the rights to nominate a majority of the Board of Directors and designate the Chair and key committee members; to direct acquisitions, transfers, and spinoffs of assets in excess of 15% of the consolidated assets or revenues of REV Group and its subsidiaries; and to approve special dividends, among other contractual rights. The Shareholders Agreement also provided for the reimbursement of expenses that AIP incurred in providing "management services" to REV Group. After executing its roll-up scheme, AIP, acting through the AIP Funds, AIP CF, and AIP/CHC, took a nearly $80 million special dividend from REV Group and exited their control position in March 2024 when AIP ceased to own, directly or indirectly, at least 15% of REV Group's outstanding shares. Since that time, AIP has continued to hold REV Group shares through AIP Holdings and thus continues to benefit from its roll-up scheme.

41.    The "AIP Defendants" include AIP, the AIP Funds, AIP CF, and AIP/CHC. Operating as a common enterprise, the AIP Defendants formed REV Group and formulated and directed its acquisitions of KME, Ferrara, and Spartan Emergency Response pursuant to the Shareholders Agreement. Acting through one or more of the REV Group Defendants, the AIP Defendants have transacted

business or held assets resulting from such transactions in this District, the State of California, and the United States, including through sales to the County of San Diego Plaintiffs. The AIP Defendants have directed, controlled, participated in, or held assets resulting from the fruit of REV Group, KME, Ferrara, Spartan Fire, Smeal SFA, Smeal LTC, and DTM's unlawful conduct.

42. Defendant Oshkosh Corporation ("Oshkosh") is a global manufacturer of specialty trucks and military vehicles. Oshkosh sells its products across three main business segments—Access, Vocational, and Defense—through a portfolio of leading brands in more than 150 countries across the world. Oshkosh reported more than $10 billion in net sales for 2024. Oshkosh's fire truck brands, which it sells through its subsidiaries, are Pierce and Maxi-Métal (the "Oshkosh Brands"). Oshkosh is incorporated under the laws of the state of Wisconsin, and its principal place of business is in Oshkosh, Wisconsin.

43. Defendant Pierce Manufacturing Inc. ("Pierce") is Oshkosh's leading North American subsidiary and operates in Oshkosh's Vocational segment. Pierce's products include custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, elliptical tankers, and homeland security apparatuses. Pierce also manufactures its own custom chassis on which it builds its custom apparatuses. Pierce, which operates factories in Wisconsin and Florida, is incorporated under the laws of the state of Wisconsin, and its principal place of business is in Appleton, Wisconsin.

44. Defendant Maxi-Métal, Inc. ("Maxi-Métal"), a joint stock company based in Quebec, Canada, is a leading Canadian manufacturer of fire apparatuses for distribution in both Canada and the United States. Oshkosh acquired Maxi-Métal in 2022; Maxi-Métal is now a wholly owned subsidiary of Oshkosh. Maxi-Métal is incorporated under the laws of the country of Canada and has its principal place of business in Saint-Georges (Quebec), Canada. The "Oshkosh Defendants" refer to Oshkosh, Pierce, and Maxi-Métal.

45. The "BME Defendants" include Defendants Boise Mobile Equipment, Inc. ("Boise Mobile") and BME Fire Trucks LLC ("BME Fire Trucks"). Boise Mobile is an Idaho corporation with its principal place of business in Boise, Idaho. BME Fire Trucks is a subsidiary of Boise Mobile and is a limited liability company organized under the laws of the state of Idaho with its principal place of business in Boise, Idaho. The BME Defendants are the leading specialized producer of wildland fire apparatus in the United States, having been manufacturing wildland fire apparatuses since 1990. The BME Defendants' customers include CAL FIRE, the U.S. Forest Service, U.S. Bureau of Land Management, and U.S. National Park Service, as well as multiple municipal and county fire departments throughout the United States. In 2021, Pierce acquired a 25% interest in BME Fire Trucks and is a co-member of the LLC with Boise Mobile.

## JURISDICTION AND VENUE

46. Plaintiffs bring this action against Defendants seeking equitable and injunctive relief, as well as damages for the County of San Diego Plaintiffs, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for Defendants' violations of Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 & 18, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; seeking equitable and injunctive relief, as well as damages for the County of San Diego Plaintiffs, under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16750 and 16754.5, for Defendants' violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 and 16727, *et. seq.*; and seeking equitable and injunctive relief, including restitution for the County of San Diego Plaintiffs, and penalties under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, 17203, 17204 & 17205, for Defendants' violations of the UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

47. This Court has jurisdiction over the subject matter of this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the

Clayton Act, 15 U.S.C. §§ 15 & 26; and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the U.S. Constitution.

48. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and one or more Defendants are licensed to do business in, have their principal places of business in, are doing business in, had agents in, are found in, transact business in, or are subject to personal jurisdiction in this District.

49. This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or substantial control of their subsidiaries, *inter alia*: (a) are headquartered in the United States; (b) transacted business in the United States, including in this District; (c) directly sold or marketed goods and services in the relevant markets throughout the United States as a whole, including in this District; (d) had substantial aggregate contacts within the United States, including in this District; or (e) directed or engaged in acquisitions and other conduct the substantial, reasonably foreseeable, and intended effect of which was the substantial lessening of competition, and/or the creation of a monopoly causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the protection of the laws of this District and of the United States.

50. Defendants' conduct alleged herein occurred inside the United States and caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

51. Defendants' alleged activities were within the stream of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the stream of interstate commerce.

## FIRE APPARATUSES AND CHASSIS

### I. Background

52. The REV Group Defendants, Oshkosh Defendants, and BME Defendants build several categories of fire apparatuses, including commercial apparatuses and/or custom apparatuses. Commercial fire apparatuses are standard medium- or heavy-duty trucks adapted for fire service and built on standard medium- or heavy-duty truck frames/chassis. Custom apparatuses ("Custom Apparatuses" or "Custom Fire Apparatuses") are more customized, specialized apparatuses built on custom frames/chassis ("Custom Chassis").

53. The fire apparatuses that Defendants assemble and sell to customers are subject to National Fire Protection Association ("NFPA") Standard 1900. NFPA is an independent standard-setting organization whose Standard 1900 guides apparatus purchasers and manufacturers throughout the United States, containing thousands of standards governing every part of the vehicle, from the engine to the pump.

54. Specifically, NFPA specifies minimum standards for "Automotive Fire Apparatus" and "Wildland Fire Apparatus," which together comprise the Fire Apparatus market in which Defendants assemble and sell fire apparatuses. Automotive Fire Apparatuses are "vehicle[s] designed to be used under emergency conditions to transport personnel and equipment or to support the suppression of fires or mitigation of other hazardous situations," and according to NFPA include

"Pumper Fire Apparatus," "Initial Attack Fire Apparatus," "Mobile Water Supply Fire Apparatus," "Aerial Fire Apparatus," "Quint Fire Apparatus," "Special Service Fire Apparatus," and "Mobile Foam Fire Apparatus." Wildland Fire Apparatuses are "[f]ire apparatus primarily used for wildland fire response," and according to NFPA include "Wildland Fire Suppression Apparatus," "Wildland Mobile Water Supply Apparatus," and "Wildland Crew Carrier Apparatus." Fire Apparatuses include both Custom Apparatuses and commercial apparatuses.

55. Defendants assemble their apparatuses from parts (e.g., engine, transmission, chassis) that they either manufacture themselves or source from third-party suppliers. For their Custom Apparatuses, the REV Group Defendants and Oshkosh Defendants manufacture their own Custom Chassis (i.e., they self-source their Custom Chassis), which they incorporate into their Custom Apparatuses that they sell to customers. The REV Group Defendants, Oshkosh Defendants, and BME Defendants all source commercial chassis for their commercial apparatuses from third-party suppliers like Freightliner and International, which they incorporate into their commercial apparatuses that they sell to customers. The cost of a custom chassis generally represents at least 25% of the cost of the overall apparatus on which it is built.

56. As discussed herein, there is a limited set of meaningful competitors in the markets to build and sell Fire Apparatuses, with the REV Group and Oshkosh Defendants (now combined with the BME Defendants) holding dominant positions.

### A. Custom Fire Apparatuses

57. The majority of Fire Apparatuses are Custom Fire Apparatuses. The three most prominent types of Custom Fire Apparatuses, which the REV Group and Oshkosh Defendants build, are Custom Chassis Pumper Fire apparatuses ("Custom Pumpers"), Custom Chassis Aerial Fire apparatuses ("Custom Aerials"),

and Custom Chassis Quint Fire apparatuses ("Custom Quints"). Figure 2 displays a Custom Pumper, a Custom Aerial, and a Custom Quint from left to right:

  

**Figure 2**

### *1. Custom Pumpers*

58.    Custom Pumpers are the vehicles most commonly referred to as "fire trucks." Custom Pumpers have a permanently mounted fire pump of at least 750 gallons per minute (3,000 liters per minute) capacity, water tank, and hose body whose primary purpose is to combat structural and associated fires. Custom Pumpers include pumpers as well as pumper-tankers. Figure 3 displays an example of a Custom Pumper manufactured for the County of San Diego Plaintiffs:



**Figure 3**

59.    The NFPA recognizes Custom Pumpers as a distinct category of apparatus that answers particular use cases. It recommends that customers determine the "mission of the apparatus" and accordingly consider whether to

Complaint - 28

build the apparatus upon a commercial or custom chassis when designing a Fire Apparatus (among other factors).

60. The NFPA highlights the enhanced crew safety features of Custom Pumpers, including the fact that their custom cab "makes it much stronger in rollover than typical conventional commercial chassis cabs."

61. Custom Pumpers are significantly more expensive, often costing at least $100,000 more than commercial chassis pumpers. Localities and other purchasers routinely incur this significant price differential to obtain the enhanced safety, durability, and operational advantages of Custom Pumpers over pumpers constructed on commercial chassis.

62. As the NFPA recognizes, "highspeed engines are frequently employed for fire apparatus, particularly in the case of commercial vehicle chassis." In contrast "[m]any fire departments" favor Custom Pumpers, which have "high-torque low-speed engines for fire department service because such engines have good performance characteristics both when powering the apparatus through city traffic and when driving the pump."

63. Custom Pumpers can comfortably seat six to ten crew members, while commercial chassis pumpers typically seat only five people. With the limited legroom in a commercial chassis, the ability to install specialized fire apparatus seating is severely impeded. No more than four specialized fire apparatus seats can be installed in a commercial chassis. Figure 4 displays an example of specialized fire apparatus seating:



**Figure 4**

64. Custom Pumpers have wider door openings and shorter step heights, which are designed to ease crew entry and egress. Commercial chassis tend to be higher from the ground, further complicating entry and egress. Custom Pumpers are also designed with notched roofs, whereas commercial cabs are limited in that respect and can thus impair crew mobility.

65. The advantage of Custom Pumpers is especially notable in urban environments. Custom Pumpers are designed with a front axle behind the driver seat, which greatly improves urban maneuverability by dramatically reducing the fire truck's turning angle and overall wheelbase. The combination of a shorter wheelbase and tighter turning radius allows Custom Pumpers to enter dense urban settings quickly in the event of a fire. In contrast, the front axle on commercial chassis tends to be further forward and in front of the driver, which contributes to a longer wheelbase and worse urban maneuverability. Additionally, Custom Pumpers possess superior durability and extended service life, attributes that are particularly critical for metropolitan jurisdictions experiencing high volumes of emergency responses.

### 2. *Custom Aerials*

66. Custom Aerials are apparatuses built on Custom Chassis that are equipped with an aerial ladder, elevating platform, or water tower that are designed and equipped to support firefighting and rescue operations by positioning personnel, handling materials, providing continued egress, or discharging water at

positions elevated from the ground. Figure 5 displays two Custom Aerials manufactured for the County of San Diego Plaintiffs:



**Figure 5**

67. Whether a Custom Aerial is equipped with a ladder, an elevating platform, or a water tower, it must consist of two or more ladder sections that, together with the steps and platforms on the apparatus body, provide continuous egress for firefighters and civilians from an elevated position to the ground. The ladder must be at least 50 feet, when at maximum elevation.

68. The ladder must be able to be raised from the bedded position to its maximum elevation and extension and rotated a set amount of degrees within a specified amount of time, depending on the height of the elevated platform. The rungs must be evenly spaced and skid-resistant and rails must be 18 inches apart. The ladder must be able to have fall protection harnesses attached to it.

69. In a strict technical sense, it is possible to build aerial fire apparatuses using a commercial chassis. But at least in the past three decades, only a handful of such apparatuses were manufactured among the thousands of Custom Aerials produced.

### 3. Custom Quints

70. Custom Quints combine the equipment capabilities of an aerial with the water-pumping ability of a pumper. They have a permanently mounted fire

pump, a water tank, a hose storage area, an aerial ladder or elevating platform with a permanently mounted waterway, and a complement of ground ladders. The primary purpose of this type of vehicle is to combat structural and associated fires and to support firefighting and rescue operations by positioning personnel-handling materials, providing continuous egress, or discharging water at positions elevated from the ground. Figure 6 displays an example of a Custom Quint, manufactured by Pierce:



**Figure 6**

71.     Custom Quints are gradually becoming the most popular ladder-mounted fire apparatuses, because of their versatility and their ability to perform all necessary firefighting functions.

72.     All elements of a Custom Quint—the fire pump, the water tank, and aerial devices—are also subject to numerous standards. For example, the fire pumps must have a minimum rated capacity of 1,000 gallons per minute (4,000 liters per minute).

73.     Water tanks must be constructed from non-corrosive material, must be opaque if exposed to sunlight, and must have a means to permit flushing of the tank.

74.     In a strict technical sense, it is possible to build quint fire apparatuses using a commercial chassis. But at least in the past three decades, only a handful of

such apparatuses were manufactured among the thousands of Custom Quints produced.

75. The prevailing industry standard for well-resourced municipal fire departments characterized by robust staffing levels is the maintenance of a diversified fleet architecture that integrates both specialized Custom Pumpers—which are also termed by fire department as "engines"—and Custom Aerials—which are also termed "trucks" or "ladders." This operational preference is rooted in the tactical necessity of performing high-intensity fire suppression and search-and-rescue functions simultaneously, for which Custom Pumpers and Customer Aerials are better suited respectively. By assigning these operational roles to distinct apparatuses, departments can ensure that water supply and elevated access/rescue capabilities are not mutually exclusive or compromised in certain operations.

76. In contrast, a growing number of less heavily staffed departments increasingly rely on multi-purpose Custom Quints, which consolidate engine and ladder functions in a single apparatus and thereby require fewer total personnel.

### B. Custom Chassis

77. A Custom Chassis is the foundation on which all Custom Apparatuses are built. As Defendant Pierce puts it, "A chassis determines everything: How you ride, handle, stop & set-up at the scene." The features of a Custom Chassis for a Custom Fire Apparatus include the frame material, engine and transmission compatibility, front and rear axle suspension, and electrical system, among other components.

78. Figure 7 displays an example of a Custom Chassis manufactured by HME Ahrens-Fox:

Complaint - 33



**Figure 7**

79. Like Custom Fire Apparatuses, Custom Chassis are subject to extensive NFPA requirements. Custom Chassis must be built in such a way that they can carry the full weight of the Fire Apparatus when it is loaded to its maximum in-service weight, as dictated by the NFPA. Also, their engines must be able to be protected with engine derate programming (a way to program an engine's electronic control module to intentionally limit power or vehicle speed when certain conditions or faults occur).

### C. Custom Fire Apparatus Builders and Custom Chassis Manufacturers

80. Fifteen to 20 years ago, fire departments in the United States could choose from a variety of independent Fire Apparatus providers, many of whom manufactured their own Custom Chassis on which their Custom Apparatuses were built. As late as 2015, there were still over 20 independent companies producing motorized Fire Apparatuses in the United States, nine of which produced their own Custom Chassis for Custom Pumpers and Custom Aerials. Today, as a result of Defendants' unlawful roll-up schemes, two corporate families—the REV Group Defendants and the Oshkosh Defendants (effectively combined with the BME Defendants)—dominate the relevant markets.

Complaint - 34

81. E-ONE was formed in 1974 and by the mid-1980s had become the largest Fire Apparatus builder in the United States. In 1984, E-ONE introduced its Hurricane Custom Chassis, and it thereafter produced a full line of custom apparatuses based on this chassis. A quarter-century of independent operation later, in 2008, American Industrial Partners acquired E-ONE, which AIP later combined with other specialty vehicle manufacturers to form REV Group. Today, E-ONE is a subsidiary of REV Group and manufactures its Typhoon and Cyclone Custom Chassis along with a range of Custom Apparatuses and commercial trucks, including Custom Aerials, Custom Pumpers, Custom Quints, and tankers, among other models. E-ONE sole-sources its Custom Chassis from within the REV Group brands and does not supply them to competing apparatus builders.

82. KME was a family-owned Fire Apparatus manufacturer founded in 1946 in Nesquehoning, Pennsylvania. After 70 years of independent operation, KME sold out to REV Group in April 2016. Today, KME is a subsidiary of REV Group. KME manufactures Custom Chassis—its Panther, Predator, and SSX models—along with a broad portfolio of apparatuses, including Custom Aerials, Custom Pumpers, Custom Quints, tankers, and rescues. KME sole-sources its Custom Chassis and does not supply them to competing apparatus builders.

83. Ferrara Fire Apparatus was founded in Baton Rouge, Louisiana in 1979. Over the years that followed, Ferrara developed itself first as a full-scale service, warranty, and repair center for Fire Apparatuses and later as a manufacturer of custom-designed apparatuses. In 1994, Ferrara opened a new plant in Holden, Louisiana, and expanded it three times from 2000 to 2009. In 1998, it introduced its first Custom Chassis, the Inferno, and today offers the additional Igniter, Cinder, and Invader models in Ferrara-branded apparatuses. Ferrara continued to build a range of apparatuses, including Custom Aerials, Custom Pumpers, Custom Quints, tankers, and rescues. In April 2017, REV Group acquired Ferrara, taking this important manufacturer of both Custom Chassis and Custom

Apparatuses out of the market as an independent competitor and turning it instead into a subsidiary of REV Group. Ferrara sole-sources its Custom Chassis and does not supply them to competing apparatus builders.

84. Founded in 1975 in Charlotte, Michigan, Spartan Motors began as a manufacturer of Custom Chassis for apparatus builders, later becoming an apparatus builder itself. At the time of its acquisition and still today, Spartan Motors' emergency response unit built Custom Pumpers, Custom Aerials (including aerial ladders and platforms), Custom Quints, rescues, and tankers, among other apparatuses. Today, its models include the Gladiator, the Metro Star, and the FC-94, which it uses to build its own apparatuses and also sells to competing apparatus builders. REV Group acquired Spartan Motors' emergency response segment in February 2020, eliminating a critical independent Custom Chassis supplier and a major competing independent apparatus manufacturer. The company, now known as Spartan Fire, LLC since REV Group's acquisition, is a subsidiary of REV Group.

85. Ladder Tower Incorporated was founded in 1974 in Ephrata, Pennsylvania. After a series of ownership changes, the company became Ladder Tower Company and later, simply "Ladder Tower." Ladder Tower built an industry-leading line of Custom Aerials, as well as aerial devices sold to other apparatus manufacturers under the Squrt, Telesqurt, and Snorkel brands. REV Group acquired the Ladder Tower brand in 2020 as part of its acquisition of Spartan Motors' emergency response segment (the company, now a wholly owned REV Group subsidiary, is now formally Smeal LTC, LLC). Today, Ladder Tower-branded Custom Aerials continue to be distributed by the Spartan ER Entities, subsidiaries of REV Group.

86. US Tanker Fire Apparatus Inc. ("UST") was a Fire Apparatus builder formed in 1989 in Burlington, Wisconsin. The company specialized in building custom stainless-steel tankers, but also built Custom Pumpers, rescues, and brush

trucks. The UST brand was acquired by REV Group in February 2020 as part of REV Group's acquisition of Spartan Motors' emergency response segment. REV Group phased out its production of UST-branded apparatuses after the acquisition, and today, REV Group no longer markets the UST brand.

87. Smeal Fire Apparatus Co. ("Smeal") was founded in 1955 as the Smeal Implement Company in Snyder, Nebraska. Smeal built its first fire truck in 1964 and, in the 1970s, began to design and build its own line of aerial ladders. In 2014, Smeal acquired Ladder Tower and UST. In January 2017, Spartan Motors acquired Smeal. Prior to its acquisition, Smeal purchased Custom Chassis from Spartan Motors and built aerial ladders and platforms, as well as pumpers, tankers, and other apparatuses. As part of its February 2020 acquisition of Spartan Motors' emergency response segment, REV Group acquired the Smeal and Ladder Tower brands. Today, REV Group markets and sells Spartan and narrowed lines of Smeal and Ladder Tower apparatuses.

88. Detroit Truck Manufacturing, LLC ("DTM") was launched by Spartan Motors in 2019 as a captive channel supplier of fabricated aluminum cabs for Spartan's fire trucks, as well as a supplier of cabs and chassis to other fire truck manufacturers. As part of its February 2020 acquisition of Spartan Motors' emergency response segment, REV Group acquired DTM.

89. Pierce is a leading Custom Chassis manufacturer and Fire Apparatus builder in the United States. Pierce was founded in 1913 as Auto Body Works. It produced its first fire truck bodies in 1939 and was acquired by Oshkosh Corporation in 1996. Pierce manufactures Custom Pumpers, Custom Aerials, and Custom Quints built on its own Custom Chassis (the Volterra, Enforcer, Impel, Saber, and Velocity), as well as Fire Apparatuses built on commercial chassis, including tankers, mini-pumpers, rescues, and its BX$^{TM}$ Wildland. Pierce does not supply Custom Chassis to competitors and sole-sources its Custom Chassis for its Custom Apparatuses.

90. In addition to Pierce's apparatus manufacturing operations, Pierce has established what it describes as "the largest North American fire apparatus distribution network"—namely, the Pierce dealer network, through which Pierce, Maxi-Métal, and—since their acquisition in 2021—the BME Defendants' Fire Apparatuses are exclusively distributed. The extensive Pierce dealer network offers apparatus sales and service to customers in all 50 states. Within the geographical regions they cover, Pierce dealers operate as the exclusive dealers for the sale of custom and commercial Fire Apparatuses manufactured by Pierce, Maxi-Métal, and the BME Defendants. Oshkosh explained to its investors in 2025 that its "[c]omprehensive dealer network with an extensive service footprint" represents a key "[c]competitive advantage" for the company. In its 2024 financial reports, Oshkosh includes the Pierce dealer network as an intangible asset with a $16.9 million net book value and a 40-year lifespan.

91. The BME Defendants (Boise Mobile and BME Fire Trucks) are a leading specialized producer of Wildland Fire Apparatuses in the United States. Their vehicles include Type 3, Wildland Urban Interface, Type 4, Type 5, Type 6, Xtreme Type 6, Xtreme Tactical Tender, Water Tender, Crew Carrier, and Mini Pumper trucks, which are generally built on commercial chassis. Boise Mobile was founded in 1990 by the Yanke family. For decades, it produced fewer than 20 trucks a year. In 2014, now President Chad Moffat's company purchased Boise Mobile and initiated major expansion plans, acquiring new buildings and adding tens of thousands of square feet of production space. By 2018, Boise Mobile was manufacturing approximately 150 trucks a year. Oshkosh and Pierce took notice of this competitor's aggressive growth. In 2021, Oshkosh subsidiary Pierce combined with Boise Mobile to form BME Fire Trucks, a subsidiary of Boise Mobile in which Pierce holds a 25% ownership interest. As Oshkosh explained to its investors, the combination has enabled the two competitors to "collaborate" in the Wildland Fire Apparatus market in which they were previously competing.

92. Maxi-Métal is a Canadian-based Fire Apparatus builder founded over 40 years ago in Saint-Georges, Québec. Its Custom Pumper, "MAXI Saber," has been in continuous production since 2016. In 2015, Maxi-Métal signed an exclusive agreement with Pierce to use Pierce's "Saber" Custom Chassis for the MAXI Saber, and to distribute the MAXI Saber through Pierce's dealer network across North America. In 2022, Oshkosh (Pierce's parent company) acquired Maxi-Métal, removing this large apparatus builder as an independent competitor in the marketplace. Today, Maxi-Métal is a subsidiary of Oshkosh.

93. Currently, beyond REV Group's and Oshkosh's subsidiaries, only five noteworthy independent competitors—the only Custom Fire Apparatus builders that also manufacture their own Custom Chassis—remain in the relevant markets: Rosenbauer, Sutphen, Seagrave, HME Ahrens-Fox, and US Fire Apparatus.

94. Rosenbauer International AG ("Rosenbauer") is an Austrian company with a limited U.S. presence. It has three production facilities in the United States. Rosenbauer builds Custom Pumpers, Aerials, and Quints, on two Custom Chassis. Rosenbauer internally sole-sources its Custom Chassis and does not supply them to competing apparatus builders. Rosenbauer does not have the capacity to take on the orders that the REV Group Defendants and Oshkosh Defendants cannot fulfill.

95. Sutphen Corporation ("Sutphen") is a family-owned Fire Apparatus manufacturer, headquartered in Dublin, Ohio. Sutphen has four production facilities. Sutphen manufactures Custom Chassis primarily for internal use in its own apparatuses, as well as Custom Aerials, Custom Pumpers, industrial apparatuses, tankers, and rescue apparatuses. Sutphen is a smaller producer than the REV Group Defendants and Oshkosh Defendants and does not have the capacity to take on the orders that these Defendants cannot fulfill.

96. Seagrave Fire Apparatus, LLC ("Seagrave") is a Fire Apparatus manufacturer headquartered in Clintonville, Wisconsin. Seagrave has two production facilities. Seagrave manufactures Custom Pumpers, Custom Aerials,

and rescue apparatuses. Seagrave also manufactures Custom Chassis, but only for internal use. Seagrave does not have the capacity to take on the orders that the REV Group Defendants and Oshkosh Defendants cannot fulfill.

97. HME Ahrens-Fox ("HME") is a family-owned Fire Apparatus manufacturer, with one location, in Wyoming, Michigan. HME manufactures Custom Pumpers, tankers, wildland, and rescue trucks. HME does not manufacture Custom Quints or Custom Aerials. While HME predominantly uses its Custom Chassis for its own builds, it also supplies Custom Chassis to competing apparatus builders. HME, Sutphen, and the Spartan ER Entities are the only manufacturers that supply Custom Chassis to competitors. HME does not have the capacity to take on the orders that the REV Group Defendants and Oshkosh Defendants cannot fulfill.

98. US Fire Apparatus ("US Fire") is a small Fire Apparatus manufacturer, with one location, in Holden, Louisiana. US Fire manufactures Custom Pumpers, commercial pumpers, commercial tankers, and rescue apparatuses. US Fire does not manufacture Custom Aerials or Custom Quints. US Fire manufactures its own Custom Chassis but generally does not supply them to competing apparatus builders. US Fire's servicing operations are focused on Louisiana and Southern and Central Mississippi. US Fire does not have the capacity to take on the orders that the REV Group Defendants and Oshkosh Defendants cannot fulfill.

99. These seven entities—the REV Group Defendants; the Oshkosh Defendants; Rosenbauer; Sutphen; Seagrave; HME; and US Fire Apparatus—are the only seven independent organizations that both manufacture the Custom Chassis essential to Custom Apparatuses, and build Custom Apparatuses. Moreover, only three of them—REV Group's Spartan ER Entities, Sutphen, and HME—supply Custom Chassis to competing specialized apparatus builders, and only the REV Group's Spartan ER Entities supply them in meaningful numbers.

Therefore, the REV Group, through the Spartan ER Entities, effectively controls the competitiveness of rival, non-vertically integrated builders' products. This means that, with a flip of the switch—a decision to stop supplying to competitors—REV Group, through the Spartan ER Entities, could put competing builders who do not manufacture their own Custom Chassis out of business in the relevant Custom Apparatus markets.

100. Other Custom Fire Apparatus builders—e.g., Custom Fire Apparatus, Marion, Toyne Fire Apparatus—supply varying quantities of these Custom Apparatuses and primarily rely on REV Group's Spartan Entities and to a much lesser degree on HME to source Custom Chassis for the Custom Apparatuses they build. Sutphen supplies a handful of Custom Chassis annually to SVI Fire Trucks.

### D. Other Fire Apparatuses and Their Builders

101. Custom Pumpers, Custom Aerials, and Custom Quints are three specific examples of Fire Apparatuses, which include all Automotive Fire Apparatuses and Wildland Fire Apparatuses as specified by NFPA Standard 1900, including apparatuses built on Custom Chassis as well as commercial chassis. Figure 8 below depicts an example of a Fire Apparatus beyond Custom Pumpers, Custom Aerials, and Custom Quints—a water tender manufactured for the County of San Diego Plaintiffs:



**Figure 8**

Complaint - 41

102.    In particular, Wildland Fire Apparatuses are vehicles utilized by fire departments located in environments with rugged and otherwise difficult-to-traverse terrain, where a regular Fire Apparatus may have difficulty maneuvering. For example, Pierce manufactures a "BX™ Wildland" which it describes as follows: "The air ride cab comfortably fits 5 personnel. The stainless-steel body integrates full-depth left side compartments, 6 standard fender compartments, lowered compartment doors for better ergonomics and large undercab compartments. Departments can expect aluminum hosebed covers, integrated hatch compartments with top and rear access, flush-mounted hinged body doors, fully enclosed low height ladder storage and dedicated dry storage areas for more extensive deployment. Standards include a 70-gallon fuel tank, bumper extension with left/right/center hose trays featuring aluminum lids, 2 bumper outlets, a hydraulic auxiliary pump for true pump-and-roll and a powerful Husky™ foam system with hose reel." Figure 9 shows an image of Pierce's BX™ Wildland:



**Figure 9**

103.    A small group of manufacturers build apparatuses within the Wildland Fire Apparatus and broader Fire Apparatus markets, which have also been the target of Defendants' roll-up schemes. Boise Mobile Equipment and its subsidiary BME Fire Trucks are the largest specialized Wildland Fire Apparatus builder. Other manufacturers in the Wildland or broader Fire Apparatus markets include E-ONE,

Ferrara, KME, the Spartan ER Entities, Pierce, and Maxi-Métal. Accordingly, Defendants' roll-ups and combinations have contributed to substantial consolidation not only in the Custom Apparatus and Custom Chassis markets but also in the Wildland Fire Apparatus and Fire Apparatus markets.

### E. The REV Group Defendants' Control Over Their Dealer Networks and Their Purchase-and-Sale Transactions with Customers

104. The REV Group Defendants exercise tight control over their brands' exclusive dealers—setting the prices at which their dealers sell their apparatuses, determining modifications to those prices after apparatuses are purchased, managing communications between their dealers and customers, and negotiating and dealing directly with customers. Essentially, the REV Group Defendants' dealers act as their respective conduits to facilitate their dealings with their customers.

105. The REV Group Defendants also both provide extensive benefits to their respective dealers, as described below, which render the dealers allies in their schemes and remove all incentive those dealers otherwise may have to push back or initiate legal action based on Defendants' anticompetitive conduct. Indeed, Fire Apparatus dealers—whether dealing in Defendants' apparatuses or the apparatuses of competing builders who, as a result of Defendants' anticompetitive conduct, have also been able to raise prices above competitive levels—have generally benefitted from these builders' price increases, as a higher price generally translates directly into a greater profit for the dealer.

106. The REV Group Defendants have sold their fire trucks directly to customers—including the County of San Diego Plaintiffs—and now predominantly sell them through a network of exclusive dealers for each REV Group Brand. Although the REV Group Defendants characterize their dealers as "independent," they exercise tight control over them. REV Group maintains a Dealer Development team that trains its dealers on how REV Group wants its dealers to sell the REV

Group Defendants' Fire Apparatuses. REV Group also runs a Dealer Advisory Council that it uses to coordinate its dealers. REV Group communicates company strategy and product changes to its dealers through the Dealer Advisory Council.

107. The REV Group Defendants maintain only a limited number of dealers and are strategic about their placement and territorial allocations. Since the 2020 Spartan acquisition, the REV Group Defendants have reduced the number of dealers in their network from approximately 96 to approximately 62. Exemplifying this dealer consolidation, the REV Group Defendants today maintain only a single dealer in all of California for their KME and Ferrara brands, and only two additional dealers serve their other brands in territories largely limited to Southern California. Where the territories of separate dealers of different REV Group brands overlap, the REV Group Defendants coordinate them to get "multiple bites at the apple" in response to individual fire department bids. As explained by Mike Virnig, President of REV Group, if a customer of one REV Group brand wants to explore other options, "[w]e've got four other opportunities where we can go and leverage other products, other dealers, and other relationships," ensuring the maintenance and growth of the REV Group Defendants' market share as a whole.

108. When selling fire trucks through their dealers, the REV Group Defendants control virtually all aspects of the sales process. The applicable REV Group Defendant's and dealer's personnel meet with customers together. The REV Group Defendants' "inside sales departments" oversee quote design, contract administration, production, and the final inspection and delivery processes. To generate specifications, pricing, and drawings for the customer, the REV Group Defendants and their dealers utilize a "configuration tool" developed by REV Group for each of its brands. Specifications are reviewed by the relevant REV Group Defendant's engineering team prior to release to the customer to ensure it is buildable, given that most orders are highly customized. The REV Group Defendants determine the price at which the customer purchases a fire truck

through the dealer, typically set as a percentage of the REV Group Defendant's MSRP. If a REV Group Defendant wishes to increase its margin after contracting but before delivery, it will even increase the price to the customer through the dealer via so-called "escalation clauses" or "equitable adjustment[s] to price."

109. With respect to contracts with cooperative purchasing agents ("co-ops") such as Sourcewell, NASPO ValuePoint, and Houston-Galveston Area Council ("HGAC")[4]—through which public entities and fire departments purchase Fire Apparatuses from the REV Group Defendants—one or more of the REV Group Defendants is identified as the relevant "vendor" or "contractor" to whom the public entity or fire department awards the contract to supply the Fire Apparatus; no dealer is identified.

110. The Sourcewell Request for Proposal ("RFP") under which Sourcewell authorized the REV Group Defendants to supply Fire Apparatuses to purchasing entities such as the County of San Diego Plaintiffs specifies that the supplier (the REV Group Defendant, e.g., KME) "will be the primary source of communication with [purchasers]" about the purchase, and the Primary Contact and Authorized Representatives provided in the REV Group Defendants' contract with Sourcewell are REV Group Defendants' employees. That contract also stipulates that Sourcewell will validate the REV Group Defendants' dealers and that the applicable REV Group Defendant will not charge a price above that which is in its proposal.

111. Similarly, the REV Group Defendants' contracts with HGAC, in which they are defined as "Contractor," provide, "The H-GAC Customer [i.e., purchasing entity] is responsible for making payment to the Contractor upon delivery and acceptance of the goods or completion of the services and submission

[4] Sourcewell, NASPO ValuePoint, and HGAC are examples of important competitive bid-sourcing agents responsible for soliciting, collecting, and evaluating bids for many public entities' fire equipment purchases.

of the subsequent invoice," and "Contractor agrees and acknowledges that any such designations of distributors, vendors, resellers or the like are for the convenience of the Contractor only and *the awarded Contractor will remain responsible and liable for all obligations under the Contract* and the performance of any designated distributor, vendor, reseller, etc." (emphasis added).

112. Being a REV Group Defendant's dealer is a very lucrative business. Dealers are given exclusive rights to sell each REV Group brand of apparatuses to the customers in their designated geographic area. On the other hand, dealers also face the threat of being closed down as a result of the REV Group Defendants' consolidation campaign. Given these benefits alongside the risk of termination, the REV Group Defendants' dealers lack any incentive to take action against them. It is therefore not surprising that Plaintiffs' research yielded no examples of a lawsuit filed by a REV Group dealer against any REV Group Defendant after its acquisition by REV Group.

113. Some of the same individuals who make decisions for the REV Group Defendants also make decisions for their dealers, including about the ways in which they compete. For instance, Mike Virnig, the President of REV Group, has publicly stated that REV Group dictates dealer behavior and how dealers compete for business, stating, "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"

## II. Relevant Fire Apparatus and Chassis Markets

### A. Relevant Product Markets

114. Defendants' acquisition schemes have substantially concentrated, increased their market shares, and tended to create monopolies in several markets, including: (1) the market for Custom Chassis for Custom Apparatuses; (2) the markets for Custom Pumpers, Custom Aerials, and Custom Quints; (3) the

Wildland Fire Apparatus market; and (4) the broader Fire Apparatus market (which includes within it the Custom Apparatus and Wildland Fire Apparatus markets).

### 1. Custom Chassis Market

115. Custom Chassis are inputs that Fire Apparatus builders use to assemble their Custom Pumpers, Custom Quints, and Custom Aerials. Custom Chassis are designed specifically for Custom Apparatuses.

116. While Fire Apparatus purchasers like the County of San Diego Plaintiffs do not purchase Custom Chassis as standalone parts from Fire Apparatus builders, they do purchase Custom Chassis from Fire Apparatus Builders as a part of the completed Custom Apparatus. For example, when a customer purchases a Custom Fire Apparatus from Pierce, the purchase price reflects the price to build the entire apparatus, including the cost to Pierce to manufacture the Custom Chassis on which the apparatus is built. When a customer purchases a Fire Apparatus from a Fire Apparatus builder that does not manufacture its own Custom Chassis, the purchase price reflects the price to build the entire apparatus, including the price the builder paid (e.g., to a Spartan Entity) for the Custom Chassis on which the apparatus is built. The REV Group Defendants' consolidation of manufacturers of Custom Chassis has therefore impacted the competitive conditions under which apparatus customers like the County of San Diego Plaintiffs purchase Custom Fire Apparatus.

117. Custom Chassis are not interchangeable with commercial chassis, as various distinct characteristics meet the particular demands of each fire department.

118. A Custom Chassis allows the front axle to be placed farther back than a commercial chassis allows, reducing the apparatus's turning radius and promoting maneuverability in urban or other complex environments.

Complaint - 47

119. Custom Chassis air intakes are designed to operate in environments where intense heat and embers are present, making them safer and otherwise more suitable than commercial chassis to operate in fire emergency environments.

120. Whereas commercial chassis often rely on airflow while driving to cool batteries and electrical components, Custom Chassis are specially designed to prevent overheating when stationary, such as when on scene engaged in firefighting operations.

121. Manufactured with heavier, more durable materials, Custom Chassis typically offer superior structural integrity and safety features, providing greater protection for firefighters from rollovers, collisions, or falling objects. This increased durability also expands the lifespan of these chassis in comparison to commercial chassis.

122. Custom Chassis generally offer more cab space than commercial chassis, with increased room for heads, legs, hips, and elbows, as well as floorspace and storage space, all enabling the apparatus to carry more personnel and equipment more safely and comfortably.

123. Custom Chassis generally include larger, single-piece windshields and specially designed dashboards and mirrors, which maximize and otherwise improve visibility for drivers and officers.

124. Custom Chassis allow for adjustments to the size, height, and other characteristics of the cab steps to make ingress and egress easier and safer for personnel compared to a commercial chassis.

125. By contrast, commercial chassis are generally constructed with lighter formed metals and fiberglass, rendering them less durable than Custom Chassis, which are generally constructed exclusively from thicker aluminum or stainless steel.

126. Prices for Custom Chassis are typically higher than prices for commercial chassis. Although prices of specific chassis can vary, the least

expensive Custom Chassis tend to be more expensive than even high-end commercial chassis. In general, Custom Chassis are roughly twice as expensive as commercial chassis.

127. These higher prices are reflective of the added value Custom Chassis provide and the fact that they are not viewed as interchangeable by customers.

128. Custom Chassis are produced exclusively by a limited set of Fire Apparatus manufacturers, including Defendants, in facilities specialized for Custom Chassis or Fire Apparatus manufacture. In contrast, while very large automotive manufacturers such as Ford and Daimler manufacture hundreds of thousands of commercial chassis that are used for many end-use cases such as ambulances, emergency vehicles, and Fire Apparatuses, none of these commercial chassis producers manufacture Custom Chassis.

129. Industry participants such as the National Fire Protection Association, as well as fire departments and manufacturers—including Defendants—recognize Custom Chassis as distinct products. For example, Pierce markets its Custom Chassis as a category distinct from commercial chassis used for building Fire Apparatuses. REV Group evaluates its market share using Custom Chassis as distinguished from commercial chassis, and distinguishes between Fire Apparatuses built on Custom Chassis versus commercial chassis in its public-facing materials. The NFPA states that whether a purchaser wants a commercial or custom chassis is one of the first things it should decide during the procurement process.

130. The Hypothetical Monopolist Test ("HMT") is a method that courts and federal agencies use to assist in determining relevant antitrust markets. The HMT evaluates whether a hypothetical monopolist of a group of products likely would undertake at least a small but significant and non-transitory increase in price ("SSNIP") or other worsening of terms for at least one product in the group. If a

hypothetical monopolist could profitably impose such a price increase or other worsening of terms, that candidate market is a valid market for antitrust analysis.

131. As indicated by the facts set forth above, a hypothetical monopolist of Custom Chassis could profitably impose a small but significant and non-transitory increase in the price of Custom Chassis.

132. The producers in the relevant market to manufacture Custom Chassis for Custom Pumpers, Custom Aerials, and Custom Quints include the REV Group Defendants, Pierce, Rosenbauer, Sutphen, Seagrave, HME, and US Fire Apparatus.

133. Where participants in the relevant markets to build and sell Custom Pumpers, Custom Aerials, and Custom Quints do not manufacture the chassis themselves, they source the chassis from a manufacturer of Custom Chassis—and almost exclusively from the Spartan ER Entities, the primary manufacturer of Custom Chassis for supply to competing Fire Apparatus builders.

### 2. *Markets for Custom Pumpers, Custom Aerials, and Custom Quints*

134. There are three main types of Custom Apparatuses: Custom Pumpers, Custom Aerials, and Custom Quints. Each of these Custom Apparatuses serves distinct firefighting purposes and is not reasonably interchangeable with the other types in the eyes of customers.

135. Custom Pumpers are vehicles with a permanently mounted fire pump of at least 750 gallons per minute (or 3,000 liters per minute) capacity, water tank, and hose body whose primary purpose is to combat structural and associated fires.

136. Custom Aerials are vehicles equipped with an aerial ladder, elevating platform, or water tower that is designed and equipped to support firefighting and rescue operations by positioning personnel, handling materials, providing continued egress, or discharging water at positions elevated from the ground.

137. Custom Quints are vehicles with a permanently mounted fire pump, a water tank, a hose storage area, an aerial ladder or elevating platform with a

permanently mounted waterway, and a complement of ground ladders. Quints are used when a fire department, due to space or personnel limitations, can only deploy one apparatus, and that apparatus must be able to perform the functions of both an aerial and a pumper.

138. These apparatuses all have specific characteristics set out by NFPA Standard 1900.

139. Each of these apparatuses serves a unique function. For example, a Custom Pumper cannot be used to extinguish a fire in a high-rise building because it lacks an elevated platform like a Custom Aerial.

140. NFPA 1900 sets out the standard characteristics of a given Custom Apparatus necessary to support such unique functions, and this and other related NFPA standards are in turn incorporated into the laws and regulations of state and local governments.

141. For example, New Jersey Administrative Code section 12:100-10.15 requires compliance with specific NFPA standards for Fire Apparatuses purchased after a certain date.

142. Defendants recognize that Custom Apparatuses occupy a distinct market and highlight their own Custom Apparatuses on their websites. For instance, Pierce says of its Custom Pumpers, "At Pierce, we understand that every second on the job counts and we tailer customization to match your requirements. The Pierce pumper body has a variety of body lengths available to provide flexibility. Customers select the body that is right for them to meet the demanding needs of the truck on scene." Similarly, the Spartan ER Entities advertise their "Side Mount Custom Pumpers," "Top Mount Custom Pumpers," "Enclosed Top Mount Custom Pumpers" and "Rear Mount Custom Pumpers." Maxi-Métal has a "Fire Apparatus" section of its website, with distinct subheadings for "MAXI Saber Custom-Chassis" and "Commercial chassis apparatus." Fire departments

similarly recognize Custom Apparatuses as being district from other Fire Apparatuses.

143. Custom Apparatuses have distinct customers. Most fire departments require bespoke Fire Apparatuses to meet the specific needs of their regions. These specific needs are based on the environments they serve—for example, a crowded urban area with narrow streets, or a mountainous region with significant snowfall. Generally, these specific needs are met by the distinct characteristics offered by Custom Pumpers, Custom Aerials, and Custom Quints. When prices rise, fire departments—public entities using taxpayer dollars to purchase their Custom Apparatuses—generally have no reasonable substitutes to which to turn.

144. A majority of Fire Apparatuses sold in the United States are Custom Apparatuses. Indeed, certain Fire Apparatuses such as aerials and quints are almost exclusively Custom Aerials and Custom Quints built on Custom Chassis, since among other things the height and other configurations of ladders and platforms must meet the specific needs of the environment.

145. Custom Apparatuses have distinct vendors—namely, a small set of Custom Apparatus builders that bid to and ultimately design and manufacture Custom Pumpers, Custom Aerials, and Custom Quints, in specialized facilities.

146. Custom Apparatuses are significantly more expensive than commercial apparatuses because they are built on Custom Chassis and use other customized parts.

147. Although prices of specific Custom Apparatuses can vary, the least expensive Custom Apparatuses tend to be more expensive than high-end commercial apparatuses. For instance, Custom Pumpers generally cost several hundreds of thousands of dollars more than commercial pumpers. These higher prices are reflective of the added value Custom Apparatuses provide to customers.

148. Other types of Fire Apparatus, such as Initial Attack Fire Apparatus and Mobile Water Supply Fire Apparatus, as well as pumpers that are built on

commercial chassis, are not in the Custom Pumper, Custom Aerial, and Custom Quint markets. These apparatuses are generally built on commercial chassis manufactured by suppliers like Ford and Daimler, required to meet less demanding industry standards, and primarily designed for ancillary firefighting functions such as rapid response, the provision of auxiliary water supply, and command and control operations. Additionally, these types of vehicles are sold by a broader set of manufacturers under different competitive conditions.

149. Although Custom Pumpers, Custom Aerials, and Custom Quints represent distinct markets, the competitive conditions in these markets are nonetheless substantially similar. Each vehicle is built on a Custom Chassis that must meet strict industry standards and designed to fulfill complex and specialized firefighting operations. Each vehicle is more expensive than the commercial equivalent or has no such equivalent. And each vehicle is primarily manufactured by the same set of companies in similar facilities with similar sets of customers.

150. A hypothetical monopolist of Custom Pumpers, Custom Aerials, or Custom Quints could profitably impose a small but significant and non-transitory increase in the price of at least one product in each such group of products.

### 3. Wildland Fire Apparatus Market

151. The market to build and supply apparatuses that qualify as Wildland Fire Apparatuses under the NFPA Standards—"[f]ire apparatus primarily used for wildland fire response"—is a distinct relevant product market, as recognized by the NFPA, Defendants, and other industry participants. The apparatuses in this market include Wildland Fire Suppression Apparatuses, Wildland Mobile Water Supply Apparatuses, and Wildland Crew Carrier Apparatuses as specified by NFPA Standard 1900.

152. The Wildland Fire Apparatus Market has specialized vendors. The BME Defendants are a leading supplier of Wildland Fire Apparatuses in the United States. Popular BME apparatuses include BME's Model 34 (a Type 3 apparatus),

Tactical Tender, and Type 6 Xtreme. Other suppliers include Pierce, REV Group (through its subsidiaries the Spartan ER Entities, KME, Ferrara, and E-ONE), HME Ahrens-Fox, Rosenbauer, SVI Trucks, and Toyne.

153. These builders market their Wildland Fire Apparatuses as a distinct category of apparatus on their websites and in their marketing materials. For example, REV Group subsidiary KME explains that "off-road is a specialized environment requiring specialized features. Features like heavy duty subframes to keep the body strong, flexible mounting systems to allow the body to move independently from the chassis or true pump-and-roll to allow a strong, steady fire attack while the truck moves at whatever speed the operator desires."

154. REV Group subsidiary Ferrara explains: "Designed with off-road capability, compact maneuverability, and powerful pump-and-roll performance, [Wildland Fire Apparatus] deliver rapid response and dependable water supply where traditional apparatus can't go." One Wildland Fire Apparatus dealer explains: "Space-saving measures, ergonomics, and safety considerations are integral in the design of these rugged and compact trucks. Wildland vehicles are built tough to get crews and equipment through the rough off-road terrain that is impassable by other apparatus."

155. Indeed, NFPA maintains comprehensive standards an apparatus must meet to qualify as a Wildland Fire Suppression Apparatus, Wildland Mobile Water Supply Apparatus, and Wildland Crew Carrier Apparatus. For example, for Wildland Fire Suppression Apparatus, the gross vehicle weight rating ("GVWR") must be at least 10,001 pounds; the fire suppression fluid tank capacity must be at least 150 gallons; the equipment storage compartment capacity must be 20 cubic feet on a vehicle with a 10,001-14,000 pound GVWR, 50 cubic feet on a vehicle with a 14,001-26,000 pound GVWR, and 75 cubic feet on a vehicle with an over 26,000 pound GVWR. All Wildland Fire Apparatuses must be capable of maneuvering across a 20% grade and up and down a 25% grade; must remain

stable in both directions when tested on a tilt table; and the calculated or measured vertical center of gravity divided by the rear axle track width must not exceed the criteria shown in Figure 10 below:

**Table 7.14.3.1  Rollover Stability Requirements**

| Vehicle | Tilt Criteria (degrees) | VCG/Track (percentage) |
|---|---|---|
| Wildland fire apparatus ≤33,000 lb (15,000 kg) GVWR | 30 | 75 |
| Wildland fire apparatus >33,000 lb (15,000 kg) GVWR | 27 | 80 |
| Structural fire apparatus not equipped with a stability control system | 26.5 | 80 |

**Figure 10**

156.   As stated, the participants in the Wildland Fire Apparatus market recognize it as a distinct market. Pierce itself describes its acquisition of an ownership interest in the BME Defendants, a Wildland Fire Apparatus manufacturer, as impacting "the wildland market."

157.   Wildland Fire Apparatuses also have distinct customers—namely, fire departments located in environments with rugged and otherwise difficult-to-traverse terrain, where a regular Fire Apparatus will have difficulty maneuvering.

158.   Although there are distinct markets within the broader Wildland Fire Apparatus market (e.g., the markets for Type 3 versus Type 6 Wildland Fire Apparatuses), and although each distinct apparatus serves a specific need that cannot be easily fulfilled by other types of apparatuses within this market, the competitive conditions for the manufacture and sale of each distinct type of Wildland Fire Apparatus are similar enough to allow for analyzing the competitive conditions for all Wildland Fire Apparatuses together. Each Wildland Fire Apparatus must meet strict industry standards for Wildland Fire Apparatuses. Each is purpose-built to meet the demands of the most challenging off-road and wildland firefighting environments, such as navigating tight trails and responding in remote

Complaint - 55

terrain without a proximate water source. And each is primarily manufactured by the same set of companies in similar facilities with similar sets of customers. For these and other reasons discussed herein, Wildland Fire Apparatuses are not reasonably interchangeable with other Fire Apparatuses. A hypothetical monopolist of each type of Wildland Fire Apparatus, and of all Wildland Fire Apparatuses, could profitably impose a small but significant, non-transitory increase in the price of at least one product in each such group of products.

### 4. *Fire Apparatus Market*

159. Where distinct product markets exist within a broader economically integrated market, anticompetitive effects may be assessed at the level of those product markets as well as the larger market in which the product markets reside in an amalgamated fashion. Here, the foregoing markets for Custom Pumpers, Custom Aerials, Custom Quints, and Wildland Fire Apparatuses, along with commercial pumpers and other fire apparatuses built on custom and commercial chassis, together comprise a broader market to build fire apparatuses (the "Fire Apparatus" market). Specifically, this market is comprised of all of the apparatuses identified by the NFPA as meeting NFPA Standard 1900 for (1) "Automotive Fire Apparatus"—"vehicle[s] designed to be used under emergency conditions to transport personnel and equipment or to support the suppression of fires or mitigation of other hazardous situations"—and (2) Wildland Fire Apparatuses.

160. This broader Fire Apparatus market, which includes constituent antitrust markets for Custom and Wildfire Apparatuses and other products, is itself a relevant antitrust market because it contains products that are grouped together as meeting the same NFPA standards and are typically offered or marketed together by the same sellers, fire apparatus manufacturers, to the same set of buyers, local fire departments. That is, the industry recognizes Automotive Fire Apparatuses and Wildland Fire Apparatuses as "Fire Apparatus" for which minimum standards are necessary to enable fire departments to protect the public safety and their

firefighting personnel, and there is a distinct set of manufacturers that market themselves as building and supplying "Fire Apparatus" to fire departments.

161. Thus, although there are distinct apparatus markets within the broader Fire Apparatus market (e.g., the markets for commercial pumpers versus commercial tankers), and although each distinct apparatus type serves a specific need that cannot be easily fulfilled by other types of apparatuses within this market, the competitive conditions for the manufacture and sale of Fire Apparatuses in this broad market are similar enough to allow for analyzing the competitive conditions for this broad group of products together.

162. Each Fire Apparatus must meet strict industry standards for Fire Apparatuses. Each is purpose-built to respond to fires. Each is primarily manufactured by the same set of companies in similar facilities with similar sets of customers. For these and other reasons alleged herein, other kinds of apparatuses and trucks—for example, emergency vehicles and commercial infrastructure vehicles like terminal trucks and street sweepers, or fire trucks that do not meet NFPA Standard 1900—are not reasonably interchangeable with Fire Apparatuses, because these other apparatuses and trucks are not sufficiently designed and built to respond to fires in emergency conditions. Indeed, NFPA Standard 1900 specifies numerous standards that "Fire Apparatus" must meet to qualify as such.

163. As mentioned, a hypothetical monopolist of Custom Pumpers, Custom Aerials, Custom Quints, and Wildland Fire Apparatuses could profitably impose a small but significant, non-transitory increase in the price of at least one product in each such group of products. In addition, a hypothetical monopolist of each other type of Fire Apparatus, and of all Fire Apparatuses together, could also profitably impose a small but significant, non-transitory increase in the price of at least one product in each such group of products, because in response to such a price increase, an insufficient number of purchasers (predominantly fire departments)

would switch to purchasing other kinds of vehicles so as to make the price increase unprofitable.

### B. Geographic Scope of Relevant Markets

164. The geographic scope of the relevant markets for Custom Chassis, Custom Pumpers, Custom Quints, Custom Aerials, Wildland Fire Apparatuses, and Fire Apparatuses for purposes of this action is the United States.

165. Purchasers of new Custom Chassis, Custom Pumpers, Custom Aerials, Custom Quints, Wildland Fire Apparatuses, and other Fire Apparatuses in the United States cannot reasonably, and generally do not, turn to manufacturers without a domestic dealer presence in the United States to source these apparatuses. Manufacturers of these apparatuses outside the United States cannot reasonably, and generally do not, sell these apparatuses to purchasers in the United States without an established domestic dealer presence.

166. A key limitation on the ability of localities to import Fire Apparatuses from outside the United States is the mismatch between NFPA standards for Fire Apparatuses, which are largely adopted by localities in the United States and Canada, and non-NFPA standards that exist for fire apparatuses outside the United States.

167. For example, while a vast majority of fire departments in the United States and Canada have accepted baseline standards for Automotive Fire Apparatus and Wildland Fire Apparatus, known as NFPA 1900 (what one industry publication has called the "bible of fire apparatus purchasing" in the United States), countries in Europe and other continents set standards on a country-by-country basis. Non-U.S. models and NFPA-approved models can differ in overall dimensions, compartment layouts, crew areas, and pump configurations. This means that a vast majority of fire apparatuses that might meet a particular country's standards outside the United States would not meet the standard of a U.S. locality like the

County of San Diego Plaintiffs. Indeed, the County of San Diego Plaintiffs require numerous components of Fire Apparatuses to meet NFPA standards.

168. This explains why a Fire Apparatus manufacturer like Rosenbauer is explicit that it "produces all types of firefighting vehicles to both European and US standards," noting that "[t]hese two firefighting worlds differ greatly." As one example, Rosenbauer notes that in localities governed by the NFPA, like the United States, "[e]ver-larger firefighting pumps" are required, which is contrary to the European goal of "put[ing] out a fire with as little water as possible" to minimize secondary damage to historical buildings in tight urban settings. As a result, Rosenbauer relies on its United States-based plants to supply North America with compliant trucks, including from its Lyons plant in South Dakota. At the same time, this is why one industry publication has commented that "exports of American aerial devices to Europe are virtually nonexistent."

169. Another difference between apparatuses purchased in versus outside of the United States is the dimensions of the apparatuses themselves. For example, a then-Vice President of E-ONE explained that the "European apparatus is shorter, narrower, and tighter in design than what we see [in the United States . . . . where] we usually have larger, wider roads and highways, so we don't need the tighter designs in most cases."

170. The United States is the relevant geographic market for the Custom Chassis markets for similar reasons. Purchasers of Custom Chassis in the United States cannot reasonably, and generally do not, turn to manufacturers outside the United States to source these chassis. Manufacturers of Custom Chassis outside the United States cannot reasonably, and generally do not, sell to purchasers in the United States.

171. There are significant differences in the use of Custom Chassis in versus outside of the United States. For example, whereas a majority of fire trucks sold in the United States are built with Custom Chassis, "[o]utside North America,

there are very few custom fire apparatus chassis," and, instead, most fire apparatuses "are what could be defined as 'commercially available trucks' adapted for fire apparatus use." As one industry publication has explained, "[a] typical pumper in Europe is built on a commercial chassis and has high compartmentation with highly organized interior spaces." A one-time national sales manager for Rosenbauer echoed this sentiment, noting that "in Europe, about 95% of chassis are commercial."

172. In addition, NFPA 1900 sets out specific guidelines for Custom Chassis manufacture which do not apply outside the United States. In fact, one major European industry standard explains that fire apparatuses "normally use a commercial chassis-cab."

173. Although NFPA standards for Fire Apparatuses are largely adopted by localities both in the United States and Canada, in practice, localities are limited in their ability to self-import fire apparatuses from Canada if the Canadian manufacturer lacks a meaningful retailing presence in the United States.

174. Without such domestic presence, localities generally will find it challenging to self-import the apparatuses into the United States and thus, will lack a reliable option to service and repair the apparatuses, especially during the initial warranty period. And typically, almost no customers import Canadian apparatuses into the United States themselves if the apparatus builder does not have a dealer and service presence in the United States to service those imported apparatuses.

175. Hence, although fire apparatuses manufactured in Canada may be technically compatible with domestic standards, only those that are manufactured in Canada and retailed in the United States through a permanent and meaningful domestic retailing presence are imports included within the relevant geographic market.

176. A hypothetical monopolist of Custom Chassis, Custom Pumpers, Custom Aerials, Custom Quints, Wildland Fire Apparatuses, and Fire Apparatuses

sold to customers in the United States could profitably impose a small but significant and non-transitory increase in price of each of these products.

### C. Barriers to Entry and Expansion in the Relevant Markets

177. According to Pierce, "[f]ire truck manufacturing and the planning required to build a fire truck is a detail-oriented, step-by-step process that requires precision, ingenuity and a great deal of expertise." Among the barriers to entry for manufacturing Fire Apparatuses (including Custom Pumpers, Custom Aerials, Custom Quints, and Wildland Fire Apparatuses) and Custom Chassis are:

- The need for tens or hundreds of thousands of square feet of design, manufacturing, and assembly space;
- Metal fabrication, including laser technology, turret punches, and water jets to cut sheet metal;
- Framing of the metal pieces according to the engineering specifications using a combination of machinery including press brakes and panel bending equipment;
- State-of-the-art welding facilities, technology, and experienced and certified professionals;
- Facilities, technology, and trained professionals for sanding, chemical cleaning and treatment, surface priming, and painting/coating the apparatus, including electrodeposition coating and galvanization;
- Facilities, equipment, technology, and professionals for building the apparatus, including welding, plumbing, assembly, and electrical work. According to Pierce, "one of the most complex and intricate assemblies is the pumphouse—the heart of the truck's water flow system. This highly option-driven build requires a blend of welding, plumbing, assembly and electrical work, making it one of the most technically demanding aspects of fire truck manufacturing."

- Manufacturing of the Custom Chassis and components, "including the sub-assemblies within the frame rails, wheels and axles, engine and transmission, and the cab."
- Final assembly and interior finishing, including mounting the painted body and water tank on the chassis, connecting the electrical wiring and plumbing systems, and installing any aerial devices;
- Stringent testing and calibration;
- Third-party inspection by an NFPA-certified inspector;
- Skilled personnel that have experience in building Fire Apparatus and manufacturing Custom Chassis.

178. The standards governing Fire Apparatuses and Custom Chassis are an additional barrier to entry. As mentioned, the NFPA, an organization tasked with composing and disseminating fire safety standards governing everything from quints to fire extinguishers, has published thousands of standards concerning Fire Apparatuses. These standards govern Custom Chassis, vehicle components, crew area, equipment mounting, the pumps, water tanks, foam proportioning systems, air systems, and many other aspects of each apparatus. The standards also specify weight allowances, engine requirements, and pump requirements. While the NFPA standards are not themselves regulations, in practice fire departments are compelled to adhere to them and purchase apparatuses in compliance with them for safety and liability reasons. And as mentioned above, many states and localities have incorporated the NFPA standards into laws and regulations, making them requirements.

179. A further barrier to entry is the substantial network of dealers that the well-established apparatus suppliers have amassed over decades. For example, Pierce boasts of "960+ dedicated service professionals," "100 service centers with 24/7/365 response," "In-house custom refurbishment," "150+ mobile service unit fleet comes to you," "Extensive factory inventory," "Online parts catalog," and

Complaint - 62

"Certified maintenance & operational training." And, as noted above, Oshkosh considers the dealer network a valuable intangible asset with a 40-year lifespan.

180. A further barrier to entry is the steep qualifications required to be included as an authorized supplier to co-ops like Sourcewell and HGAC. As described above, to be considered as a supplier by most public entities who have competitive bid process requirements, a supplier must be a part of a co-op. Otherwise, the purchasing public entity must satisfy lengthy competitive bidding requirements, which it can skip by using a co-op because of its upfront requirements for suppliers to qualify as sellers to participating public entities.

181. For example, Sourcewell's 2021 RFP #113021, which requested proposals for Firefighting Apparatuses and Fire Service Vehicles, included the following specifications:

- Proposers are expected to offer "a wide array of equipment, products, or services."
- "Safety Requirements. All items proposed must comply with current applicable safety or regulatory standards or codes."
- "Deviations from industry standards must be identified with an explanation of how the equipment, products, and services will provide equivalent function, coverage, performance, and/or related services."
- "All equipment, products, supplies, and services must be covered by a warranty that is the industry standard or better."
- Scoring of proposers' submissions was based on, *inter alia*, "Financial Viability and Marketplace Success," "Service Marketing Plan," "Warranty Depth," and "Breadth of Offered Equipment, Products, or Services."

182. Brand loyalty and other factors favoring incumbent apparatus manufacturers present additional barriers to entry. In announcing the Spartan acquisition, REV Group's then-CEO acknowledged that "fire apparatus tends to be

Complaint - 63

an incumbent business" and that "[f]ire chiefs and fire houses are typically brand loyal, which creates a legacy brand that can be difficult to displace." Fire departments also tend to procure apparatuses from a single source, which allows for consistency of customization across the fleet, facilitating training and maintenance. In addition, many Fire departments strive to have a uniform fleet that allows for greater interoperability and flexibility in deploying department firefighting personnel. Moreover, apparatus demand is driven by a replacement cycle, in which apparatuses are replaced from anywhere between 5 and 30 years. Potential entrants therefore have limited opportunities to win business, and fire departments have significant sunk costs that make it difficult to switch between builders.

183. The barriers to entry into Custom Chassis manufacturing are also high. Manufacturing Custom Chassis for Fire Apparatus is a complicated, cost- and regulatory-intensive process that presents unique engineering and financial challenges.

184. The NFPA standards lay out detailed requirements for a Custom Chassis' structural integrity (including verification of crash resistance, rollover protection, and related stability metrics), weight distribution, and axle load limits—all of which require sophisticated engineering and testing capabilities.

185. Custom Chassis manufacturing also requires a high level of capital investment and fixed costs. The size and required durability of a Custom Chassis means manufacturers need to invest in heavy manufacturing infrastructure for processes that can include large-scale metal fabrication, welding, and painting operations. Potential entrants into this market cannot (like, for example, Pierce does) rely on Oshkosh's financial might to furnish it with a 1.5 million square foot facility, and investments in robotics and precision automation technology, to manufacture their Custom Chassis. Additionally, because custom chassis are produced in much lower volumes than commercial chassis—and, by definition,

involve unique and customized components or designs such as increased seating or a higher roof—is capital intensive and the per-unit manufacturing cost beyond any initial investment is also higher than it is for commercial chassis.

186. Another barrier to entry into the market to manufacture and supply Custom Chassis is the vertical integration of several Custom Chassis manufacturers into Fire Apparatus building, including the Oshkosh Defendants and REV Group Defendants. The Custom Apparatus building businesses of these vertically integrated companies are captive to their Custom Chassis manufacturing businesses, i.e., Pierce does not purchase Custom Chassis from competing manufacturers; it exclusively uses Pierce-manufactured Custom Chassis. This effectively forecloses would-be Custom Chassis manufacturing market entrants from all of the demand represented by these vertically integrated Custom Apparatus builders which dominate the relevant markets.

187. In practice the only demand from Custom Apparatus builders available to would-be Custom Chassis manufacturing market entrants is demand from Custom Apparatus builders that do not also manufacture their own Custom Chassis. This constitutes a significant economic barrier to entry in the Custom Chassis manufacturing market, depriving would-be entrants of economies of scale. For example, Pierce knows it can count on the significant demand for its Pierce and Maxi-Métal specialized apparatuses to supply sufficient demand for the Custom Chassis it manufactures for these apparatuses to overcome the high costs of operating in both markets. Indeed, several years before Oshkosh purchased Maxi-Métal, it entered into an exclusive agreement with Maxi-Métal in which Maxi-Métal agreed to sole-source the Pierce Saber Custom Chassis for its MaxiSaber Custom Pumper.

### III. Defendants Have Engaged in Anticompetitive Schemes to Harm Competition in the Relevant Fire Apparatus and Custom Chassis Markets

188. No one is better positioned to appreciate fire departments' need for Fire Apparatuses and the profits to be had from eliminating competition in the relevant markets than the REV Group Defendants, AIP Defendants, Oshkosh Defendants, and BME Defendants.

189. Where the family-owned apparatus and chassis manufacturing businesses of the 20th century saw the opportunity to build quality lifesaving products at reasonable prices to serve the public safety, the REV Group Defendants and AIP Defendants, and the Oshkosh Defendants and BME Defendants, saw a profit opportunity. Through a series of acquisitions of apparatus and chassis manufacturers—Oshkosh's purchase of Maxi-Métal and acquisition of an ownership interest in the BME Defendants, and AIP and REV Group's acquisitions of E-ONE, KME, Ferrara, and Spartan Emergency Response—Defendants have consolidated the relevant markets and ballooned their respective market shares, enabling them to dictate the terms on which apparatuses and chassis are purchased and extract hundreds of millions of dollars in value from public entities and taxpayers. Defendants' acquisitions have destroyed any meaningful competition in these markets.

#### A. The REV Group Defendants and AIP Defendants' Anticompetitive Conduct

190. In 2008, at the onset of the Great Recession, the AIP Defendants, led by their private equity firm American Industrial Partners, acquired E-ONE, entering a competitive and relatively deconcentrated market that was ripe for consolidation. Fire trucks are a necessity, and demand from municipalities and other public entities is inelastic. When the availability of a well-maintained fire

truck can be the difference between life and death, the local fire department will continue to buy fire trucks—even after a private equity firm jacks up the price.

191. In 2014, the AIP Defendants hired Tim Sullivan as CEO of Allied Specialty Vehicles—REV Group's former name—and instructed Sullivan that his top priorities should include "[i]dentifying and assisting with the purchase and integration of targeted acquisitions and preparing the Company for a highly successful public exit." By 2015, the AIP Defendants and the newly rebranded REV Group were accelerating their "roll-up" scheme to consolidate large manufacturers of Custom Apparatuses and Custom Chassis across the United States. On top of its prior ownership of E-ONE, AIP and REV Group added KME in 2016 and Ferrara in 2017, taking two vertically integrated manufacturers of Custom Apparatuses and Custom Chassis off the map.

192. In 2020, the AIP Defendants and REV Group swallowed several historic brands at once with their Spartan Emergency Response acquisition, adding Spartan as well as Smeal, Ladder Tower, DTM, and UST to REV Group's brand portfolio. At the time, Spartan Motors was the third-largest Custom Apparatus manufacturer after Pierce and REV Group. And while E-ONE, KME, Ferrara, and Spartan Motors all manufactured Custom Chassis for use in their Custom Apparatuses, Spartan Motors had a unique and well-established business as the supplier—usually the sole supplier—of Custom Chassis to approximately 40 smaller apparatus builders. In its announcement of the acquisition, REV Group boasted that "[t]he newly combined business will further solidify [REV Group's Fire & Emergency segment] as a top-two North American fire apparatus manufacturer."

193. After its 2020 Spartan acquisition, in September 2021, REV Group announced the closure of the two KME plants in Nesquehoning, Pennsylvania, and Roanoke, Virginia, consolidating the production of Custom Chassis and Custom Pumpers, Custom Aerials, and Custom Quints under the KME and Ferrara brands

at the Holden, Louisiana plant. The plant closures affected nearly 400 workers in Nesquehoning and an unknown number in Roanoke. KME delivered the last apparatus produced in its Nesquehoning plant to the fire department of Lehighton, Pennsylvania, in April 2022.

194. The consolidation of KME's and Ferrara's manufacturing facilities into a single plant in Holden, Louisiana directly resulted in worse terms for customers. Employees were now tasked with building two different apparatus lines instead of focusing on a single platform. This manufacturing consolidation thus not only slowed production but also negatively impacted overall build quality. Additionally, the consolidation combined existing production backlogs into one facility, significantly extending build times.

195. Indeed, while REV Group was closing the factories it acquired, the backlog of orders to its clients grew. As of REV Group's 2025 Q3 earnings call, the backlog of undelivered orders in its fire and emergency vehicles was more than two years. From 2020 to 2024, REV Group's backlog for its segment that includes fire and emergency vehicles grew from $965 million to a massive $4.18 billion in undelivered orders.

196. Rather than viewing these unfulfilled customer expectations as a problem, REV Group boasted that the backlog benefitted the company by making its demand more predictable and rendering the company an "attractive investment opportunity." REV Group even promoted executive Mike Virnig to President of REV Group because the backlog for Fire Apparatuses had tripled under his tenure in a prior role.

197. Beyond the closure of the KME plants in early 2022, the AIP and REV Group Defendants' roll-up scheme has allowed the REV Group Defendants to continue to reduce their operating footprint, their manufacturing capacity, and the repair and replacement services offered to REV Group Fire Apparatus customers. One fire chief in Benton, Arkansas reported that, while he used to be able to call a

local contact and get parts for his Ferrara trucks within a day, it took more than 10 months to get needed parts from REV Group in 2024.

198. Through their roll-up scheme, the AIP and REV Group Defendants also inflated their profits by reducing choice for customers. Before being acquired by REV Group, the acquired companies had developed distinct products and identities that could satisfy fire departments' diverse needs. Those needs are determined by a community's setting, the density of the communities they serve, the mix of residential, commercial, and industrial buildings in those communities, water availability, the topography of the region, the climate, fire department staffing levels, station distribution, available budgets, the preferences of the firefighters themselves, and the type of equipment the apparatus will carry.

199. Today, in its investor presentations, REV Group recognizes and touts the value proposition of its differentiated brands. But behind the scenes, the REV Group Defendants have eliminated variations to inflate their margins. For instance, after the 2020 Spartan acquisition, the REV Group Defendants (according to REV Group) "developed an integrated product roadmap across our Fire Group brands to enable platforming and simplification" which would "lead to the standardization of subassemblies[.]" The REV Group Defendants work internally to "converge designs" of the brands they have consolidated. Because the REV Group Defendants know that their customers value the historical differences in the brands they consolidated and maintain brand loyalty, they focus the standardization of their apparatuses on "items not visible" to their customers.

200. One REV Group presentation explains this approach in the context of apparatus cab doors. The REV Group Defendants' "convergence" program involves standardizing the internal mechanisms and parts for apparatus cab doors, while maintaining only the superficial appearance of the doors. Other aspects of its apparatuses "not visible" to the customer that the REV Group Defendants have identified to "converge designs" of their brands include engine cooling systems,

cab electronics, steering systems, engine emissions systems, axles, brakes, and occupant protection systems like safety belts and airbags.

201. Similarly, manufacturers REV Group and the AIP Defendants acquired used to rely on a broad array of Custom Chassis across their apparatuses. But since acquiring Spartan, REV Group has embarked on a program to transition its Fire Apparatuses onto the same lines of Spartan Custom Chassis, despite customers' preference for diversification of options and not to be dependent on a single line of chassis. Building its apparatuses on a limited range of Spartan Custom Chassis has allowed the REV Group and AIP Defendants to capture more of the margin for each truck.

202. On top of ordering the closures of the KME plants in September 2021, REV Group's Board of Directors approved a share repurchase program the same month. Having authorized the repurchase of up to $150 million of outstanding stock, REV Group bought back $70 million worth of its own stock by the end of fiscal year 2022. In June 2023 and December 2024, despite growing production bottlenecks which warranted additional capital investment to increase manufacturing capacity, the Board repeatedly approved new share repurchase programs, authorizing buybacks worth up to $175 million and $250 million respectively. REV Group has bought back at least $126.1 million worth of shares under these programs, bringing the total spent on buybacks (which effectively line the pockets of its shareholders, including the AIP Defendants and the very shareholder board members who approved the buybacks) since 2021 to nearly $200 million.

203. REV Group has used other mechanisms to extract the fruits of Defendants' unlawful conduct for the AIP Defendants and their investors since executing their roll-up scheme and completing their plant closures in 2022. In fiscal years 2022, 2023, and 2024, REV Group paid a quarterly cash dividend of $0.05 per share of common stock instead of investing capital in manufacturing

capacity. And in fiscal year 2024, REV Group paid a special cash dividend of $3.00 per share, worth $178.1 million alone and $192 million in combination with the quarterly dividends. Nearly $80 million of it went to American Industrial Partners.

204. All in all, REV Group has rewarded investors in its output-suppressing, price-increasing roll-up scheme with at least $400 million worth of share buybacks and dividends. In March 2024, after collecting their spoils, the AIP Defendants completed two public offerings of their shares in REV Group and exited their position as a beneficial owner and equity sponsor of the firm. These cash-outs equate very simply to hard dollars illegally squeezed out of fire departments, public entities, and taxpayers, and converted to spoils for the AIP Defendants and REV Group shareholders, which they continue to unlawfully hold.

205. In October 2025, Terex Corp., a global equipment conglomerate based in Connecticut with annual revenues of $5.13 billion, agreed to acquire a majority stake in REV Group for $425 million. The transaction closed on February 2, 2026, and the REV Group Defendants became wholly owned subsidiaries of Terex Corp.

### B. The Oshkosh Defendants' and BME Defendants' Anticompetitive Conduct

206. The Oshkosh Defendants have more recently gotten into the consolidation and roll-up business. Over the last four or five years, Oshkosh acquired Maxi-Métal, and the Oshkosh Defendants acquired an ownership interest in the BME Defendants.

207. Maxi-Métal is a leading designer of Custom Fire Apparatuses based in Quebec, Canada. Founded in 1983, Maxi-Métal employs over 90 workers in Canada and is a dominant player in the Canadian fire apparatus markets, claiming to hold a 55% market share in Quebec and approximately 20% across all of Canada.

208. Maxi-Métal has pioneered custom Fire Apparatus features such as the Paragon™ narrow pumphouse configuration, which it claims is the "first reduced-footprint pumphouse design in North America using a split-shaft pump," and the Titan™ equipment rack system which it claims can carry up to 750 pounds of equipment on the same side of an apparatus. Maxi-Métal manufactures pumpers, pumper-tankers, tanker-tenders, and rescue-command vehicles built on either commercial chassis or Custom Chassis.

209. In 2015, in search of a partner to grow its Canadian business as well as recognizing Maxi-Métal's apparatus design and manufacturing capabilities generally, Pierce entered into an exclusive partnership with Maxi-Métal. Under the deal, Maxi-Métal began offering Custom Pumpers and Custom Pumper-tanker configurations built on Pierce's Custom Chassis, and Pierce's network of Canadian dealers would then market and sell these vehicles on Maxi-Métal's behalf to fire departments throughout Canada.

210. In 2017, buoyed by its success and growth in the Canadian market, Maxi-Métal expanded its sales to the United States. In particular, in February 2018, Maxi-Métal announced that two lines of trucks, ETM pumpers and PIC tankers built on commercial chassis, would be available in the United States under the Contender by Maxi-Métal product name and through the Pierce dealer network. Since this initial entry, Maxi-Métal has supplied Fire Apparatuses to customers across the United States, including Colorado, Utah, Wyoming, New York, Michigan, and West Virginia.

211. Oshkosh and Pierce watched carefully as Maxi-Métal made inroads into their incumbent U.S. markets. They knew firsthand the strength and quality of Maxi-Métal's products and the competitive threat its entry into the U.S. markets posed. So, they acquired it. On June 13, 2022, Oshkosh announced it had completed its acquisition of Maxi-Métal.

212. Oshkosh was already familiar with deploying consolidation tactics, having made a similar move nine months earlier. On September 16, 2021, Oshkosh subsidiary Pierce and Boise Mobile announced that Pierce had "completed the purchase of an ownership interest in Boise Mobile" to "facilitate greater collaboration between Pierce and BME [Boise Mobile] within the wildland market" in which they were previously competing. Boise Mobile announced this combination as a "Strategic Alliance/Partnership" between these two competitors. The Oshkosh and BME Defendants accomplished this combination by forming a new subsidiary of Boise Mobile, BME Fire Trucks, of which Boise Mobile owns 75% and Pierce owns 25%.

213. As a result of this combination, Boise Mobile moved from a factory-direct model to a dealer distribution model in which the BME Defendants' trucks are now exclusively available only through Pierce dealers. Through this acquisition and combination, Oshkosh and Pierce effectively eliminated a significant independent and close head-to-head competitor in Wildland Fire Apparatus production and secured Pierce as the exclusive distributor of the BME Defendants' Fire Apparatuses.

214. As a result of the Oshkosh Defendants' acquisitions and combinations with competitors, they have been able to keep supply constrained and consistently raise prices, without repercussion.

215. For example, in the summer of 2017, CAL FIRE awarded Boise Mobile a $10 million contract for over 30 new Type 3 BME Wildland Fire Apparatuses, for a per-unit price of roughly $290,000. Numerous municipalities across the country "tagged onto" this contract, leading to its doubling in size to 60 units by August of 2018. In September 2022—after the Oshkosh Defendants' combination with the BME Defendants and the elimination of the threat of head-to-head competition—the BME Defendants imposed a price increase on the units remaining for delivery of over $30,000 per vehicle, pretextually blaming the after-

the-fact price hike on supply constraint issues. The BME Defendants gave CAL FIRE and the tag-on municipalities two options: pay the increased price or cancel the contract. Some municipalities investigated whether it would be more economical to cancel the contract and order the units from a different manufacturer. When Pierce was asked to provide a quote by one municipality, it quoted *over $500,000* per unit and a longer delivery timeline than the existing contract with its competitor-turned-partner the BME Defendants. Then, in 2024, the BME Defendants imposed an *additional* approximately $20,000 price increase. Fire departments across California were left with no choice but to accept the substantial price increases, each forking over tens to hundreds of thousands of tax dollars to the BME Defendants and, indirectly, the Oshkosh Defendants.

216. In fact, according to Oshkosh, the backlog for its business segment including Fire Apparatuses increased to $6.32 billion by the end of 2024 "due to strong demand for municipal fire apparatus and price increases," and the unit backlog specifically for Fire Apparatuses increased 3.8% year-over-year. Oshkosh highlighted to investors in its 2024 Annual Report that "[c]ustomer orders in backlog for delivery in 2025 were booked at significantly higher prices." It is no wonder that, by 2024, the Oshkosh Defendants were still celebrating that "[o]ur backlog for Pierce trucks continues to grow"—a backlog that enables Oshkosh and Pierce, now combined with Maxi-Métal and the BME Defendants, to force endless price increases on fire departments while deliveries get delayed.

217. Over time, Pierce has also consolidated many dealers, eliminating dealers near many customers and forcing them to travel farther for Pierce-authorized service.

### C. *Defendants' Anticompetitive Schemes Have Substantially Lessened and May Substantially Lessen Competition or Tend to Create a Monopoly in the Relevant Markets*

218. There is overwhelming evidence that Defendants' acquisition schemes have enabled them to acquire market dominance and to use that power to produce substantial anticompetitive effects. Defendants' acquisitions substantially increased their market shares and concentration levels in the relevant markets—thus raising a presumption that the acquisitions may substantially lessen competition or tend to create monopolies. They also enabled Defendants to eliminate head-to-head competition with the acquired firms; increased the risk of coordination in the relevant markets; foreclosed competition and discouraged entry in the market for Custom Chassis; gave the REV Group Defendants the power to raise rivals' costs and neutralize price competition in the markets for Custom Pumpers, Custom Aerials, and Custom Quints by controlling the price and availability of Custom Chassis; entrenched Defendants' dominant positions in the relevant markets; and in the case of Oshkosh's acquisition of Maxi-Métal, eliminated an entrant in the U.S. Custom Pumpers market. The anticompetitive impact of the REV Group Defendants and AIP Defendants' scheme has been amplified and reinforced by the Oshkosh Defendants' and BME Defendants' conduct, and vice versa. Defendants have driven a significant industry trend towards horizontal and vertical consolidation.

219. There is also abundant direct evidence that Defendants are able to exercise the market power they unlawfully acquired through their schemes—namely, evidence that Defendants have increased prices substantially and reduced supply well beyond what inflation, COVID supply shortages, and other factors can explain; consolidated their dealers, thus forcing customers to travel farther for authorized service; reduced quality, variety, and customer choice; and otherwise systematically worsened terms. Defendants are able to produce and supply less and

Case 2:26-cv-00635-WCG    Filed 04/01/26    Page 75 of 140    Document 1

at inferior quality, and charge more on a sustained basis, precisely because their anticompetitive schemes have eliminated meaningful competitive constraints. Each set of Defendants' price increases and other worsening of terms have also directly enabled each *other* competing Fire Apparatus builder to raise *its* prices and worsen *its* terms to customers—an umbrella price effect market-wide for which each Defendant is responsible.

### 1. Defendants' Anticompetitive Conduct Has Enabled Them to Control High Shares of Concentrated Markets

220. In each of the relevant markets, Defendants' anticompetitive conduct has substantially increased concentration levels and Defendants' shares of these markets.

221. The Department of Justice and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger.

222. The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2,000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2,000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

223. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically, a merger is presumptively illegal when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points. Supreme Court precedent also

establishes that a merger that results in a combined firm with market share of 30% or more is also presumptively unlawful.

### a. U.S. Markets for Custom Pumpers, Custom Aerials, and Custom Quints

224. Based on publicly available information, in the U.S. Custom Pumpers market the REV Group Defendants hold more than a 25% share. The Oshkosh Defendants hold more than a 40% share of this market.

225. Based on publicly available information, in the U.S. Custom Aerials and Custom Quints markets the REV Group Defendants hold an approximately 20% share. The Oshkosh Defendants hold more than a 55% share of those markets.

226. These shares are consistent with Defendants' public reporting of their positions in the relevant markets. For example, in its response to Sourcewell's request for bids to supply Fire Apparatuses to Sourcewell purchasing cooperative participants in 2025-2026, including the County of San Diego Plaintiffs, REV Group reported that its "US market share for the solutions that [it was] proposing" is "25.86%." These "solutions" included Custom Pumpers, commercial pumpers, initial attacks, single-axle tenders, tandem-axle tenders, light rescues, heavy rescues, full response pumpers, and industrial foam delivery systems. Many of these apparatuses are outside the relevant U.S. markets for Custom Pumpers, Custom Aerials, and Custom Quints and are built by a larger set of manufacturers than the small set of important suppliers in the Custom Pumper, Aerial, and Quint markets.

227. Oshkosh's acquisition of Maxi-Métal resulted in a combined market share of Pierce and Maxi-Métal exceeding 40% in the Custom Pumpers market and was therefore presumptively illegal.

228. Based on publicly available information, the U.S. Custom Pumpers market is highly concentrated, with HHIs exceeding 2,300. The AIP Defendants and REV Group's acquisitions of E-ONE, Ferrara, KME, and Spartan Emergency

Response cumulatively resulted in an increase in HHI far exceeding 100 in the already highly concentrated U.S. Custom Pumpers market and were therefore presumptively unlawful.

229. Based on publicly available information, the U.S. Custom Aerials and Custom Quints markets are highly concentrated, with HHIs exceeding 3,000. The AIP Defendants and REV Group's acquisitions of E-ONE, Ferrara, KME, and Spartan Emergency Response cumulatively resulted in an increase in HHI far exceeding 100 in the already highly concentrated U.S. Custom Aerials and Custom Quints markets and therefore were presumptively unlawful.

### b. U.S. Market for Custom Chassis

230. Based on publicly available information, in the U.S. Custom Chassis market the REV Group Defendants hold an approximately 30% share. The Oshkosh Defendants hold more than a 50% share of this market.

231. Based on publicly available information, the U.S. Custom Chassis market is highly concentrated, with HHIs exceeding 3,500. The AIP Defendants and REV Group's acquisitions of E-ONE, Ferrara, KME, and Spartan Emergency Response resulted in a cumulative increase in HHI far exceeding 100 in the already highly concentrated U.S. Custom Chassis market and therefore were presumptively unlawful. The AIP Defendants and REV Group's acquisition of Spartan Emergency Response alone was presumptively unlawful, as it resulted in a cumulative increase in HHI far exceeding 100 in the already highly concentrated U.S. Custom Chassis market.

### c. U.S. Market for Wildland Fire Apparatuses

232. Based on publicly available information, in the U.S. Wildland Fire Apparatuses Market the combined share of the Oshkosh Defendants and BME Defendants far exceeds 30%. For example, the Oshkosh Defendants and BME Defendants manufacture approximately 60% of all Type 3 Wildland Fire

Apparatuses in the United States, one of the two most widely used Wildland Fire Apparatuses.

233. Based on publicly available information, the U.S. Wildland Fire Apparatus market was already concentrated before the Oshkosh Defendants' combination with the BME Defendants. After these two competitors combined, the post-transaction HHI exceeded 2,000, with an HHI delta of more than 100 from pre- to post-transaction.

### d. U.S. Market for Fire Apparatuses

234. Based on public reporting, in the broader relevant market to manufacture and sell Fire Apparatuses to purchasers in the United States, the REV Group Defendants hold a share in excess of 30%. Indeed, in an April 2024 interview, the President of REV Group's Specialty Vehicles Division Mike Virnig stated, "We're about 40% of the fire truck business." Based on public reporting, the combined share of the Oshkosh Defendants and BME Defendants far exceeds 30%; and the combined share of the Oshkosh Defendants and Maxi-Métal far exceeds 30%.

235. Based on publicly available information, the U.S. Fire Apparatus market was already concentrated before the AIP Defendants and REV Group's acquisitions of E-ONE, Ferrara, KME, and Spartan Emergency Response. After these four acquisitions, the post-transaction HHI in the U.S. Fire Apparatus market exceeded 1,800, with an HHI delta of more than 100 from before the first acquisition to after the most recent.

### 2. *Defendants' Unlawful Acquisitions Have Substantially Lessened and May Substantially Lessen Competition or Tend to Create a Monopoly*

236. Beyond enabling the REV Group Defendants, Oshkosh Defendants, and BME Defendants to control high shares of concentrated markets, Defendants'

acquisition schemes tend to and have substantially lessened competition in several other ways.

237.   ***First***, the acquisitions eliminated substantial competition between firms previously competing head-to-head to offer the same products. For example, E-ONE, Ferrara, KME, and Spartan each used to independently produce their own Custom Chassis for their own Custom Apparatuses. Fire departments historically would routinely put E-ONE, Ferrara, KME, and Spartan in competition with each other to win awards for Custom Pumpers, Custom Aerials, or Custom Quints. With REV Group and the AIP Defendants' consolidation of these four competitors into a single firm, that direct, head-to-head competition is gone.

238.   Similarly, the Oshkosh Defendants' acquisition of an ownership interest in the BME Defendants eliminated head-to-head competition to produce, market, and sell Type 3 Wildland Fire Apparatuses. Indeed, Pierce's BX$^{TM}$ Wildland apparatus is virtually indistinguishable from the BME Defendants' Model 34 Type 3 Engine. Both apparatuses feature around 500-gallon tanks, 500 gallon-per-minute pumps, pump-and-roll capabilities, full-depth storage, low-profile designs, and 4x4 off-road performance for harsh terrain on International chassis for wildland-urban interface operations. Figure 11 below shows a side-by-side comparison of these two apparatuses, with the BME Model 34 on the left and the Pierce BX$^{TM}$ Wildland on the right:

 

**Figure 11**

Complaint - 80

239. The elimination of head-to-head competition between the Oshkosh and BME Defendants is all the more concerning because Pierce is the most dominant Fire Apparatus builder in the United States and the BME Defendants are the most prominent specialized manufacturer of Wildland Fire Apparatuses in the country. These two significant formerly independent competitors are now "collaborating" on these very apparatuses. Indeed, in a Q&A about the combination, Boise Mobile explained, "What does this mean? There is not a simple answer, but at [Boise Mobile] the changes mean the following: Collaboration and R&D between two companies . . . to design and develop state-of-the-art wildland chassis, including custom Type 3 engines." Competition in R&D is just as important, if not more so, than price and quality competition. These former competitors have combined to eliminate all forms of substantial competition between them. And as described above, the elimination of this head-to-head competition has already resulted in price increases to fire departments.

240. *Second*, the acquisitions eliminated numerous independent sources of Fire Apparatus manufacturing capacity. Before their absorption into REV Group, firms such as KME, Spartan, and Ferrara were vertically integrated builders with the inherent capacity to expand their own Custom Chassis production to meet market demand. And before their absorption into Oshkosh, firms like Maxi-Métal had the ability and incentive to expand Fire Apparatus output to meet increased demand, keeping prices at competitive levels. Had these firms remained independent, they would have served as a vital check against any attempt by the REV Group Defendants, Oshkosh Defendants, or BME Defendants to artificially limit supply and create a backlog. Instead, following the acquisitions, the REV Group Defendants systematically shuttered assembly sites and consolidated production, eliminating the potential excess capacity that former competitors in the market could have wielded to expand production and meet demand. By removing these multiple independent sources of Custom Chassis and Fire Apparatuses, the

REV Group Defendants, AIP Defendants, Oshkosh Defendants, and BME Defendants were able to create a bottleneck that affected the entire market, forcing the remaining market participants to increase their lead times and allowing them to raise prices to meet pent-up demand.

241. ***Third***, the acquisitions and combinations executed by the REV Group Defendants, AIP Defendants, Oshkosh Defendants, and BME Defendants have transformed the once-fragmented relevant markets into highly concentrated oligopolies, meaningfully increasing the risk of coordination among the remaining firms. By absorbing independent maverick manufacturers and builders and consolidating the supply of critical inputs like Custom Chassis, these Defendants have achieved a combined control of an estimated at least 80% of the Custom Chassis market, 65-75% of the supply of Custom Pumpers, Aerials, and Quints, over 50% of the Wildland Fire Apparatus market, and over 55% of the overall Fire Apparatus market. This structural shift has created a market environment where the remaining few participants can and do more easily observe, anticipate, and mirror each other's competitive moves.

242. The fact that many market participants entirely rely on the REV Group Defendants for the supply of Custom Chassis further exacerbates the risk of tacit or explicit coordination in the market. The REV Group Defendants now have the ability to increase the price of a critical input—representing over 25% of the total cost of an apparatus—across several competing apparatus builders, and are constantly fed confidential information from rival builders who are also their Custom Chassis customers regarding delivery dates, prices, proprietary innovations, client lists, and backlogs. Similarly, the Oshkosh Defendants and BME Defendants' "collaboration" through BME Fire Trucks enables them to share information on pricing, product plans and features, and output, further enabling explicit and tacit collusion. With such a tightly concentrated market, Defendants' smaller competitors can (and have) mirrored Defendants' price increases and

worsening of terms, making it impossible for fire departments to obtain competitive prices. Defendants are responsible for the higher prices and other worsening of terms that fire departments and public entities like the County of San Diego Plaintiffs have incurred, regardless of whether they purchased one of Defendants' apparatuses or a rival's.

243. *Fourth*, Oshkosh's acquisition of Maxi-Métal has foreclosed competition and discouraged new entrants into the Custom Chassis market, who now have no reasonable possibility of relying on a large and growing apparatus builder like Maxi-Métal to purchase their Custom Chassis. Given the control exercised by the REV Group Defendants and Pierce in the Custom Chassis market, and the general trend towards consolidation and integration, realistically a potential Custom Chassis market entrant would need to establish itself as both a Custom Apparatus builder and Custom Chassis manufacturer to viably enter the latter market—a formidable, arguably impossible, task.

244. *Fifth*, REV Group and the AIP Defendants' acquisition of Spartan Emergency Response gave the REV Group Defendants the power to raise rivals' costs and neutralize price competition in the markets for Custom Pumpers, Custom Aerials, and Custom Quints by controlling the price and availability of Custom Chassis. Their cumulative additional acquisitions of KME, Ferrara, and E-ONE further constitute a vertical "roll-up" designed to limit access to products that any REV Group Defendant's rival would require to be able to compete.

245. REV Group and the AIP Defendants' acquisition of Spartan Emergency Response removed the industry's premier independent manufacturer of Custom Chassis—a critical input for Custom Apparatuses that has no reasonable substitutes. For decades, Spartan served as the essential backbone for dozens of small, family-owned apparatus builders. By seizing control of this critical third party-supplier of Custom Chassis, REV Group gained the power to dictate the survival of its own rivals. With only two other companies, HME and Sutphen,

providing a trivial number of Custom Chassis to small, independent builders, the REV Group Defendants have their non-vertically integrated apparatus competitors in a vice. Now, the mere threat of the Spartan ER Entities delaying Custom Chassis deliveries or increasing input costs—or "squeezing" margins—is sufficient to ensure that no small apparatus rival dares to compete aggressively on price.

246. REV Group and the AIP Defendants' acquisitions of E-ONE, KME, and Ferrara reinforced the anticompetitive effects of the Spartan acquisition. While E-ONE, KME, and Ferrara have not historically supplied their Custom Chassis to competing apparatus builders, prior to their acquisitions by REV Group, they were poised to and capable of doing so had Spartan increased its Custom Chassis prices to other apparatus builders or restricted supply. Now, all four manufacturers are controlled by REV Group, which can restrict Spartan Custom Chassis supply and indiscriminately raise prices with no risk that these three well-established, formerly independent Custom Chassis manufacturers will swoop in and start competing to supply Custom Chassis to other apparatus builders.

247. By consolidating the primary manufacturers of Custom Chassis, REV Group and the AIP Defendants have fundamentally altered the structure of the related Custom Apparatus markets, creating a vertical bottleneck. This allows the REV Group Defendants to dictate the supply of a highly significant competitive input by raising costs or restricting supply to independent Custom Apparatus builders. The effect is a systemic weakening of competition, as newly dependent builders—once nimble rivals—are now forced to operate at the whim of a dominant competitor, thereby reducing the overall output and quality of Fire Apparatuses available to the public, while prices relentlessly increase.

248. Beyond the threat of actual foreclosure, REV Group and the AIP Defendants' acquisition of Spartan Emergency Response has provided the REV Group Defendants with an unlawful information advantage that facilitates coordination and undermines the incentive of independent builders to compete.

Because independent builders must purchase their Custom Chassis from the Spartan ER Entities, they are forced to disclose competitively sensitive information, including proprietary build specifications, customer-specific configurations, and delivery timelines. Access to this data allows the REV Group Defendants to peer into their rivals' playbooks, enabling them to anticipate their rivals' bids, mirror their pricing, and either mimic or preempt their innovations.

249. This information exchange undermines the independence of rivals required for a competitive market. It discourages independent apparatus builders from investing in unique features or aggressive pricing strategies, knowing that the REV Group Defendants can use their dual role as supplier and competitor to neutralize any competitive advantage the rival might seek to gain.

250. The overarching trend toward vertical integration, spearheaded by REV Group and the AIP Defendants, has created a market environment that deters both potential entrants and existing rivals from investing in their businesses or increasing output in the Custom Apparatus markets. The mere threat of limited or discriminatory access to Spartan Custom Chassis serves as a potentially powerful deterrent against long-term capital expenditure by independent firms.

251. *Sixth*, by acquiring Maxi-Métal, Oshkosh preemptively eliminated a well-capitalized entrant into the U.S. Custom Pumpers market who would be capable of undercutting the pricing power of the domestic incumbents and of introducing substantial additional competition into that market. Prior to its acquisition by Oshkosh, Maxi-Métal functioned as a significant competitive force in North America, earning a dominant position in the Canadian market and actively beginning to execute on an ambitious expansion into the United States. Oshkosh's acquisition of Maxi-Métal effectively removed a well-resourced competitor who had begun to make inroads in the United States market for Custom Pumpers.

252. Oshkosh's acquisition of Maxi-Métal eliminated any probability that Maxi-Métal would meaningfully enter the U.S. market through alternative means,

as well as the likely and actual beneficial influence on competition that resulted from Maxi-Métal's position at the time of the acquisition, an incipient competitor, poised on the edge of the U.S. market.

253. It is reasonably probable that Maxi-Métal would have meaningfully entered the U.S. Custom Pumpers market through alternative means absent the acquisition. In fact, Maxi-Métal had since 2018 taken steps to expand its presence in the United States, including a major facility expansion in response to what Maxi-Métal framed as an increased "dealer demand . . . across Canada and the USA for [Maxi-Métal's] fire division's products." Although Maxi-Métal built its Custom Apparatuses on Pierce Custom Chassis, at the time of the acquisition it was expanding its market share in the United States at the expense of its competitors, including Pierce. But for the acquisition, further increased competition from Maxi-Métal was reasonably probable. For several years the Fire Apparatus market in United States has experienced significant backlogs and dramatic price hikes. As a large and well-resourced competitor on the edge of the market, there is a reasonable probability that Maxi-Métal would have exploited these backlogs and price hikes to grow its share and deconcentrate the highly concentrated Custom Pumpers market, which would also have had other procompetitive effects such as lowering customer prices and accelerating delivery times.

254. Now owned by Oshkosh and controlled by Oshkosh and its subsidiary Pierce, Maxi-Métal is no longer actively seeking to compete with Pierce and win over market share, meaningfully increase its share in the U.S. market generally, or inject competition into these highly consolidated markets. The acquisition gave Oshkosh and Pierce comfort that they would not face any new price pressure or further competition from Maxi-Métal.

255. *Seventh*, the Oshkosh Defendants' acquisition of a partial ownership interest in the BME Defendants, and these competitors' "collaboration" on

Wildland Fire Apparatus products that they previously competed to produce and market to customers, enables them to coordinate instead of competing head-to-head. With their ownership interest in the BME Defendants, the Oshkosh Defendants can influence how the BME Defendants price their apparatuses, invest in R&D, plan for expansions or reductions in capacity, market their products, and ultimately pursue competitive initiatives.

256. The Oshkosh Defendants' ownership interest in the BME Defendants also substantially diminishes the Oshkosh Defendants' incentive to compete with the BME Defendants. For example, instead of continuing to market and invest in Pierce's BX$^{TM}$ Wildland, the Oshkosh Defendants can let that product fall by the wayside, eliminating price competition with the BME Defendants' Type 3 Model 34 while directly profiting from the higher BME prices through their ownership stake in Boise Mobile. This combination of competitors also facilitates the sharing of competitively sensitive information, which both the BME Defendants and the Oshkosh Defendants can use to tacitly or explicitly collude.

257. *Eighth*, REV Group and the AIP Defendants' acquisitions of E-ONE, Ferrara, Spartan, and KME, and the Oshkosh Defendants' acquisitions of Maxi-Métal and an interest in the BME Defendants, have entrenched and extended Defendants' dominance in the relevant markets. For example, Oshkosh subsidiary Pierce was already the leading Fire Apparatus builder in the United States before its acquisitions. With its purchase of Maxi-Métal, Oshkosh protected Pierce's dominance by warding off a Canadian competitor starting to make inroads into the U.S. markets, and extended Oshkosh and Pierce's dominance in the Custom Pumpers market to the Custom Chassis market by capturing an important source of demand for Custom Chassis. Similarly, with their combination with the BME Defendants, Oshkosh and Pierce substantially bolstered Pierce's position in the relevant Fire Apparatus markets not only by eliminating competition with the BME Defendants but also by effectively absorbing an entire portfolio of Wildland Fire

Apparatus. This combination essentially allowed the industry goliath Peirce to control the smaller, but already dominant, BME Defendants, thereby further lessening competition in the relevant Fire Apparatus markets by raising entry barriers even further and by effectively dissuading smaller firms from aggressively competing. Defendants' acquisitions have substantially increased barriers to entry in the relevant Fire Apparatus markets by creating even more firmly rooted market leaders with which to compete.

258. *Finally*, Defendants' respective acquisitions have not taken place in isolation. They reflect an industry trend towards consolidation, in which Custom Apparatus manufacturers roll up rival (or would-be rival) Custom Apparatus manufacturers, and an industry trend towards vertical integration, in which Custom Chassis manufacturers acquire leading apparatus designers and builders, thereby eliminating those companies as potential buyers of competing Custom Chassis. Indeed, as early as 2016, Spartan Motors was characterizing the relevant markets as "an increasingly consolidating industry." Each of the unlawful acquisitions identified herein are all the more anticompetitive because they have taken place in the context of this broader industry trend toward consolidation. For example, the competitive impact of Oshkosh's acquisition of Maxi-Métal, and Oshkosh and Pierce's acquisition of an ownership interest in the BME Defendants, can only be understood against the backdrop of the prior decade of the REV Group and AIP Defendants' consolidation scheme.

### 3. There Is Direct Evidence that Defendants Have Used Their Unlawfully Acquired Dominance to Harm Customers

259. There is ample direct evidence of how Defendants' unlawfully acquired market power has resulted in the imposition of supra-competitive prices and worsened terms, without any negative repercussions for Defendants.

260. The REV Group Defendants, Oshkosh Defendants, and BME Defendants have been able to impose massive price increases—and have enabled

competing manufacturers to follow suit with similar price increases—for apparatuses and parts on public entities and fire departments, including the County of San Diego Plaintiffs, as a result of their acquisitions. Only a small fraction of the price increases experienced by the County of San Diego Plaintiffs can be attributed to supply shocks and pandemic-related price increases.

261. Defendants' consolidation of the relevant markets has also allowed them to degrade product quality and led to a significant reduction in customer choice, as they have leveraged their market dominance to prioritize manufacturing standardization over responsiveness to the judgment and requests of local fire departments, their specific operational demands, and their budgetary constraints.

262. In competitive markets, Fire Apparatus builders once competed by accommodating highly specific operational requirements—such as lowered floors to maximize storage space for heavy rescue gear or narrowed body profiles essential for navigating tight urban streets with high traffic density. However, following the consolidation of builders and manufactures, Defendants have actively pushed back on these essential customizations, citing multi-year backlogs as a pretext to force fire departments toward "stock" or "standardized" models. By effectively eliminating the ability of fire departments to obtain these customization options, Defendants have suppressed innovation driven by customer demand and forced fire departments to accept equipment that is not tailored to their specific localities.

263. Beyond the loss of customization, the lack of competitive pressure has led to a measurable decline in the physical durability and reliability of the apparatuses produced by Defendants. Custom Apparatus units delivered by the REV Group and Oshkosh Defendants are increasingly plagued by chronic malfunctions, for example with complex electronic control systems and multiplex wiring or air tank welding, which often require weeks of repair before a vehicle can even enter its initial service.

264. Furthermore, the Custom Chassis currently produced by the REV Group and Oshkosh Defendants in the consolidated Custom Chassis market lack the structural rigidity of heavy-duty Custom Chassis produced prior to COVID-19, leading to premature wear and compromised handling and performance. These quality failures have shifted the financial burden onto municipalities, as trucks now spend an unacceptable amount of time in maintenance garages rather than in service protecting local communities. The resulting increase in downtime and the escalating cost of proprietary parts and labor constitute another hidden price increase, whereby these dominant firms extract higher margins while delivering a product that is objectively inferior, less reliable, and more expensive to maintain over its lifecycle, which in turn necessitate expanding fire department fleets.

265. Hand in hand with the price increases and quality degradation, Defendants have imposed severe supply restrictions in the form of plant closures and astronomical delivery delays. The REV Group Defendants affirmatively shut down production at multiple plants, and all Defendants, far from expanding supply to meet market demand, have celebrated ever-increasing backlogs. For example, in one investor presentation, REV Group touted a backlog of over two and a half years for specialty vehicles like fire trucks as providing "Production Visibility" and making REV Group a "unique and attractive investment opportunity." Similarly, when promoting executive Mike Virnig to President of REV Group in 2022, REV Group's CEO boasted: "Under his tenure, our backlog for fire apparatus has tripled, growing by over $1 billion." In 2018, REV Group's then-CEO Tim Sullivan told investors: "We like backlog, we love backlog."

266. In a competitive market, customers would have turned to competitors in the face of Defendants' higher prices and worsening of terms. But with Defendants having cornered such a large portion of the relevant markets, there were effectively no reasonable alternatives to which to turn. The County of San

Diego Plaintiffs and other public entities had, and continue to have, no choice but to get in line—a backlog line that has grown and grown, with no end in sight.

267. Certain Defendants have recently sunk to a particularly galling new low, telling certain localities suffering from extended delivery delays that they can skip to the front of the line—essentially leaving every other customer with a backlogged truck facing even longer delays—by paying the difference between the price they contracted to pay at the time of the original award, and *today's* unprecedentedly high prevailing prices for Fire Apparatuses. In other words, redolent of a protection racket, with their consolidation schemes complete and their market power firmly established, Defendants are not only charging supra-competitive prices for new purchase orders; they are reaching back in time and retroactively imposing those same prices on purchase orders from years ago.

268. Further evidence that Defendants can and do profitably worsen terms—i.e., evidence of their market power resulting from their unlawful acquisitions—is their ability to consolidate and shut down dealers virtually without consequence. For example, Oshkosh subsidiary Pierce has consolidated the dealers already in its network to limit geographic overlap between dealers, thereby limiting the options for its customers.

269. The REV Group Defendants have also consolidated their dealers. After REV Group acquired Spartan Emergency Response in 2020, the REV Group brands were sold through approximately 100 dealers across the United States. As Mike Virnig, currently President of REV Group, has publicly related, incumbent dealers, for example, expressed a "firestorm" of resistance to the prospect of integrating new dealers as part of the Spartan acquisition. REV Group was more than responsive to incumbent dealers' concerns about preserving their respective fiefdoms. As of today, the number of affiliated dealers has fallen precipitously, with REV Group brands only sold through approximately 62 dealers across the United States.

270. These dealer consolidations are price increases by another name. Fire apparatuses require constant maintenance, both to meet safety standards and to keep up with rapid advances in Fire Apparatus technology. Accordingly, most fire departments need local support personnel. In a competitive market, the existence of viable competitors with large local dealer networks would force Defendants to keep local options available to customers and have those dealers compete to provide better service or lower prices for repair and maintenance. But Defendants have largely consolidated themselves with those competitors, allowing themselves to reduce local services and offerings without losing customers. This is yet further evidence of the market power Defendants have amassed through their roll-up schemes.

271. To add insult to injury, Defendants have falsely blamed the COVID-19 pandemic—for example, in REV Group's words, "global supply chain bottlenecks and inflationary conditions"—for the entirety of their astronomical price increases and delivery delays. In other words, Defendants have effectively covered up the full explanation for their price increases and worsening of terms, which overwhelmingly resulted from their exploitation of the market power they deliberately amassed through unlawful acquisitions and other conduct. As late as May 2025—over *five years* after the pandemic started—Oshkosh was still using the pandemic as a false cover for its price increases, stating that "[g]lobal supply challenges, unprecedented demand, and significant inflation since the pandemic started in 2020 have resulted in extended delivery times and increased prices."

272. In large part due to Defendants' repeated false insistence that their price increases, delivery delays, and other worsening of terms were entirely attributable to pandemic-induced inflation and supply shocks, it is only recently that their customers like the County of San Diego Plaintiffs have been able to connect the dots between their historical acquisitions and the crushing rent extraction by which they have been victimized for years. For example, it was only

Complaint - 92

less than one year ago that, on the heels of the Palisades and Eaton wildfire disasters, Matt Stoller's newsletter *Big* and then the *New York Times* published exposés, suggesting Defendants' consolidation schemes were to blame for straining fire departments' budgets across the country.[5] It took this public scrutiny to reveal how Defendants' narrative—that macroeconomic factors were to blame—obscured the real causes of Plaintiffs' harm.

### REPLACEMENT PARTS FOR PIERCE FIRE APPARATUSES

273. Oshkosh and Pierce's anticompetitive conduct is not limited to unlawful consolidations. Oshkosh and Pierce go a step further, and force customers to use Pierce proprietary replacement parts for their Pierce Fire Apparatuses, thereby harming their customers and competition.

274. Oshkosh and Pierce are able to stifle competition by enlisting their parts dealers to deal exclusively in proprietary Pierce parts, and by forcing customers to purchase these proprietary Pierce parts at inflated prices when they would otherwise have the choice of competitive alternatives. Through this scheme, Oshkosh and Pierce further milk fire departments and public entities of critical dollars, especially in the later years of the life of an apparatus on which they already made a killing.

275. Pierce operates an extensive replacement parts and service business, which it calls Pierce Aftermarket. Pierce maintains a separate Pierce Aftermarket website which provides resources, manuals, diagrams, training, and technical support to customers. Pierce relies on its parent company Oshkosh's technological and financial strength in sourcing materials for its parts. In addition, Pierce maintains a dedicated parts facility of over 100,000 square feet in Appleton, Wisconsin, which Pierce claims stocks in excess of $14 million in parts and

---

[5] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html.

employs a staff dedicated solely to the distribution and shipment of service and replacement parts. Pierce sells hundreds of thousands of dollars of replacement parts for Pierce Fire Apparatuses each year.

276. Pierce generally sells replacement parts to customers through third-party dealers. This set of third-party dealers is different from and substantially more numerous than the small, exclusive set of dealers who are anointed by Pierce to serve as a conduit between Pierce and the customer for purposes of Fire Apparatus (as opposed to replacement parts) sales.

277. For any given part on a Pierce Fire Apparatus (e.g., a roll-up door, a power steering gear), there is a distinct replacement part that can function as a replacement for the original part, and that is not interchangeable with parts that perform different functions or that are manufactured to fit Fire Apparatuses other than Pierce Fire Apparatuses.

278. For example, a replacement air conditioning compressor that is compatible with a Pierce Fire Apparatus and can replace the air conditioning compressor installed in the original apparatus is a distinct product that is not interchangeable with, for example, a seat belt and is not interchangeable with an air conditioning compressor that is not compatible with a Pierce Fire Apparatus.

279. In fact, many replacement parts for Pierce Fire Apparatuses are designed deliberately to be integrated into Fire Apparatuses manufactured by Pierce or built on Pierce Custom chassis. Pierce itself explains that it manufactures "[p]roprietary parts" that play "a specific role . . . on [its] fire apparatus."

280. The market for each replacement part for use in a Pierce Fire Apparatus to replace the original part installed in the apparatus is a distinct relevant product market. For example, the market for replacement air conditioning compressors to replace the original air conditioning compressor installed in a Pierce Fire Apparatus is a relevant product market. A hypothetical monopolist in each of these replacement parts markets could profitably impose a small but

significant and non-transitory increase in price ("SSNIP") or other worsening of terms. This is because, for example, if this hypothetical monopolist imposed a SSNIP in replacement air conditioning compressors, customers would accept the increased price and would not substitute away to other replacement parts such as a roll-up door or to air conditioning compressors that are not compatible with a Pierce Fire Apparatus.

281. Oshkosh and Pierce manufacture, and Pierce sells, several lines of replacement parts for its Fire Apparatuses in the United States, earning an estimated hundreds of millions of dollars in revenues per year on these replacement parts sales.

282. These parts include "genuine" or Pierce original equipment manufacturer parts ("OEM Parts"), which are manufactured to the same specifications as parts used in new equipment. OEM Parts generally are incompatible with fire apparatuses that are not manufactured by Pierce.

283. Pierce also sells Pierce-branded replacement parts that are manufactured for Pierce by third-party manufacturers ("White-Label Parts"). White-Label Parts are compatible with Pierce Fire Apparatuses as well as other vehicles. Pierce OEM Parts and White-Label Parts comprise Pierce proprietary parts as referenced herein.

284. For example, Horton manufactures branded fan clutches that can be used in many different manufacturers' apparatuses including Pierce Fire Apparatuses. But Pierce contracts with Horton to manufacture virtually identical white-label fan clutches specifically for Pierce, which are assigned a Pierce serial number and sold by Pierce.

285. Other examples of White-Label Parts that are made by third-party manufacturers but are assigned a Pierce serial number and sold by Pierce include IMMI seatbelts and supplemental restraint systems, Innovative Controls gauges, Sheppard power steering gears, and Trident Emergency Products hose parts.

Because Pierce White-Label Parts have a Pierce serial number and not the serial number of the equivalent or near-equivalent part manufactured and sold by the same third-party manufacturer under that manufacturer's brand name, fire departments cannot easily identify and source the lower-priced, non-Pierce-branded equivalent part from a non-Pierce dealer—even if they know the identity of the manufacturer.

286. Replacement parts for Pierce Fire Apparatuses are purchased by a distinct set of customers, namely localities and fire departments that have Pierce Fire Apparatuses. When a part in a customer's Pierce Fire Apparatus breaks, the customer is stuck with the options available that are compatible with and will function in the customer's Pierce Fire Apparatus. Replacement parts for Pierce Fire Apparatuses are distributed by a limited set of specialized vendors: Pierce-authorized dealers and parts suppliers.

287. For the same reasons identified with respect to the relevant markets for the various Fire Apparatuses and Custom Chassis, *see supra*, Section II.B, the relevant geographic market for each replacement part for Pierce Fire Apparatuses is the United States.

288. The U.S. markets for replacement parts for Pierce Fire Apparatuses are defined by many of the same high barriers to entry present in the various Fire Apparatus and the Custom Chassis markets. Replacement parts for Pierce Fire Apparatuses are generally extremely specialized and often complicated products requiring specialized manufacturing facilities, equipment, processes, and know-how across multiple disciplines including chemical, electrical, industrial, and mechanical engineering, as well as skilled and experienced labor. Accumulating such resources requires significant upfront investment. Suppliers in this market must also invest substantial resources to understand and test whether the part will work in a Pierce Fire Apparatus. Particularly for OEM Parts designed and manufactured by Pierce itself, the addressable market is limited to Pierce Fire

Apparatuses, which deters investment. Relatedly, loyalty to the Pierce brand and Pierce dealers itself presents a barrier to entry and reinforces information barriers.

289. Pierce is a monopolist in numerous U.S. markets for replacement parts for Pierce Fire Apparatuses, including, for example, fan clutches, seatbelts and supplemental restraint systems, gauges, power steering gears, hose parts, door handles, and window regulators for Pierce Fire Apparatuses. In each of the enumerated markets and many more, Pierce is the sole supplier with 100% share or holds a monopoly market share well in excess of 70%.

290. Pierce's monopoly position in these relevant markets for replacement parts for Pierce Fire Apparatuses in the United States is no accident. Through a variety of acts and arrangements with Pierce-authorized parts suppliers, Oshkosh and Pierce have monopolized and otherwise taken control over these markets, excluded competitors, ensured that customers have no choice but to purchase parts from Pierce (through the dealers with which Pierce has coordinated to implement its scheme), and enabled themselves to reap extraordinary profits. This comes as no surprise as Pierce's parent company, Oshkosh, has made clear that "aftermarket parts and service provide a robust growth opportunity while offering stability throughout business cycles."

291. First, Pierce requires its parts dealers/suppliers to agree to sell only Pierce-branded replacement parts for Pierce Fire Apparatuses to customers, and not to sell non-Pierce branded equivalent parts. For example, if a customer approaches a Pierce-authorized parts supplier about acquiring a Horton fan clutch for their Pierce Fire Apparatus, the supplier is required by agreement with Pierce to refuse to sell the Horton-branded fan clutch to the customer—even if it would technically fit and function in the apparatus—and offer the customer only the Pierce-branded White-Label Part instead.

292. Second, Pierce deliberately manufactures its Fire Apparatuses with proprietary OEM Parts that are designed to be incompatible with third-party

replacement parts, and when they break, they can only be replaced with a Pierce-branded part manufactured by the Oshkosh Defendants (because they are the only manufacturers of these OEM Parts). These parts make up the majority of the parts in Pierce Fire Apparatuses.

293. For example, although third-party pump panel gauges are theoretically fully compatible with Pierce Fire Apparatuses, Pierce deliberately manufacturers its own pump panel gauges in slightly larger diameters than industry standard, which requires boring larger holes into the body of the truck. Due to this deliberate design decision, fire departments are unable to replace Pierce's pump panel gauges with third-party pump panel gauges when those fail and are instead forced to buy the OEM Part. The proprietary design of the Pierce pump panel, as well as other OEM Parts, does not serve any function but to limit or prevent the interoperability of third-party parts.

294. As one commentator with industry experience noted: "One of the problems with Pierce is they have purposely altered or manufactured cab and chassis parts that are proprietary and can only be purchased from Pierce. . . . [L]et's say you need a replacement power steering pump . . . . [M]any other fire apparatus manufacturers use common parts that are available through local auto parts or diesel truck repair dealers. Often the Pierce part is only available from Pierce. And the local Pierce dealers aren't going to stock a huge inventory of parts. So [the apparatus] goes to the dealer and sits for 2-3 weeks waiting [for] a part to be shipped from Wisconsin."

295. Indeed, over time, Oshkosh and Pierce have increasingly designed Pierce Fire Apparatuses to require the integration of these proprietary OEM Parts. For these OEM Parts, the only option when they break is for the customer to purchase a replacement part from Pierce.

296. Third, Pierce forces its customers to purchase Pierce replacement parts through provisions in its various product warranties provided to customers as

part of the purchase agreement for an apparatus. For example, both Pierce's "material and workmanship" warranty and "custom chassis frame" warranty may become void if the customer repairs or replaces a part without written approval from the Pierce Customer Service Department. Similarly, the installation of any non-Pierce branded replacement part by a customer without Pierce's authorization permits Pierce to void the warranty. Pierce and its authorized parts suppliers work together to enforce these restraints. These provisions allow Pierce to insist that its customers use Pierce-branded parts for repairs, or else void their warranties.

297. Adhering to the terms of their warranties is important for purchasers of Pierce Fire Apparatuses, because the purchasers require Pierce's warranty-related services to maintain and repair the vehicles. The purchasers pay for Pierce's warranties when they acquire Fire Apparatuses. Without these warranties, repairs would result in unpredictable and sometimes prohibitively expensive costs.

298. The exclusive dealing agreements and understandings that Pierce imposes on Pierce-authorized replacement parts dealers/suppliers are effectively long-term in nature and mandatory. This is because Pierce-authorized replacement parts dealers/suppliers depend on healthy sales of replacement parts for Pierce Fire Apparatuses—the highest-selling brand of Fire Apparatuses in the United States—for their revenue streams. If they do not agree to Pierce's terms, they will lose access to those crucial revenue streams.

299. Pierce's exclusionary restraints substantially foreclose competition in the U.S. markets for replacement parts for Pierce Fire Apparatuses in which Pierce imposes these restraints. Indeed, Pierce's restraints have excluded all competition in each affected market, with Pierce as the monopolist supplier.

300. Pierce Fire Apparatuses represent a substantial (as alleged, conservatively over 30%) share of all Fire Apparatuses owned nationwide. This enormous source of demand for replacement parts for these Pierce Fire Apparatuses is closed off to would-be replacement parts competitors. Even if

competitors can sell replacement parts for non-Pierce Fire Apparatuses, Pierce's restraints deprive them of the scale needed to efficiently compete and thus represent a substantial barrier to entry into the manufacture and sale of replacement parts generally.

301. Pierce Fire Apparatus customers are harmed as result of this foreclosure and substantial lessening of competition. The exceptionally long operational lifespan of a Fire Apparatus—which frequently extends to 20 years or more—enables Pierce to use customers' reliance on Pierce-branded replacement parts to extract long-term profits. Because these vehicles represent a multi-decade commitment for high-volume municipalities, the initial purchase price is only the first stage of a much longer revenue cycle. By ensuring that, over the lifecycle of those trucks, customers will largely only be able to purchase replacement parts from Pierce, Pierce locks in decades of supra-competitive profits on what was already an overpriced apparatus.

302. Fire departments find it impossible to predict the true life-cycle costs of their Pierce Fire Apparatuses. This lack of predictability stems in part from extreme delivery backlogs, which currently span two to five years from order to delivery. Indeed, years into the waiting period, Pierce may unilaterally change critical specifications to add new Pierce-proprietary parts—such as the type of doors or suspension bearings—which impact the true life-cycle costs of the apparatus slated for delivery. Faced with these mid-production shifts, departments have no meaningful recourse: They must either accept the apparatus updated with Pierce-proprietary parts, or cancel the order and face another years-long wait with a different builder, with no guarantee that this problem will not repeat itself. Pierce knows that no customer will cancel a $500,000 or $1,000,000 order which takes years to fulfill if it unilaterally decides to incorporate proprietary Pierce seatbelt pretensioners, even if, for example, they cost three times more than the third-party seatbelt pretensioners which were originally specified by the customer.

303. This cycle effectively traps customers into buying Pierce Fire Apparatuses without having a clear understanding of the costs or parts involved at the time of bidding. This lock-in is further exacerbated by the fact that many fire departments often intentionally maintain large fleets of Fire Apparatuses from a single brand in order to facilitate fleet interoperability. These fire departments cannot easily switch to a different builder even when faced with the ever-increasing use and cost of Pierce proprietary parts in new Fire Apparatuses that are added to their fleets.

304. Those costs are enormous. Pierce-branded replacement parts cost customers routinely two, three, and even sometimes four or more times what they would pay for an equivalent part manufactured by a third-party supplier. For example, R•O•M manufactures White-Label roll-up doors for Pierce. When the door breaks, the customer is forced to purchase the White-Label Part (manufactured for Pierce by R•O•M) for two to three times what they would pay if Pierce and the Pierce-authorized parts supplier allowed the customer to purchase the part from R•O•M (either directly or through the dealer) without the Pierce serial number.

305. Another example is Pierce's TAK-4 Independent Suspension System, which Pierce explains is "proprietary" and "[c]ustom built for Pierce chassis." Pierce reengineered TAK-4, which had originally been engineered by Oshkosh for military and aircraft rescue vehicles, for its Fire Apparatuses, and now offers a range of TAK-4 custom products in its vehicles. However, because TAK-4 is a proprietary OEM Part, when it breaks, Pierce and its authorized suppliers give customers no choice but to purchase a replacement from Pierce. The same limitations apply to Pierce's proprietary cab switches, steering wheel airbags, Mux computer system and modules, seat back covers with stitched logos, door panels, compartment doors, and window operators. This pricing dynamic is replicated across a broad range of replacement parts for Pierce Fire Apparatuses.

306. Pierce's anticompetitive parts scheme and exclusionary arrangements with its authorized parts dealers result not only in customers paying supra-competitive prices for replacement parts they could get for a fraction of the cost absent Pierce's restraints, but also in customers being forced to use inferior parts. Customers forced to use Pierce parts have reported a multitude of defects, including, among others, corrosion and failure of electrical wiring due to moisture intrusion, malfunctioning data link steel wire connectors, air tanks that are not airtight, battery boxes with welds at the seams breaking, and screws with inconsistent thread diameters that tend to pull out and strip. A decade ago, Pierce was known for the quality of its products; today, the Oshkosh Defendants appear to be focusing on cutting costs, allowing their quality to decline.

307. In summary, the Oshkosh Defendants use their stranglehold over the supply of replacement parts for Pierce Fire Apparatuses and their customers' dependency on those parts to significantly inflate their long-term profit margins on the Fire Apparatuses they sell. Unlike other Fire Apparatuses where parts might be interchangeable or available through third-party wholesalers, Pierce's custom-engineered architecture and exclusive arrangements with authorized parts dealers prevent customers from benefiting from price competition and innovation on parts. This lack of replacement parts alternatives leaves fire departments with zero leverage; they are forced to accept Pierce's pricing and quality for replacement parts. And it is only a matter of time before the Oshkosh Defendants employ the same tactics with respect to replacement parts for Maxi-Métal and the BME Defendants' apparatuses.

308. Ultimately, Pierce's restraints transform a one-time apparatus sale into a sustained, monopolistic revenue stream, as the restraints Pierce imposes act as a barrier to entry for any competing replacement parts manufacturer. For the taxpayer and the locality, this results in a significantly higher total cost of ownership.

309. Pierce's establishment and maintenance of a monopoly over Pierce replacement parts has led to inflated pricing and diminished availability of repair and replacement parts for owners of Pierce Fire Apparatuses. Pierce's exclusion of third-party parts manufacturers through exclusive arrangements with dealers and other restrictive conduct forces departments into a state of dependency on Pierce, while simultaneously stifling industry-wide innovation. By preventing third-party manufacturers from developing compatible, lower-price, potentially superior components, Pierce effectively halts the price competition and technological evolution that would exist in a competitive market.

**DEFENDANTS HAVE USED THEIR UNLAWFULLY ACQUIRED DOMINANCE TO OVERCHARGE FIRE DEPARTMENTS, DELAY DELIVERIES, AND OTHERWISE WORSEN TERMS, INJURING AND THREATENING TO FURTHER INJURE PLAINTIFFS**

310. Defendants' consolidation and other unlawful conduct in the relevant markets have had disastrous effects on the competitiveness of these markets and the ability of fire departments across the country, including the County of San Diego Plaintiffs, to obtain Fire Apparatuses and parts at fair, competitive prices and on the timelines required to serve their communities. Defendants' conduct drastically reduced options and increased the prices for Fire Apparatuses to the County of San Diego Plaintiffs.

311. For example, in April 2023, the County of San Diego Plaintiffs contracted to purchase a KME rear-mount Custom Aerial directly from KME Fire Apparatus, agreeing to pay approximately $1,778,000. This price includes hundreds of thousands of dollars in anticompetitive overcharges. The County of San Diego Plaintiffs similarly paid overcharges as a result of Defendants' anticompetitive roll-ups on other Fire Apparatuses, including Custom Pumper-tankers it purchased directly from Ferrara, Wildland Fire Apparatuses it purchased directly from E-ONE, and Mobile Water Supply Apparatuses, urban search and

rescue trucks, and a fuel truck supplied by other Fire Apparatus manufacturers in the time period from 2022 to the present. On all of these purchases, the County of San Diego Plaintiffs paid an unlawful overcharge as a result of Defendants' anticompetitive conduct, which enabled both Defendants and their smaller competitors to raise prices and otherwise worsen terms.

312. On top of these apparatuses, in October 2020, the County of San Diego Plaintiffs entered into a contract directly with Ferrara to purchase one or more Custom Pumpers at pre-set prices over the following five years. The County of San Diego Plaintiffs initially made two purchases under the contract that same year. Then, when the County of San Diego Plaintiffs began talks with Ferrara to purchase additional units in 2022—after REV Group had consolidated its KME and Ferrara production facilities in a single plant in Holden, Louisiana—Ferrara sent them a letter in which it insisted that, "[a]t this time, we simply cannot accept any Type 1 orders at the current contract price."

313. When the County of San Diego Plaintiffs refused to accept Ferrara's attempted cost increase, Ferrara nevertheless accomplished the price hikes in other ways. Specifically, Ferrara effectively moved the County of San Diego Plaintiffs to the back of the line, repeatedly delaying deliveries of trucks, delivering unfinished trucks that required nearly a year of warranty work before the County of San Diego Plaintiffs could put them in operation, and delivering substantially lower-quality apparatuses. These were price increases by another name—to the tune of hundreds of thousands of dollars per apparatus ordered.

314. Indeed, during a mid-inspection trip to the Ferrara production plant, when the County of San Diego Plaintiffs' apparatus team brought up the astronomical delivery delays they were experiencing at the hands of Ferrara with the former President of REV Group Mike Virnig, Mr. Virnig stated that REV Group (Ferrara) would not commit to delivery timelines for the County of San Diego Plaintiffs because the pricing was five years old. This was an express

admission that delivery delays and price increases are two sides of the same coin, causing substantial damage to the County of San Diego Plaintiffs. This damage resulted directly from Defendants' unlawful acquisition schemes, including the REV Group Defendants' consolidation of formerly independent manufacturers and shutdown of production facilities, enabling them to force price increases and other worsening of terms on customers with nowhere else to turn.

315. The County of San Diego Plaintiffs have suffered substantial delivery delays outside of the Ferrara Custom Pumpers mentioned above. For example, whereas Ferrara quoted only 180 days to deliver the urban search and rescue truck that the County of San Diego Plaintiffs purchased in September 2018, the estimate that the County of San Diego Plaintiffs received for three urban search and rescue trucks that they ordered in June 2024 was nearly four times that: 650 to 700 days— or almost two years. A given Fire Apparatus's useful life is anywhere from 10-20 years. Because each year of delay represents tens if not hundreds of thousands of dollars in damage, the County of San Diego Plaintiffs have incurred millions of dollars in damages—on top of original apparatus purchase overcharges—in the form of delivery delays as a result of Defendants' anticompetitive conduct. These damages continue to the present day. The County has also paid overcharges on Pierce replacement parts as a result of Pierce's anticompetitive conduct.

316. Not only has Defendants' anticompetitive conduct directly injured the County of San Diego Plaintiffs, but it has also harmed the People of the State of California at large. When the County of San Diego Plaintiffs and other public entities in California pay hundreds of thousands to millions of dollars in overcharges; when they cannot get the parts they need for their apparatuses in a timely and cost-effective manner, their citizens pay the price, in the form of higher taxes and budget shifts that force state and local entities to reduce funding to other services.

317. Plaintiffs' injuries will continue indefinitely into the future unless the Court enjoins Defendants' unlawful conduct orders the unwinding of each of their unlawful combinations. There is no substitute for Custom Fire Apparatuses, Wildland Fire Apparatuses, or Fire Apparatuses at large, and there is no substitute for replacement parts for Pierce Fire Apparatuses. The fire departments of public entities like the County of San Diego Plaintiffs must have these lifesaving vehicles and replacement parts to protect the People and the public safety, yet departments currently have no choice but to continue to make purchases in the relevant markets to source this critical equipment. Absent Court intervention, fire departments will continue to pay extractive prices—draining localities' health and safety budgets—and suffer reduced choice, worsened terms, delivery delays, and other harms, which they must endure as they meet their obligations to protect the public safety far into the future. Because no remedy at law can adequately compensate Plaintiffs for this future harm, the Court must stop Defendants' anticompetitive conduct and restore the relevant markets to their deconcentrated, pre-acquisition state.

## VIOLATIONS ALLEGED

## CAUSE OF ACTION ONE

*Violations of Clayton Act § 7, 15 U.S.C. § 18, Against the REV Group Defendants and the AIP Defendants, by the County of San Diego Plaintiffs*

318. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

319. Between 2008 and 2020, the AIP Defendants and REV Group, directly or indirectly, made four horizontal acquisitions in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States, substantially reducing choice and competition in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets. The AIP Defendants controlled, directed, dictated, and encouraged REV Group's

conduct with respect to, and directly and actively participated in, the acquisitions of E-ONE, KME, Ferrara, and Spartan's emergency response unit.

320. The AIP Defendants and REV Group's acquisitions may substantially lessen competition or tend to create a monopoly—indeed, they have already substantially lessened competition and tended to create a monopoly—in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States when considered as a series of acquisitions. The AIP Defendants and REV Group's acquisition of Spartan's emergency response segment on its own may substantially lessen competition or tend to create a monopoly—indeed, it has already substantially lessened competition and tended to create a monopoly—in the Custom Chassis market in the United States.

321. The AIP Defendants and REV Group Defendants cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that their acquisitions were not anticompetitive.

322. The AIP Defendants and REV Group's acquisitions, when considered cumulatively, violated Section 7 of the Clayton Act, 15 U.S.C. § 18. The AIP Defendants and REV Group's acquisition of Spartan's emergency response unit on its own violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

323. As a result of the AIP Defendants and REV Group Defendants' violations of Clayton Act Section 7, and the harm to competition caused by those violations, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the AIP Defendants and the REV Group Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

324. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the AIP Defendants and the REV Group Defendants from their unlawful conduct and continuing and threatened

future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the AIP Defendants and the REV Group Defendants under 15 U.S.C. § 26.

325. The County of San Diego Plaintiffs are also entitled to recover from the AIP Defendants and the REV Group Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**CAUSE OF ACTION TWO**

*Violations of Clayton Act § 7, 15 U.S.C. § 18, Against the Oshkosh Defendants, by the County of San Diego Plaintiffs*

326. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

327. In 2021, Pierce acquired stock or other share capital providing an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile. Oshkosh controlled, directed, dictated, and encouraged Pierce's conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in the BME Defendants. Through their ownership interest, Oshkosh and Pierce can and do actively influence and direct the BME Defendants.

328. In 2022 Oshkosh Corporation acquired Maxi-Métal. Pierce controlled, directed, dictated, and encouraged Oshkosh's conduct with respect to, and directly and actively participated in, the Maxi-Métal acquisition.

329. Oshkosh and Pierce's acquisitions of Maxi-Métal and an ownership interest in the BME Defendants may substantially lessen competition or tend to create a monopoly—indeed, they have already substantially lessened competition and tended to create a monopoly—in the Fire Apparatus market in the United States, when considered as a series of acquisitions or individually. Oshkosh and Pierce's acquisition of Maxi-Métal, considered on its own, may substantially lessen competition or tend to create a monopoly—indeed, it has already substantially

lessened competition and tended to create a monopoly—in the Custom Pumpers and Custom Chassis markets in the United States. Oshkosh and Pierce's' acquisition of an ownership interest in the BME Defendants, on its own, may substantially lessen competition or tend to create a monopoly—indeed, it has already substantially lessened competition or tended to create a monopoly—in the Wildland Fire Apparatus market in the United States.

330.   The Oshkosh Defendants cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that these acquisitions were not anticompetitive.

331.   Oshkosh and Pierce's acquisition of Maxi-Métal and an ownership interest in the BME Defendants, when considered individually or as a series of acquisitions, violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

332.   As a result of the Oshkosh Defendants' violations of Clayton Act Section 7, and the harm to competition caused by those violations, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the Oshkosh Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

333.   The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws.  The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under 15 U.S.C. § 26.

334.   The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## CAUSE OF ACTION THREE

### *Violations of Clayton Act § 7, 15 U.S.C. § 18, Against the BME Defendants, by the County of San Diego Plaintiffs*

335. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

336. In 2021, Pierce acquired stock or other share capital providing an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile. Boise Mobile controlled, directed, dictated, and encouraged BME Fire Trucks' conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in BME Fire Trucks. Through their ownership interest, Oshkosh and Pierce can and do actively influence and direct the BME Defendants.

337. Pierce and Oshkosh's acquisition of an ownership interest in the BME Defendants may substantially lessen competition or tend to create a monopoly—indeed, it has already substantially lessened competition and tended to create a monopoly—in the Wildland Fire Apparatus and Fire Apparatus markets in the United States.

338. The BME Defendants cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that the acquisition was not anticompetitive.

339. Pierce and Oshkosh's acquisition of an ownership interest in the BME Defendants violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

340. As a result of the BME Defendants' violations of Clayton Act Section 7, and the harm to competition caused by those violations, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the BME Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

341. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the BME Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the BME Defendants under 15 U.S.C. § 26.

342. The County of San Diego Plaintiffs are also entitled to recover from the BME Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

### CAUSE OF ACTION FOUR

*Violations of Sherman Act § 2, 15 U.S.C. § 2 – Attempted Monopolization – Against the REV Group Defendants and AIP Defendants, by the County of San Diego Plaintiffs*

343. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

344. Between 2008 and 2020, the AIP Defendants and REV Group, directly or indirectly, made four horizontal acquisitions in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States. The AIP Defendants controlled, directed, dictated, and encouraged REV Group's conduct with respect to, and directly and actively participated in, the acquisitions of E-ONE, KME, Ferrara, and Spartan's emergency response unit.

345. The AIP Defendants and REV Group's acquisitions, considered cumulatively, constituted attempted monopolization of the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The AIP Defendants and REV Group's acquisition of Spartan's emergency response unit on its own constituted attempted monopolization of the Custom Chassis market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

346. The REV Group Defendants possess market power in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high market shares, barriers to entry, and ability to charge supra-competitive prices in the relevant markets.

347. The AIP Defendants and REV Group Defendants' acquisitions set forth above were anticompetitive, and they implemented their anticompetitive acquisition scheme, and otherwise acted, with the specific intent for the REV Group Defendants to monopolize the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States.

348. There is a dangerous probability that the AIP Defendants and REV Group Defendants' anticompetitive acquisition scheme has resulted or will result in the REV Group Defendants' achievement of a monopoly in the Custom Chassis, Custom Pumper, Custom Aerial, Custom Quint, and Fire Apparatus markets in the United States. The AIP Defendants and REV Group Defendants' anticompetitive acquisition scheme has reduced competition and has produced anticompetitive effects in these markets, including County of San Diego's antitrust injury and damages.

349. The AIP Defendants and REV Group Defendants' anticompetitive acquisition scheme had no procompetitive benefit or justification. The anticompetitive effects of their acquisitions outweigh any purported procompetitive justifications.

350. As a result of the AIP Defendants and REV Group Defendants' anticompetitive acquisition scheme, and the harm to competition caused by that conduct, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the AIP Defendants and REV Group Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

351. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the AIP Defendants and the REV Group Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the AIP Defendants and the REV Group Defendants under 15 U.S.C. § 26.

352. The County of San Diego Plaintiffs are also entitled to recover from the AIP Defendants and REV Group Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## CAUSE OF ACTION FIVE

### *Violations of Sherman Act § 2, 15 U.S.C. § 2 – Attempted Monopolization – Against the Oshkosh Defendants, by the County of San Diego Plaintiffs*

353. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

354. In 2021, Pierce acquired stock or other share capital providing an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile, and began engaging in concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. Oshkosh controlled, directed, dictated, and encouraged Pierce's conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in the BME Defendants and this combination with the BME Defendants. Through their ownership interest, Pierce and Oshkosh can and do actively influence and direct the BME Defendants.

355. In 2022 Oshkosh Corporation acquired Maxi-Métal. Pierce controlled, directed, dictated, and encouraged Oshkosh's conduct with respect to, and directly and actively participated in, the Maxi-Métal acquisition.

356. Oshkosh and Pierce's acquisitions of Maxi-Métal and an ownership interest in the BME Defendants and their combination with the BME Defendants constituted attempted monopolization of the Fire Apparatus market in the United States, when considered as a series of acquisitions or individually, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Oshkosh and Pierce's acquisition of Maxi-Métal, considered on its own, constituted attempted monopolization of the Custom Pumpers market in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Oshkosh and Pierce's acquisition of an ownership interest in the BME Defendants and their combination with the BME Defendants, on their own, constituted attempted monopolization of the Wildland Fire Apparatus market in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

357. The Oshkosh Defendants possess market power in the Custom Pumper and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high market shares, barriers to entry, and ability to charge supra-competitive prices in those relevant markets. The BME Defendants possess market power in the Wildland Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. The Oshkosh Defendants combined with the BME Defendants possess market power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high combined market shares, barriers to entry, and ability to charge supra-competitive prices in those relevant markets.

358. The Oshkosh Defendants' acquisitions and combinations set forth above were anticompetitive, and they implemented their anticompetitive acquisitions and combinations, and otherwise acted, with the specific intent to monopolize the Custom Pumper, Wildland Fire Apparatus, and Fire Apparatus markets in the United States.

359. There is a dangerous probability that the Oshkosh Defendants' anticompetitive acquisitions and combinations have resulted or will result in the achievement of a monopoly in the Custom Pumper, Wildland Fire Apparatus, and Fire Apparatus markets in the United States. The Oshkosh Defendants' anticompetitive acquisitions and combinations have reduced competition and have produced anticompetitive effects in these markets, including County of San Diego's antitrust injury and damages.

360. The Oshkosh Defendants' anticompetitive acquisitions and combinations had no procompetitive benefit or justification. The anticompetitive effects of their acquisitions and combinations outweigh any purported procompetitive justifications.

361. As a result of the Oshkosh Defendants' anticompetitive acquisitions and combinations, and the harm to competition caused by that conduct, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the Oshkosh Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

362. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under 15 U.S.C. § 26.

363. The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**CAUSE OF ACTION SIX**

*Violations of Sherman Act § 2, 15 U.S.C. § 2 – Attempted Monopolization –*

*Against the BME Defendants, by the County of San Diego Plaintiffs*

364. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

365. In 2021, Pierce acquired an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% stock or other share capital providing an ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile, and began engaging in anticompetitive concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. Boise Mobile controlled, directed, dictated, and encouraged BME Fire Trucks' conduct with respect to, and directly and actively participated in, this sale of an ownership interest to and combination with Pierce and Oshkosh. Through their ownership interest, Pierce and Oshkosh can and do actively influence and direct the BME Defendants.

366. The BME Defendants' sale of an ownership interest in the BME Defendants to Pierce and Oshkosh and their concerted activity with Pierce and Oshkosh in the Wildland Fire Apparatus and Fire Apparatus markets constituted attempted monopolization of the Wildland Fire Apparatus and Fire Apparatus markets in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

367. The BME Defendants possess market power in the Wildland Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. The Oshkosh Defendants possess market power in the Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. The Oshkosh Defendants combined with the BME

Defendants possess market power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high combined market shares, barriers to entry, and ability to charge supra-competitive prices in those relevant markets.

368. The BME Defendants' sale of an ownership interest to and combination with Pierce and Oshkosh set forth above were anticompetitive, and they engaged in this anticompetitive conduct, and otherwise acted, with the specific intent to monopolize the Wildland Fire Apparatus and Fire Apparatus markets in the United States.

369. There is a dangerous probability that the BME Defendants' sale of an ownership interest to and combination with Pierce and Oshkosh have resulted or will result in the achievement of a monopoly in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. This conduct has reduced competition and has produced anticompetitive effects in the Wildland Fire Apparatus and Fire Apparatus markets, including County of San Diego's antitrust injury and damages.

370. The BME Defendants' sale of an ownership interest to and combination with Pierce and Oshkosh had no procompetitive benefit or justification. The anticompetitive effects of this conduct outweigh any purported procompetitive justifications.

371. As a result of the BME Defendants' sale of an ownership interest to and combination with Pierce and Oshkosh, and the harm to competition caused by that conduct, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from the BME Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

372. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the BME Defendants from their

unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the BME Defendants under 15 U.S.C. § 26.

373. The County of San Diego Plaintiffs are also entitled to recover from the BME Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## CAUSE OF ACTION SEVEN

### *Violations of Sherman Act § 1, 15 U.S.C. § 1 – Combination in Restraint of Trade – Against Pierce and Oshkosh and the BME Defendants, by the County of San Diego Plaintiffs*

374. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 333 as though fully set forth herein.

375. In 2021, Pierce acquired an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% stock or other share capital providing ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile, and began engaging in anticompetitive concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. Oshkosh controlled, directed, dictated, and encouraged Pierce's conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in the BME Defendants and this combination with the BME Defendants. Boise Mobile controlled, directed, dictated, and encouraged BME Fire Trucks' conduct with respect to, and directly and actively participated in, this sale of an ownership interest to and combination with Pierce and Oshkosh.

376. Pierce and Oshkosh's acquisition of an ownership interest in the BME Defendants and their concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, and the BME Defendants' sale of an ownership interest in the BME Defendants to Pierce and

Oshkosh and their concerted activity with Pierce and Oshkosh in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, constitute a contract, combination in the form of trust or otherwise, and conspiracy in restraint of trade in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

377. Pierce, Oshkosh, and the BME Defendants' combination is a nakedly anticompetitive, per se illegal horizontal restraint of trade amongst competitors. Before the combination, Pierce and Oshkosh and the BME Defendants were independently competing with each other in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, including to research, innovate, develop, market, and sell Fire Apparatuses in those markets. The combination has enabled these Defendants to reduce or avoid that competition and instead to coordinate on research, investment, development, marketing, and sale of Fire Apparatuses. An observer with even a rudimentary understanding of economics would conclude that the combination would have anticompetitive effects on customers in the U.S. markets for Wildland Fire Apparatuses and Fire Apparatuses.

378. In the alternative, Pierce, Oshkosh, and the BME Defendants' combination is an unreasonable restraint of trade. The Oshkosh Defendants have market power in the Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. The BME Defendants have market power in the Wildland Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. Pierce and Oshkosh combined with the BME Defendants possess market power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high combined market shares, barriers to entry, and ability to charge supra-competitive prices in those relevant markets. Pierce, Oshkosh, and the BME Defendants'

combination has reduced and harmed competition in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. The combination has no procompetitive benefit or justification. The anticompetitive effects of the combination outweigh any purported procompetitive justifications.

379. As a result of Pierce, Oshkosh, and the BME Defendants' combination, and the harm to competition caused by that conduct, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from Pierce, Oshkosh, and the BME Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

380. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Pierce, Oshkosh, and the BME Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against Pierce, Oshkosh, and the BME Defendants under 15 U.S.C. § 26.

381. The County of San Diego Plaintiffs are also entitled to recover from Pierce, Oshkosh, and the BME Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## CAUSE OF ACTION EIGHT

*Violations of Sherman Act § 2, 15 U.S.C. § 2 – Conspiracy to Monopolize – Against Pierce, Oshkosh, and the BME Defendants, by the County of San Diego Plaintiffs*

382. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

383. Pierce, Oshkosh, and the BME Defendants knowingly entered into an agreement or mutual understanding to obtain or maintain Pierce and Oshkosh's

and/or the BME Defendants' monopoly power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, in violation of Sherman Act Section 2, 15 U.S.C. § 2.

384. Pierce, Oshkosh, and the BME Defendants specifically intended that Pierce and Oshkosh and/or the BME Defendants would obtain or maintain monopoly power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States.

385. Pierce's, Oshkosh's, and the BME Defendants' acts in furtherance of the conspiracy include Pierce's acquisition of an ownership interest in Boise Mobile, through its acquisition of a 25% ownership interest in BME Fire Trucks; Pierce, Oshkosh, and the BME Defendants' announced "partnership" with respect to Wildland Fire Apparatuses; and their ongoing coordination of their activities in the U.S. markets for Fire Apparatuses and Wildland Fire Apparatuses. Oshkosh controlled, directed, dictated, and encouraged Pierce's conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in the BME Defendants and this combination with the BME Defendants. Boise Mobile controlled, directed, dictated, and encouraged BME Fire Trucks' conduct with respect to, and directly and actively participated in, this sale of an ownership interest to and combination with Pierce and Oshkosh.

386. The conspiracy reduced competition and has produced anticompetitive effects in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, including County of San Diego's antitrust injury and damages.

387. As a result of the conspiracy, and the harm to competition caused by the conspiracy, County of San Diego has suffered substantial injuries to its business and property, and are entitled to recover from Pierce, Oshkosh, and the BME Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

388. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Pierce, Oshkosh, and the BME Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against Pierce, Oshkosh, and the BME Defendants under 15 U.S.C. § 26.

389. The County of San Diego Plaintiffs are also entitled to recover from Pierce, Oshkosh, and the BME Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**CAUSE OF ACTION NINE**

***Violations of California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq. –***
***Restraint of Trade – Against Pierce, Oshkosh, and the BME Defendants,***
***by the County of San Diego Plaintiffs***

390. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

391. In 2021, Pierce acquired an ownership interest in Boise Mobile Equipment, Inc., through its acquisition of a 25% stock or other share capital providing ownership interest in BME Fire Trucks LLC, a subsidiary of Boise Mobile, and began engaging in anticompetitive concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. Oshkosh controlled, directed, dictated, and encouraged Pierce's conduct with respect to, and directly and actively participated in, Pierce's acquisition of this ownership interest in the BME Defendants and this combination with the BME Defendants. Boise Mobile controlled, directed, dictated, and encouraged BME Fire Trucks' conduct with respect to, and directly and actively participated in, this sale of an ownership interest to and combination with Pierce and Oshkosh.

Complaint - 122

392. Pierce and Oshkosh's acquisition of an ownership interest in the BME Defendants and their concerted activity with the BME Defendants in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, and the BME Defendants' sale of an ownership interest in the BME Defendants to Pierce and Oshkosh and their concerted activity with Pierce and Oshkosh in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, constitute an unlawful trust.

393. Pierce and Oshkosh and the BME Defendants have combined their capital, skill, and acts for the purpose of creating or carrying out restrictions in the Wildland Fire Apparatus and Fire Apparatus markets in the United States; limiting or reducing the production of and increasing the prices of Fire Apparatuses, including Wildland Fire Apparatuses, in the United States; preventing competition in manufacturing, making, and selling Fire Apparatuses, including Wildland Fire Apparatuses, in the United States; fixing at a standard or figure, whereby their prices to the public and consumers are controlled or established, Fire Apparatuses, including Wildland Fire Apparatuses, in the United States; and making, entering into, and executing and carrying out a contract, obligation, and agreement by which they bound themselves not to sell Fire Apparatuses, including Wildland Fire Apparatuses, below a common standard figure or fixed value in the United States, agreed to keep the prices of Fire Apparatuses, including Wildland Fire Apparatuses, in the United States at a fixed or graduated figure, established or settled the prices of Fire Apparatuses, including Wildland Fire Apparatuses, in the United States between themselves so as directly and indirectly to preclude a free and unrestricted competition among themselves, and agreed to pool, combine, and directly and indirectly unite their respective interests connected with the sale of Fire Apparatuses, including Wildland Fire Apparatuses, in the United States that their prices might in any manner be affected.

394. Following Pierce's acquisition of an ownership interest in BME Fire Trucks LLC, Piere and Oshkosh, on one hand, and the Boise Mobile Defendants, on the other, remained separate entities and maintained separate and independent interests, and yet acted in concert, or combined, including not only by both holding ownership interests in BME Fire Trucks but also by working together and "partnering" with respect to Wildland Fire Apparatuses and Fire Apparatuses that they otherwise compete to manufacture, market, and sell. Pierce and Oshkosh, on one hand, and the Boise Mobile Defendants, on the other, have thus engaged in cooperative action for an anticompetitive purpose while otherwise continuing to exist as independent, competing entities. For example, following the combination, Pierce and the BME Defendants both have continued to market and sell their respective Type 3 Fire Apparatuses (Pierce's BX$^{TM}$ Wildland and the BME Defendants' Cal Fire Model 34, Targhee, Summit, Rocky Mountain, and Tamarack models).

395. Pierce, Oshkosh, and the BME Defendants' combination is a nakedly anticompetitive, per se illegal horizontal restraint of trade amongst competitors that violates the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* Before the combination, Pierce and Oshkosh and the BME Defendants were independently competing with each other in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, including to research, innovate, develop, market, and sell Fire Apparatuses in those markets. The combination has enabled these Defendants to reduce or avoid that competition and instead to coordinate on research, investment, development, marketing, and sale of Fire Apparatuses. An observer with even a rudimentary understanding of economics would conclude that the combination would have anticompetitive effects on customers in the U.S. markets for Wildland Fire Apparatuses and Fire Apparatuses.

396. In the alternative, Pierce, Oshkosh, and the BME Defendants' combination is an unreasonable restraint of trade that violates the California

Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* Pierce and Oshkosh have market power in the Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. The BME Defendants have market power in the Wildland Fire Apparatus market in the United States, as demonstrated by, *inter alia*, their high market share, barriers to entry, and ability to charge supra-competitive prices in that relevant market. Pierce and Oshkosh combined with the BME Defendants possess market power in the Wildland Fire Apparatus and Fire Apparatus markets in the United States, as demonstrated by, *inter alia*, their high combined market shares, barriers to entry, and ability to charge supra-competitive prices in those relevant markets. Pierce, Oshkosh, and the BME Defendants' combination has reduced and harmed competition in the Wildland Fire Apparatus and Fire Apparatus markets in the United States. The combination has no procompetitive benefit or justification. The anticompetitive effects of the combination outweigh any purported procompetitive justifications.

397. Pierce, Oshkosh, and the BME Defendants' combination, and the harm to competition caused by that conduct, were a substantial factor in the County of San Diego Plaintiffs' suffering of substantial injuries to their business and property. The County of San Diego Plaintiffs are entitled to recover from Pierce, Oshkosh, and the BME Defendants damages, in an amount to be proven at trial and automatically trebled, as provided by Cal. Bus. & Prof. Code § 16750, as well as the interest on the total damages pursuant to Cal. Bus. & Prof. Code § 16761.

398. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Pierce, Oshkosh, and the BME Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled

to injunctive relief against Pierce, Oshkosh, and the BME Defendants under Cal. Bus. & Prof. Code §§ 16750 and 16754.5.

399. The County of San Diego Plaintiffs are also entitled to recover from the Pierce, Oshkosh, and the BME Defendants costs of suit, including reasonable attorney fees, as provided by Cal. Bus. & Prof. Code § 16750.

**CAUSE OF ACTION TEN**

*Violations of Sherman Act § 2, 15 U.S.C. § 2 – Conspiracy to Monopolize –*
*Against the Oshkosh Defendants, by the County of San Diego Plaintiffs*

400. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

401. Pierce has knowingly entered into agreements or mutual understandings with Pierce-authorized replacement parts dealers/suppliers to obtain or maintain Pierce's monopoly power in markets for replacement parts for Pierce Fire Apparatuses in the United States, in violation of Sherman Act Section 2, 15 U.S.C. § 2. Oshkosh controlled, directed, dictated, and encouraged these agreements or mutual understandings between Pierce and Pierce-authorized replacement parts dealers/suppliers, and directly and actively participated in those agreements or understandings. There is a reasonable probability that the Oshkosh Defendants, including Maxi-Métal, have entered or will enter into agreements or mutual understandings with Pierce- and Maxi-Métal-authorized replacement parts dealers/suppliers to obtain or maintain the Oshkosh Defendants' monopoly power in markets for replacement parts for Maxi-Métal Fire Apparatuses.

402. Pierce, Oshkosh, and Pierce-authorized replacement parts dealers/suppliers conspired with the specific intent that Pierce would obtain or maintain monopoly power in markets for replacement parts for Pierce Fire Apparatuses in the United States.

403. Pierce and its authorized replacement parts dealers/suppliers engaged in overt acts in furtherance of the conspiracy to monopolize the markets for

replacement parts for Pierce Fire Apparatuses in the United States. Pierce's acts in furtherance of the conspiracy include entering into and enforcing agreements with Pierce-authorized replacement parts dealers/suppliers under which the dealers/suppliers agree not to sell non-Pierce proprietary replacement parts to customers for their Pierce Fire Apparatuses even when they are compatible, to exclusively sell Pierce proprietary replacement parts to those customers, to void or dishonor or threaten to void or dishonor the Pierce warranty of any customer who purchased and installed a non-Pierce proprietary replacement part in their Pierce Fire Apparatus, and not to cover under a customer's Pierce warranty the replacement of a part in the customer's Pierce Fire Apparatus with a non-Pierce proprietary replacement part. Pierce's replacement parts dealers/suppliers entered into the above-described agreements with Pierce. Oshkosh controlled, directed, dictated, and encouraged these acts, and directly and actively participated in them.

404. The conspiracy reduced competition and has harmed competition in relevant markets for replacement parts for Pierce Fire Apparatuses in the United States, and has produced significant anticompetitive effects, leading to the County of San Diego Plaintiffs' antitrust injury and damages.

405. As a result of the conspiracy, and the harm to competition caused by the conspiracy, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from Oshkosh and Pierce damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

406. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under 15 U.S.C. § 26.

407. The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**CAUSE OF ACTION ELEVEN**

*Violations of Clayton Act § 3, 15 U.S.C. § 14 – Exclusive Dealing – Against the Oshkosh Defendants, by the County of San Diego Plaintiffs*

408. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

409. Pierce has sold and contracted to sell, and fixed the price charged for, replacement parts for use in Pierce Fire Apparatuses in the United States on the agreement and understanding from Pierce-authorized replacement parts dealers/suppliers that they will not use or deal in replacement parts for Pierce Fire Apparatuses of competitors of Pierce, thereby violating Clayton Act Section 3, 15 U.S.C. § 14. Oshkosh has controlled, directed, dictated, and encouraged these agreements and understandings between Pierce and Pierce-authorized replacement parts dealers/suppliers, and directly and actively participated in those agreements and understandings. There is a reasonable probability that the Oshkosh Defendants, including Maxi-Métal, have entered or will enter into agreements or mutual understandings with Pierce- and Maxi-Métal-authorized replacement parts dealers/suppliers to obtain or maintain the Oshkosh Defendants' dominance in markets for replacement parts for Maxi-Métal Fire Apparatuses.

410. Pierce is dominant in the relevant markets for replacement parts for Pierce Fire Apparatuses in the United States. The effect of Pierce's exclusive agreements and understandings with its authorized parts dealers/suppliers may be to substantially lessen competition or tend to create a monopoly—indeed, they have already substantially lessened competition and tended to create a monopoly—in those markets. With respect to the relevant U.S. market for each replacement part for Pierce Fire Apparatuses that Pierce sells and contracts to sell on the

agreement or understanding that the replacement parts dealer/supplier will not use or deal in a competing replacement part, a substantial volume of commerce has been affected, competitors of Pierce have been substantially foreclosed, and competition has been harmed. Pierce's agreements and understandings have no procompetitive benefit or justification. The anticompetitive effects of the agreements and understandings outweigh any purported procompetitive justifications.

411. As a result of Pierce's agreements and understandings in violation of Clayton Act Section 3, 15 U.S.C. § 14, and the harm to competition caused thereby, the County of San Diego Plaintiffs have suffered substantial injuries to their business and property, and are entitled to recover from Oshkosh and Pierce damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

412. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under 15 U.S.C. § 26.

413. The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**CAUSE OF ACTION TWELVE**

*Violations of Cartwright Act, Cal. Bus. & Prof. Code § 16727 – Exclusive Dealing – Against the Oshkosh Defendants, by the County of San Diego Plaintiffs*

414. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

415. Pierce has sold and contracted to sell, and fixed the price charged for, replacement parts for use in Pierce Fire Apparatuses in the United States, including California, on the condition, agreement, and understanding from Pierce-authorized replacement parts dealers/suppliers that they will not use or deal in replacement parts for Pierce Fire Apparatuses of competitors of Pierce, thereby violating the California Cartwright Act, Cal. Bus. & Prof. Code § 16727. Oshkosh has controlled, directed, dictated, and encouraged these conditions, agreements, and understandings between Pierce and Pierce-authorized replacement parts dealers/suppliers, and directly and actively participated in those agreements and understandings. There is a reasonable probability that the Oshkosh Defendants, including Maxi-Métal, have entered or will enter into conditions, agreements, or mutual understandings with Pierce- and Maxi-Métal-authorized replacement parts dealers/suppliers to obtain or maintain the Oshkosh Defendants' dominance in markets for replacement parts for Maxi-Métal Fire Apparatuses.

416. Pierce has a dominant position in relevant markets for replacement parts for Pierce Fire Apparatuses in the United States. With respect to the relevant U.S. market for each replacement part for Pierce Fire Apparatuses that Pierce sells and contracts to sell on the condition, agreement, or understanding that the replacement parts dealer/supplier will not use or deal in a competing replacement part, a substantial volume of commerce has been affected, competitors of Pierce have been substantially foreclosed, and competition has been harmed. Pierce's conditions, agreements, and understandings have no procompetitive benefit or justification. The anticompetitive effects of the conditions, agreements, and understandings outweigh any purported procompetitive justifications.

417. Pierce's conditions, agreements, and understandings in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16727, and the harm to competition caused by that conduct, were a substantial factor in the County of San Diego Plaintiffs' suffering of substantial injuries to their business and property. The

County of San Diego Plaintiffs are entitled to recover from Oshkosh and Pierce damages, in an amount to be proven at trial and automatically trebled, as provided by Cal. Bus. & Prof. Code § 16750, as well as the interest on the total damages pursuant to Cal. Bus. & Prof. Code § 16761.

418. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under Cal. Bus. & Prof. Code §§ 16750 and 16754.5.

419. The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by Cal. Bus. & Prof. Code § 16750.

**CAUSE OF ACTION THIRTEEN**

***Violations of Cartwright Act, Cal. Bus. & Prof. Code § 16720, et seq. – Exclusive Dealing – Against the Oshkosh Defendants, by the County of San Diego Plaintiffs***

420. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

421. Pierce has sold and contracted to sell, and fixed the price charged for, replacement parts for use in Pierce Fire Apparatuses in the United States, including California, on the agreement and understanding from Pierce-authorized replacement parts dealers/suppliers that they will not use or deal in replacement parts for Pierce Fire Apparatuses of competitors of Pierce. Oshkosh has controlled, directed, dictated, and encouraged these agreements and understandings between Pierce and Pierce-authorized replacement parts dealers/suppliers, and directly and actively participated in those agreements and understandings. There is a reasonable

Complaint - 131

probability that the Oshkosh Defendants, including Maxi-Métal, have entered or will enter into agreements or mutual understandings with Pierce- and Maxi-Métal-authorized replacement parts dealers/suppliers to obtain or maintain the Oshkosh Defendants' dominance in markets for replacement parts for Maxi-Métal Fire Apparatuses.

422. In so doing, Pierce has entered into unlawful trusts with its Pierce-authorized replacement parts dealers/suppliers, in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* Pierce and these dealers/suppliers have combined their capital, skill, and acts for the purpose of creating or carrying out restrictions in U.S. markets for replacement parts for Pierce Fire Apparatuses; limiting or reducing the production of and increasing the prices of replacement parts for Pierce Fire Apparatuses in the United States; preventing competition in manufacturing, making, and selling replacement parts for Pierce Fire Apparatuses in the United States; fixing at a standard or figure, whereby their prices to the public and consumers are controlled or established, replacement parts for Pierce Fire Apparatuses in the United States; and making, entering into, and executing and carrying out a contract, obligation, and agreement by which they agreed to pool, combine, and directly and indirectly unite their respective interests connected with the sale of replacement parts for Pierce Fire Apparatuses in the United States that their prices might in any manner be affected.

423. Pierce's agreements and understandings with its authorized replacement parts dealers/suppliers are unreasonable restraints of trade. Pierce has a dominant position in relevant markets for replacement parts for Pierce Fire Apparatuses in the United States. With respect to the relevant U.S. market for each replacement part for Pierce Fire Apparatuses that Pierce sells and contracts to sell on the agreement or understanding that the replacement parts dealer/supplier will not use or deal in a competing replacement part, a substantial volume of commerce has been affected, competitors of Pierce have been substantially foreclosed, and

competition has been harmed. Pierce's agreements and understandings have no procompetitive benefit or justification. The anticompetitive effects of the agreements and understandings outweigh any purported procompetitive justifications.

424. Pierce's agreements and understandings with its authorized replacement parts dealers/suppliers were a substantial factor in the County of San Diego Plaintiffs' suffering of substantial injuries to their business and property. The County of San Diego Plaintiffs are entitled to recover from Oshkosh and Pierce damages, in an amount to be proven at trial and automatically trebled, as provided by Cal. Bus. & Prof. Code § 16750, as well as the interest on the total damages pursuant to Cal. Bus. & Prof. Code § 16761.

425. The County of San Diego Plaintiffs will suffer actual and threatened irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins the Oshkosh Defendants from their unlawful conduct and continuing and threatened future violations of the antitrust laws. The County of San Diego Plaintiffs are thus entitled to injunctive relief against the Oshkosh Defendants under Cal. Bus. & Prof. Code §§ 16750 and 16754.5.

426. The County of San Diego Plaintiffs are also entitled to recover from the Oshkosh Defendants costs of suit, including reasonable attorney fees, as provided by Cal. Bus. & Prof. Code § 16750.

## CAUSE OF ACTION FOURTEEN

*Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, Against the AIP Defendants and the REV Group Defendants, by the County of San Diego Plaintiffs and the People of the State of California*

427. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

428. Unlawful prong: The AIP Defendants and REV Group Defendants have engaged, and continue to engage, in the acts or practices described herein, which taken individually or collectively are unlawful and constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code. The AIP Defendants and REV Group Defendants have violated Clayton Act Section 7, 15 U.S.C. § 18, and Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2.

429. Unfair prong: The AIP Defendants and REV Group Defendants have engaged, and continue to engage, in the acts or practices described herein, which individually or collectively are unfair, irrespective of the violation of any other law, and which individually or collectively constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

430. Under California Business and Professions Code Section 17200, *et seq.*, the County of San Diego Plaintiffs and the People of the State of California seek injunctive and other equitable relief to require the AIP Defendants and REV Group Defendants to cease their anticompetitive conduct and to restore fair competition, to deny the AIP Defendants and REV Group Defendants the fruits of their illegal conduct, to restore to the County of San Diego Plaintiffs money or property acquired by Defendants' unlawful, anticompetitive, and unfair business practices, and to impose such other relief as may be just and appropriate for the AIP Defendants and REV Group Defendants' violations of the California Unfair Competition Law.

431. The People of the State of California also seek a civil penalty of two thousand five hundred dollars ($2,500) against the AIP Defendants and REV Group Defendants for each violation of Business and Professions Code Section 17200.

## CAUSE OF ACTION FIFTEEN

### *Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, Against the Oshkosh Defendants, by the County of San Diego Plaintiffs and the People of the State of California*

432. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

433. Unlawful prong: The Oshkosh Defendants have engaged, and continue to engage, in the acts or practices described herein, which taken individually or collectively are unlawful and constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code. The Oshkosh Defendants have violated Clayton Act Sections 3 and 7, 15 U.S.C. §§ 14 & 18, Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727, *et seq.*

434. Unfair prong: The Oshkosh Defendants have engaged, and continue to engage, in the acts or practices described herein, which individually and collectively are unfair, irrespective of the violation of any other law, and which individually or collectively constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

435. Under California Business and Professions Code Section 17200, *et seq.*, the County of San Diego Plaintiffs and the People of the State of California seek injunctive and other equitable relief to require the Oshkosh Defendants to cease their anticompetitive conduct and to restore fair competition, to deny the Oshkosh Defendants the fruits of their illegal conduct, to restore to the County of San Diego Plaintiffs money or property acquired by Defendants' unlawful, anticompetitive, and unfair business practices, and to impose such other relief as may be just and appropriate for the Oshkosh Defendants' violations of the California Unfair Competition Law.

436. The People of the State of California also seek a civil penalty of two thousand five hundred dollars ($2,500) against the Oshkosh Defendants for each violation of Business and Professions Code section 17200.

## CAUSE OF ACTION SIXTEEN

### *Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, Against the BME Defendants, by the County of San Diego Plaintiffs and the People of the State of California*

437. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 317 as though fully set forth herein.

438. Unlawful prong: The BME Defendants have engaged, and continue to engage, in the acts or practices described herein, which taken individually or collectively are unlawful and constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code. The BME Defendants have violated Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*

439. Unfair prong: The BME Defendants have engaged, and continue to engage, in the acts or practices described herein, which individually and collectively are unfair, irrespective of the violation of any other law, and which individually or collectively constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

440. Under California Business and Professions Code Section 17200, *et seq.*, the County of San Diego Plaintiffs and the People of the State of California seek injunctive and other equitable relief to require the BME Defendants to cease their anticompetitive conduct and to restore fair competition, to deny the BME Defendants the fruits of their illegal conduct, to restore to the County of San Diego Plaintiffs money or property acquired by Defendants' unlawful, anticompetitive, and unfair business practices, and to impose such other relief as may be just and

appropriate for the BME Defendants' violations of the California Unfair Competition Law.

441. The People of the State of California also seek a civil penalty of two thousand five hundred dollars ($2,500) against the BME Defendants for each violation of Business and Professions Code section 17200.

## REQUEST FOR RELIEF

442. Wherefore, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and:

a. Declare that Defendants have variously engaged in unlawful, anticompetitive, and unfair business acts and practices in violation of Clayton Act Sections 3 and 7, 15 U.S.C. §§ 14 & 18; Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2; the California Carwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727, *et seq.*; and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

b. Enjoin Defendants from performing or proposing to perform any acts in violation of Clayton Act Sections 3 and 7, 15 U.S.C. §§ 14 & 18; Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2; the California Carwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727, *et seq.*; and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, pursuant to 15 U.S.C. § 26, and Cal. Bus. & Prof. Code §§ 16750, 16754.5, 17203, and 17204, *et seq.*, for the benefit of the County of San Diego Plaintiffs and the People of the State of California;

c. Order such divestitures as are necessary or proper to restore distinct, separate, independent, and viable businesses; to restore competition; and to prevent and mitigate further harm to competition in the relevant markets;

d. Order Defendants to pay the County of San Diego Plaintiffs restitution of any money or property acquired from the County of San Diego Plaintiffs by Defendants' unlawful, anticompetitive, and unfair business practices, pursuant to Cal. Bus. & Prof. Code § 17203, *et seq.*;

e. Order Defendants to pay civil penalties for each act of unfair and unlawful competition, pursuant to Cal. Bus. & Prof. Code § 17206;

f. Order Defendants to pay money damages—automatically trebled—to the County of San Diego Plaintiffs for injuries to their business or property by reason of Defendants' violations of Clayton Act Sections 3 and 7, 15 U.S.C. §§ 14 & 18 and Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 & 2, pursuant to 15 U.S.C. § 15; and pursuant to Cal. Bus. & Prof. Code § 16750, money damages—automatically trebled—to the County of San Diego Plaintiffs for injuries to their business or property by reason of Defendants' violations of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727, *et seq.*;

g. Order Defendants to pay the County of San Diego Plaintiffs pre- and post-judgment interest, pursuant to 15 U.S.C. § 15 and Cal. Bus. & Prof. Code § 16761;

h. Order Defendants to pay the cost of suit, including attorney fees, pursuant to 15 U.S.C. §§ 15 and 26, Cal. Bus. & Prof. Code § 16750, Cal. Code of Civ. Proc. § 1021.5, and the Court's inherent authority.

i. Provide such further and additional relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the County of San Diego Plaintiffs demand a trial by jury on all claims in this Complaint so triable.

Complaint - 138

Dated: April 1, 2026        Respectfully Submitted,

DAMON M. BROWN, County Counsel, County of San Diego

By: /s/ Damon M. Brown

JOHN P. COOLEY, Chief Deputy (SBN 162955)
  John.Cooley@sdcounty.ca.gov
AUSTIN M. UHLER, Principal Deputy (SBN 319684)
  Austin.Uhler@sdcounty.ca.gov 1600 Pacific Highway, Room 355
San Diego, CA 92101
Tel: (619) 531-4860

**SIMONSEN SUSSMAN LLP**

By: /s/ Catherine S. Simonsen
Catherine S. Simonsen (SBN 307325)
  catherine@simonsensussman.com
Thomas G. Mattes (SBN 355010)
  thomas.mattes@simonsensussman.com
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel: (917) 747-5196
Fax: (913) 262-0058

**BARON & BUDD, P.C.**

By: /s/ John P. Fiske
John P. Fiske (SBN 249256)
  jfiske@baronbudd.com
Lindsay Stevens (SBN 256811)
  lstevens@baronbudd.com
11440 West Bernardo Court, Suite 265
San Diego, CA 92127

Complaint - 139

Tel: (858) 251-7424
Fax: (214) 523-6600

*Attorneys for Plaintiffs the People of the State of California, acting by and through the Office of County Counsel, County of San Diego; County of San Diego; and San Diego County Fire Protection District*

Complaint - 140